**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Allscripts Healthcare, LLC, a North Carolina LLC, Health Grid Holding Company, LLC, Health Grid, LLC, Health Grid Coordinated Care Solutions, Inc., and Mahathi Software, LLC, | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) C.A. No. 1:21-cv-00704-MAK ) |
| Andor Health, LLC, a Delaware Corporation; Mahathi Software Pvt., Ltd.; Raj Toleti, individually and as Representative of the Participating Equityholders the Merger Agreement; Paul Tyriver, individually; and Amar Bulsara, individually, | ) ) ) ) ) ) ) |
| Defendants | ) ) ) |

**PLAINTIFF'S / COUNTERCLAIM DEFENDANTS' MEMORANDUM IN
SUPPORT OF THEIR MOTION TO DISMISS COUNTERCLAIMS**

Dated:  September 3, 2021

BARNES & THORNBURG LLP
Chad S.C. Stover (No. 4919)
1000 N. West Street, Suite 1500
Wilmington, DE 19801
Tel:  (302) 300-3474
E-mail:  chad.stover@btlaw.com

Mark L. Durbin (*pro hac vice* admitted)
Scott T. Peloza (*pro hac vice* admitted)
BARNES & THORNBURG LLP
One North Wacker Drive, Suite 4400
Chicago, Illinois 60606
Tel: (312) 357-1313
E-mail:  mark.durbin@btlaw.com
E-mail:  speloza@btlaw.com

*Attorneys for Plaintiff Allscripts Healthcare, LLC*

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF CONTENTS ................................................................................................ i

BACKGROUND ......................................................................................................... 1

Allscripts and Mahathi ............................................................................................. 1

Allscripts and Andor ................................................................................................ 4

ARGUMENT .............................................................................................................. 6

I.   The CFAA claim fails for at least two reasons. ............................................. 7

II.  Informing customers of the lawsuit is neither tortious interference nor a deceptive trade practice. ................................................................................................ 9

III. Allegations "upon information and belief" that Allscripts is attempting to reverse engineer alleged trade secrets cannot support a claim for breach of contract or misappropriation under DTSA ................................................... 11

IV.  Allscripts has not breached the covenant of good faith and fair dealing "upon information and belief" by exercising its contractual rights. ............................. 12

V.   Allscripts did not breach the SOW, and Mahathi lacks standing to bring such claim... 14

VI.  Claim of violation under Florida Computer Crime Acts lacks condition precedent and fails to satisfy the statutory requirements for a claim. .................................. 17

CONCLUSION ..........................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................6, 11

*Bramshill Invs., LLC v. Pullen*,
    No. CV 19-18288, 202................................................................................11

*In re Encore Energy Partners LP Unitholder Litig.*,
    2012 WL 3792997 (Del. Ch. Aug. 31, 2012) ...........................................13

*Gerber v. EPE Holdings, LLC*,
    2013 WL 209658 (Del. Ch. Jan. 18, 2013)................................................13

*Herman Miller v. Teknion Furniture Sys., Inc.*
    Civ.A. No. 93 C7810, 1996 WL 341541 (N.D. Ill., June 20, 1996)........10

*Idenix Pharms., Inc. v. Gilead Sciences, Inc.*,
    2014 WL 4222902 (D. Del. Aug. 25, 2014) ................................................7

*Jazz Pharms., Inc. v. Synchrony Grp., LLC*,
    343 F.Supp.3d 434 (E.D. Pa. 2018) ...........................................................11

*Livingston v. State Farm Mut. Auto Ins. Co.*,
    774 So. 2d 716 (2d Fla. Dist. Ct. App. 2000) ...........................................16

*Lynchval Sys. Inc. v. Chicago Consulting Actuaries Inc.*,
    No. 95 C 1490, 1998 WIL 151814 (N.D. Ill. March 27, 1998)................10

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010) .........................................................................13

*Ray Dancer, Inc. v. DMC Corp.*,
    230 Ill.App.3d 40, 171 Ill.Dec. 824, 594 N.E.2d 1344 (2d Dist.1992) .............9, 10

*Umland v. PLANCO Financial Services, Inc.*,
    542 F.3d 59 (3d Cir. 2008).............................................................................6

*Van Buren v. United States*,
    141 S.Ct. 1648 (2021)................................................................................8, 9

*Zenith Elecs. Corp., v. Exzec, Inc.*,
    1997 WL 223067 (N.D.Ill. March 27, 1997)...............................................9

**Statutes**

18 U.S.C. § 1030 ................................................................................................................7

18 U.S.C. § 1030 (e)(1) .....................................................................................................7

Computer Fraud and Abuse Act ................................................................................ *passim*

Defend Trade Secrets Act ...................................................................................10, 11, 18

Fla. Stat. § 815.03 ....................................................................................................17, 18

Fla. Stat. § 815.06(5)(a) ..................................................................................................17

Florida Computer Crime Act ..................................................................................16, 17, 18

Florida Computer Crime Act (Fla. Stat. § 815.01 *et seq*.) .............................................16

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ................................................................................................6, 7

Rule 8 ........................................................................................................................6, 11

Rule 8(a) ..........................................................................................................................6

Allscripts Healthcare, LLC ("Allscripts") along with individual counterclaim defendants James Hewitt, Jeff Franks, Warren Nash, and Bryan Seaborn (collectively the "Individuals") respectfully move this Court to dismiss Counterclaims I-VII, X, & XI, showing the Court as follows:

## BACKGROUND

### Allscripts and Mahathi

Allscripts acquired a company called Health Grid Corp. ("HealthGrid") in 2018, including HealthGrid's intellectual property and contracts.  (Counterclaims (D.I. 59) ("Countercl."), ¶ 4, 9.)

One of the contracts acquired was the 2017 Statement of Work between HealthGrid and Mahathi whereby Mahathi agreed to provide HealthGrid with certain ownership rights in Mahathi's standard UI and to provide services to make transformative changes to the UI code for HealthGrid's purposes.  (Countercl., ¶ 173.)  The May 1, 2017 SOW provides:  "Mahathi will provide its standard User Interface ("UI")" to which "HealthGrid Corporation shall have a non-exclusive, perpetual paid up and royalty free license to use this UI to make and have made improvements and derivative works, to use, sell, market applications using such UI."  (2017 SOW,[1] Exhibit A-2, § III.D)  Further,

> Health Grid Corporation shall own all right, title and interest to any intellectual property, including patent rights, copyrights, trade secret rights, maskwork rights, trademark rights, sui generis data base rights, and all other intellectual and industrial property rights of any sort throughout the world, relating to any and all inventions (whether patentable or not) works of authorship, mask works, designations, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part by Mahathi during the term of this Agreement that relate to the subject matter of, or arise out of, this Agreement or the services, of any Confidential Information of Health Grid Corporation (collectively, "Intellectual Property").   [Mahathi] will promptly disclose and provide all Intellectual Property to HealthGrid.  All Intellectual Property are works made for

---

[1] The 2017 SOW is included as Exhibit 2 to the Declaration of Chad S.C. Stover, filed herewith.

hire to the extent allowed by law, … and in addition [Mahathi] hereby makes all assignments necessary to accomplish the foregoing ownership.

(*Id.*)

Additionally, as part of the acquisition of HealthGrid, on May 18, 2018, Allscripts entered into the 2018 Statement of Work (the "SOW") directly with Mahathi. (Countercl., ¶ 165.) The original term of the SOW expired on May 17, 2021, unless extended by Allscripts. (Countercl., ¶ 179.) Within the SOW, Mahathi agreed that Allscripts

shall own all right, title and interest to any intellectual property, …relating to any and all inventions (whether patentable or not), works of authorship, mask works, designations, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by Mahathi during the term of this Agreement that relate to the subject matter of, or arise out of, this Agreement or the services, …. [Mahathi] will promptly disclose and provide all Intellectual Property to Allscripts All Intellectual Property are works made for hire to the extent allowed by law, … and in addition [Mahathi] hereby makes all assignments necessary to accomplish the foregoing ownership.

(SOW,[2] Exhibit A-2, § III.D.) In furtherance of these unqualified rights, Mahathi also gave Allscripts "a non-exclusive, perpetual, paid-up and royalty free license to use" Mahathi's standard UI code "to make and have made improvements and derivative works, to use, sell, market applications using such UI." (*Id.*)

Throughout 2019, Allscripts stored certain iterations of the transformed UI code in the DevOps repository. (Countercl., ¶ 176.) Mahathi does not dispute that Allscripts owned the DevOps repository and had the right to access it at any time. (*Id.*) Certain versions of the UI code were also stored in the Subversion repository, to which both Mahathi and Allscripts had access for purpose of Mahathi performing services in support of Allscripts under the SOWs. (Countercl., ¶¶174-175.)

---

[2] The SOW is included as Exhibit 3 to the Declaration of Chad S.C. Stover, filed herewith.

On September 6, 2019, Mahathi sent Allscripts "notice of assignment and assumption" of certain contracts whereby Mahathi "assigned all of its right, title, and interest in and to the Contracts" to Andor.  (Assignment Documents,[3] p. 1.)  The notice further stated that Andor had agreed in writing to "assume all of [Mahathi's] obligations under the Contracts."  (*Id.*)  Mr. Toleti signed as acknowledging the assignment notice on behalf of Allscripts.  (*Id.*)  Exhibit A to the assignment documents identified as a "Contract" being assigned the SOW and "any and all other contracts, agreements, purchase orders, statement of works, change order forms, etc., by and between Allscripts (or any of its affiliates) and Mahathi Software Private Limited."  (Assignment Documents, p. 4.)  Mahathi acknowledges this assignment in its counterclaims.  (Countercl., ¶ 169.)

Mahathi contends that the DevOps repository was located on a Microsoft Azure "tenant" that Mahathi claims it "owns."  (Countercl., ¶ 158.)  According to Mahathi, the tenant is a "cloud computing service" or a "cloud-based computing service." (Countercl., ¶¶ 20 & 158.)

On May 14, 2021, Allscripts informed Mahathi and Andor that Allscripts would not renew the SOW and instead allow the SOW to expire pursuant to its terms on May 17, 2021.  (Countercl., ¶ 177.)

Also on May 14, 2021, Warren Nash, at the direction of James Hewitt and Jeff Franks, accessed the tenant, removed Mahathi users' access to the DevOps repository, and removed Mahathi's administrative access to the tenant.  (Countercl., ¶¶ 180-182.)  Mahathi does not allege that it was prevented from accessing the tenant, just blocked from "administrative access."  (*Id.*)  An "unknown Allscripts employee" also used a "service principal account" in a manner Allscripts was not authorized to utilize, to reissue credentials within the tenant.  (Countercl., ¶ 183.)  At some

---

[3] The Assignment Documents are included as Exhibit 4 to the Stover Declaration, filed herewith.

point on May 14, Allscripts also removed Mahathi's access to the Subversion repository. (Countercl., ¶ 184.)

Mahathi alleges it planned to delete all of Allscripts' data and records but it was prevented from doing so when Allscripts removed the materials on May 21. (Countercl., ¶ 197.) Mahathi also alleges that it offered to assist Allscripts in moving all Allscripts data from the tenant. (Countercl., ¶ 201.) Instead of working with Mahathi to remove the data, Mahathi alleges that Allscripts did it itself. (Countercl., ¶ 202.)

Mahathi alleges that, on May 21, Bryan Seaborn, at the direction of James Hewitt and Jeff Franks, logged into the tenant. (Countercl., ¶ 204.) Mr. Seaborn then removed the contents of the DevOps repository. (Countercl., ¶ 207.) Mahathi further alleges that an "unknown Allscripts employee" leveraged a "service principal account" to open a support ticket with Microsoft for assistance in removing Allscripts' subscription and data off the tenant. (Countercl., ¶¶ 205-206.) Mahathi does not allege that Allscripts did not own the data removed, but contends it should have been removed prior to May 17, 2021. (Countercl., ¶¶ 211-212, 218.)

Mahathi claims that Allscripts' actions in taking the HealthGrid subscription and associated data (that Allscripts owned) constituted a breach of the UI license in the SOW permitting Mahathi to terminate the license. (Countercl., ¶¶ 218-219.)

<u>Allscripts and Andor</u>

Effective September 30, 2019, Allscripts entered into a Reseller Agreement with Andor (f/k/a Patient Comp., LLC) whereby Andor would provide certain products and services to Allscripts. (Countercl., ¶ 88.) One such product was what Andor called the Config. Tool. (Countercl., ¶ 89.) Within the Reseller Agreement, Andor provided to Allscripts broad rights in and to the code, including, among other things, the right to "[t]o use, reproduce, modify, make

derivative works of, distribute, perform, promote, sell, offer to sell, import, market, combine [the software] with or in Allscripts Products, resell, and distribute the Company Product either as a standalone or bundled product or service". (Reseller Agreement,[4] § 2.1(a); Countercl., ¶ 89.) Within Section 2.2, the parties agreed that "[e]xcept as expressly permitted by this Agreement" Allscripts would not "reverse engineer" the source code. (Reseller Agreement, § 2.2(e).)

As part of the Reseller Agreement, Andor agreed not to sell the Config. Tool directly to Allscripts clients; however, Andor was free to market and sell the product to other entities. (Countercl., ¶ 93-95; Reseller Agreement, § 11.2.)

Andor claims that Mahathi worked with Andor to provide technical support for the Config. Tool. (Countercl., ¶ 142.) In July 2020, Jeff Franks, an Allscripts employee, contacted Mahathi seeking certain JSON output files and code for the Config. Tool. (Countercl., ¶ 143.) Andor contends the email request "suggested" that Allscripts was moving forward with testing of the tool. (*Id.*) Believing the request was for a proper purpose, the Mahathi employee provided the code and other requested files to Mr. Franks. (Countercl., ¶ 144.) Andor claims it would not have provided the code had it been asked instead of Mahathi. (Countercl., ¶ 145.) Andor alleges, upon information and belief, that Mr. Franks actually wanted the JSON files to be able to reverse engineer the Config. Tool in what Andor contends would be a breach of the Reseller Agreement, and that therefore, the request was made under false pretenses. (Countercl., ¶¶ 147, 260.) Upon further information and belief, Andor contends that Allscripts' motivation to enter into the Reseller Agreement was not to sell the Config Tool, but to prevent Andor from selling the tool to Allscripts' clients. (Countercl., ¶ 148-149.) Andor also contends, upon information and belief, that Allscripts

---

[4] The Reseller Agreement is included as Exhibit 1 to the Stover Declaration, filed herewith.

told "Customer 1" that the tool did not work and if the customer had used the tool, it would have resulted in approximately $700,000 of revenue to Andor.  (Countercl., ¶¶ 150-155.)

Both parties had the right to terminate the Reseller Agreement with thirty (30) days written notice if the other party committed a material breach of the Agreement.  (Reseller Agreement, § 5.2(a).)  Andor has not attempted to trigger this provision, but Allscripts sent a letter on August 18, 2021 to terminate the agreement.  (Countercl., ¶ 98.)

Andor contends that upon information and belief, Allscripts brought the instant action not as a means of pursuing damages, but to launch a "public relations campaign" against Andor and "discourage existing and prospective customers from doing business with Andor."  (Countercl., ¶ 120.)  Andor alleges that unidentified customers claimed that Allscripts told them that Allscripts filed the instant lawsuit and that it was planning a public relations campaign based on the suit. (Countercl., ¶ 122.)  As part of these discussions, Andor alleges upon information and belief that Allscripts also informed the prospective customers that Andor is prohibited from selling certain products due to non-compete agreements with Allscripts or that Andor is otherwise prohibited from doing business with the prospective customer.  (Countercl., ¶ 123.)  The only customer identified is Optum to whom Andor claims, upon information and belief, that Allscripts told of the filing of this lawsuit and the claims asserted, and thereafter, Optum was pausing any efforts to work with Andor.  (Countercl., ¶ 131-133.)

## ARGUMENT

In ruling on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), well pled allegations in the complaint are accepted as true and viewed most favorable to the plaintiff to determine whether, under any reasonable reading of the claims, the claimant may be entitled to relief. *Umland v. PLANCO Financial Services, Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).

However, "factual allegations in the complaint must not be 'so undeveloped that it does not provide a defendant the type of notice of claim which is contemplated by Rule 8.'" *Id.* (*citing Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). Labels and conclusions, formulaic recitation of the elements of a cause of action, and "'naked assertions' devoid of 'further factual enhancement'" do not satisfy the pleading standard of Rule 8(a). *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"[C]ourts use the same standard in ruling on a motion to dismiss a counterclaim under Rule 12(b)(6) as they do in assessing a claim in a complaint." *Idenix Pharms., Inc. v. Gilead Sciences, Inc.*, 2014 WL 4222902 at *5 (D. Del. Aug. 25, 2014), *citing Fowler v. UPMC Shadyside,* 578 F.3d 203, 201 (3d Cir. 2009).

Here, the claims asserted fail to present factual support showing Mahathi or Andor are entitled to the relief requested. Most allegations are supported, at best, with conclusory statements made "upon information and belief" without factual allegations supporting those alleged beliefs. Such pleading does not satisfying the pleading requirements, and so the claims should be dismissed.

## I.    The CFAA claim fails for at least two reasons.

Mahathi asserts violations of the Computer Fraud and Abuse Act ("CFAA") for the alleged access to "the Mahathi Azure tenant." The CFAA prohibits certain actions taken as to a computer. *See* 18 U.S.C. § 1030. However, the "tenant" is not a computer as defined under CFAA, and therefore, even if Mahathi's allegations are taken as true, the CFAA claim fails.

Pursuant to CFAA, a "computer" is

an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating

in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device

18 U.S.C. § 1030 (e)(1).

Mahathi alleges that its tenant is "a cloud computing service" or a "cloud-based computing service." (Countercl., ¶¶ 20 & 158.)  However, a "service" is not a device or a facility, and therefore, does not fall within the definition of a "computer" for purposes of CFAA claims.

Additionally, even if the tenant is a "computer" under CFAA, none of the alleged actions fall within the definition of "unauthorized" under CFAA.

As recently clarified by the United States Supreme Court, "unauthorized access" under CFAA is not the same as in common parlance or in violation of company policies.  *See Van Buren v. United States*, 141 S.Ct. 1648, 1657 (2021).  The Court held: "an individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information located in particular areas of the computer – such as files, folders, or databases – that are off limits to him." *Id.* at 1662 (holding employee did not exceed authorization by accessing information he was entitled to access but doing so for an improper/unauthorized purpose).

Here, Mahathi contends that on May 14, 2021, Warren Nash, at the direction of James Hewitt and Jeff Franks, accessed the tenant, removed Mahathi's access to the DevOps repository, and used a "service principal account" to remove Mahathi access to the tenant.  (Countercl., ¶¶ 180-183.)  However, Mahathi acknowledges that: (1) Allscripts (Nash's employer) was still authorized to access the tenant on May 14, 2021 (Countercl., ¶ 179) (claiming actions occurred before termination of the SOW); (2) Mahathi does not allege it owns the UI code stored in the DevOps repository (Countercl., ¶ 176); and; (3) the use of the "service principal account" is only alleged to have been "not authorized [for] use … in this manner."  (Countercl., ¶ 183.)  Accordingly, even as alleged by Mahathi, the actions on May 14th were not "unauthorized" as that

8

term is used in the CFAA. Allscripts was entitled to access the information it had placed in its DevOps folder and to use the service principal account. At best, Mahathi argues that Allscripts was not entitled to use the service principal account "in this manner," but that is no different than the argument that failed in *Van Buren*, where the employee accessed information he was allowed to access, but for an improper purpose. It was not a violation of CFAA in *Van Buren*, and it is not one here.

Similarly, the allegation of wrongdoing on May 21, 2021 is that Bryan Seaborn, at the direction of James Hewitt and Jeff Franks, removed the contents of the DevOps repository and otherwise removed "the HealthGrid subscription and associated data." (Countercl., ¶¶ 207, 218.) Not only does Mahathi admit that Allscripts owns the HealthGrid applications and associated data, but that Mahathi alleged that it offered to *help* Allscripts move that content off the tenant and into Allscripts' sole control. (Countercl., ¶ 214.) Allscripts could not access materials in excess of its authority where Mahathi alleges that the materials are *owned* by Allscripts.

In summary, Mahathi's claim of a violation of CFAA fails for at least two reasons: (1) the tenant is not a "computer" as that term is used in the statute; and (2) the alleged actions of Allscripts and the Individuals did not "exceed authorization." Count I should be dismissed for failure to state a claim.

## II.    Informing customers of the lawsuit is neither tortious interference nor a deceptive trade practice.

Andor contends that Allscripts tortiously interfered with prospective economic advantage and is engaging in unfair competition because "upon information and belief" Allscripts told customers or potential customers of the existence of this action and the claims therein. (Countercl., ¶¶ 131-133.) However, neither tort can be supported by the disclosure of a lawsuit.

Not all interference with a competitor's business is actionable.  A defendant is privileged to interfere with a competitors' relationship with a third party unless the party acted with malice, *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill.App.3d 40, 49, 171 Ill.Dec. 824, 594 N.E.2d 1344, 1350 (2d Dist.1992), or utilized wrongful means. *Zenith Elecs. Corp., v. Exzec, Inc*., 1997 WL 223067 (N.D. Ill. March 27, 1997).  The requisite malice must show there "was a desire to do harm unrelated to a desire to protect the acting party's interest and which is not reasonably related to the defense of a recognized property or social interest." *Ray Dancer,* 230 Ill.App.3d at 49, 171 Ill.Dec. 824, 594 N.E.2d at 1350.  Merely informing a third party client of a pending lawsuit is not a wrongful means of interfering with a competitor's business.  *Lynchval Sys. Inc. v. Chicago Consulting Actuaries Inc.,* No. 95 C 1490, 1998 WIL 151814 (N.D. Ill. March 27, 1998).

Likewise, in the context of unfair competition, disclosing a pending lawsuit to a third party client is only actionable when the lawsuit is filed in bad faith against the opposing party as a means to harass the opposing party.  *See Herman Miller v. Teknion Furniture Sys., Inc.,* No. 93 C7810, 1996 WL 341541, at *3 (N.D. Ill., June 20, 1996) (dismissing action for unfair competition and finding that plaintiff's statements about the existence of the lawsuit are not actionable because a suit was in fact pending).

Moreover, while Andor attempts to describe Allscripts' claims as being brought for public relations reasons "upon information and belief" (Countercl., ¶ 238), Andor has not moved to dismiss any of Allscripts' claims in the Second Amended Complaint, and in fact has admitted significant portions of Allscripts' allegations.  Accordingly, Andor has not alleged facts to support the claim that Allscripts' claims are not bona fide disputes but have been asserted solely for the improper purpose of interfering with Andor's business.  Both claims (Counts II & III) fail to assert valid claims and should be dismissed.

### III.    Allegations "upon information and belief" that Allscripts is attempting to reverse engineer alleged trade secrets cannot support a claim for breach of contract or misappropriation under DTSA.

Andor contends that "upon information and belief, Allscripts is using or has used the output files … to attempt to reverse engineer" a similar program in violation of the Defend Trade Secrets Act ("DTSA"). (Countercl., ¶ 263.) Likewise, that "upon information and belief, Allscripts' has attempted to reverse engineer Andor's Config Tool" in breach of the Reseller Agreement. (Countercl., ¶ 272.) The only "fact" supporting this conclusion on information and belief is that Mahathi gave Allscripts the source code for the Config Tool and Andor claims Mahathi should not have done so. (Countercl., ¶ 143-147.) Andor claims that Allscripts requested the code "under false pretenses." (Countercl., ¶ 260.) However, the facts alleged are that Jeff Franks correctly identified who he was and with which company, and the Mahathi employee voluntarily gave Allscripts the code believing the request was made for a proper purpose. (Countercl., ¶¶ 143-144.)

Pertinent and specific facts must be alleged sufficient to support Andor's theory of information and belief. *Bramshill Invs., LLC v. Pullen*, No. CV 19-18288, 202 WL 4581827, at *3 (D.N.J. Aug. 10, 2020). There are no facts alleged to support the conclusory assumption that there were false pretenses or to support any wrongdoing by Allscripts. Further, if Mahathi improperly distributed the source code (and assuming the source code is a trade secret), Andor's claim for misappropriation under DTSA should be asserted against Mahathi, not Allscripts.

Andor's claims are insufficient to satisfy its Rule 8 obligations to assert factual support for its claims. *See Iqbal*, 556 U.S. at 678; *Jazz Pharms., Inc. v. Synchrony Grp., LLC*, 343 F. Supp. 3d 434, 446 (E.D. Pa. 2018) (allegations only pass muster if there are enough facts to state a claim for relief as to misappropriation of trade secrets). Its claims that "upon information and belief" Allscripts is reverse engineering source code for the Config. Tool are insufficient and unsupported,

thereby rendering the claims for violation of DTSA and breach of the Reseller Agreement insufficient to state claims.

Moreover, even if the scant pleadings were sufficient, the language of the Reseller Agreement directly contradicts Andor's claim that Allscripts was not entitled to the code. The very purpose of the Reseller Agreement was to deliver the software to Allscripts for use with its products. In Section 2.1 of the Reseller Agreement, Andor grants Allscripts broad rights in and to the code, including, among other things, the right to "[t]o use, reproduce, modify, make derivative works of, distribute, perform, promote, sell, offer to sell, import, market, combine [the software] with or in Allscripts Products, resell, and distribute the Company Product either as a standalone or bundled product or service." (Reseller Agreement, § 2.1(a)). The provision on which Andor relies, Section 2.2, is explicitly subject to the rights granted in Section 2.1. Therefore, Allscripts request for and receipt of the code and its use of that code "upon information and belief" would neither be a breach of contract nor misappropriation of trade secrets.

Therefore, Counts V and VI should be dismissed.

## IV.    Allscripts has not breached the covenant of good faith and fair dealing "upon information and belief" by exercising its contractual rights.

According to Andor, upon information and belief, Allscripts has not tested, validated, nor sold the Config. Tool in the eighteen months that the Reseller Agreement has been in place. Upon further information and belief, such failure is evidence that Allscripts has exercised its contractually granted discretion for the improper purpose of preventing Andor from being able to sell its Config. Tool to third parties. Not only is this claim yet another example of Andor making baseless allegations "upon information and belief" without alleging facts to support that purported belief, but Andor's argument attempts to ascribe improper purpose from Allscripts' exercises of its contractual rights. The covenant of good faith and fair dealing operates to "fill gaps" in a

contract where the parties did not anticipate events occurring at the time of the contract, not to punish a party for exercising its express contractual rights.

"The implied covenant of good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated. '[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement.'" *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (citations omitted); *In re Encore Energy Partners LP Unitholder Litig.*, 2012 WL 3792997, at *12 (Del. Ch. Aug. 31, 2012) ("The implied covenant is a limited gap-filling tool to infer contractual terms to which the parties would have agreed had they anticipated a situation they failed to address[.]"). The "covenant is a limited and extraordinary legal remedy." *Nemec v. Shrader*, 991 A.2d at 1125. The Court of Chancery has explained the doctrine as follows:

> [F]air dealing is not akin to the fair process component of entire fairness, *i.e.*, whether the fiduciary acted fairly when engaging in the challenged transaction as measured by duties of loyalty and care . . . it is rather a commitment to deal 'fairly' in the sense of consistently with the terms of the parties' agreement and its purpose. Likewise 'good faith' does not envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract. Both necessarily turn on the contract itself and what the parties would have agreed upon had the issue arisen when they were bargaining originally.

*Gerber v. EPE Holdings, LLC*, 2013 WL 209658, at *10 (Del. Ch. Jan. 18, 2013) (quoting *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440 (Del. Ch. 2012)).

Andor does not allege that the parties failed to contemplate a situation in which Allscripts would fail or refuse to sell the Config. Tool. Nor could it. The Reseller Agreement provides Allscripts with the express contractual right to determine whether and to whom the tool would be sold. (Countercl., ¶ 279.) The Reseller Agreement also provides for a situation in which Allscripts would sell the Config. Tool to third parties at no cost, and that Andor would receive no further

13

consideration for the tool.  (Reseller Agreement, § 3.1.)  This would not negatively impact Andor because Allscripts would still be liable for the license fees to Andor, which Andor admits Allscripts has paid, and Andor would remain free to sell the Config. Tool to third parties who are not Allscripts customers.  (Countercl., ¶ 97.)  Finally, if Andor believed Allscripts' actions constituted a material breach, it had the right to terminate the Reseller Agreement with only thirty (30) days-notice.  (Reseller Agreement, § 5.2.)

Far from failing to contemplate a situation in which Allscripts may decide not to sell the Config. Tool, the Reseller Agreement gives Allscripts the right not to sell the tool, or even to "sell" the tool for zero cost.  Andor, apparently, was fine granting these contractual rights because it would still receive its license fees and be free to sell the product itself to others.  After all, if at any time Andor believed Allscripts was materially breaching the agreement, it could terminate the agreement with a relatively short notice period.  There are no applicable "gaps" to fill here.  The parties contemplated circumstances in which Allscripts would either not sell the Config. Tool or "sell" it for no cost and the Reseller Agreement sets forth the parties' agreement as to what happens in those circumstances.  With no "gap" to fill, and the only alleged violation being "upon information and belief," the claim for breach of the covenant of good faith and fair dealing fails and should be dismissed.

## V.    Allscripts did not breach the SOW, and Mahathi lacks standing to bring such claim.

Mahathi claims that Allscripts breached the May 18, 2018 SOW by blocking Mahathi's access to the DevOps repository and the Subversion repository when the SOW was still in effect. (Countercl., ¶ 322.)  However, neither of these alleged actions constitute a breach of the SOW, and Mahathi has not identified any provision within the SOW that obligated Allscripts to provide Mahathi with access to Allscripts' DevOps folder or the Subversion repository.

14

As Mahathi alleges, it granted Allscripts rights to the Standard UI and certain modified versions of the UI.  (Countercl., ¶ 173.)  These versions of the UI were stored in the Subversion repository.[5]  (Countercl., ¶ 174.)  Allscripts also deposited certain code into the DevOps repository.  (Countercl., ¶ 176.)  Additionally, Mahathi agreed that Allscripts

> shall own all right, title and interest to any intellectual property, …relating to any and all inventions (whether patentable or not), works of authorship, mask works, designations, designs, know-how, ideas and information made or conceived or reduced to practice, in whole or in part, by Mahathi during the term of this Agreement that relate to the subject matter of, or arise out of, this Agreement or the services, …. [Mahathi] will promptly disclose and provide all Intellectual Property to Allscripts All Intellectual Property are works made for hire to the extent allowed by law, … and in addition [Mahathi] hereby makes all assignments necessary to accomplish the foregoing ownership.

(SOW, Exhibit A-2, § III.D.)  Simply put, Allscripts owns the code it is alleged to have taken steps to protect—steps that Mahathi contends breached the SOW.

Mahathi has failed to allege actions taken contrary to Allscripts' rights under the SOW.  It has not and cannot cite to any provision in the SOW that obligated Allscripts to continue providing Mahathi with access to Allscripts' storage locations, whether during the term of the SOW or after it expired on May 17, 2021.  Notably, Allscripts' alleged removal of code from the DevOps folder occurred on May 21, 2021 – after the SOW had terminated.  (Countercl., ¶ 207.)  And Mahathi admits that it did not ask for access to the code until June 18, 2021 – long after the SOW had terminated – and Allscripts provided a copy of the UI code that was in the Subversion archive, per Mahathi's request.  (Countercl., ¶¶ 219-221.)  Accordingly, Mahathi has not identified any provision of the SOW that Allscripts breached, let alone that Allscripts committed a material

---

[5] Mahathi does not allege that the code was *only* stored in the Subversion repository.  *Id.* Mahathi alleges the code was stored in the Subversion repository but is silent as to whether other copies of its "most important intellectual property" existed or was stored anywhere other than the Subversion repository to which it knew Allscripts had access.

breach by returning to Mahathi a copy of the code Mahathi requested for the first time a month after the SOW expired.

Even so, nothing in the SOW authorizes Mahathi to terminate either Allscripts' ownership rights, described above, or its "perpetual" license to any aspect of the UI that Allscripts might not own outright.  There is no termination provision in the SOW or any language purporting to give Mahathi rights to terminate the license or reverse course as to Allscripts' unqualified ownership rights.

Further, even if Mahathi could identify any provision within the SOW that obligated Allscripts to provide Mahathi with access to Allscripts' code depositories during (or after) the SOW's term, Mahathi would have no standing to accuse Allscripts of breaching that provision. Mahathi "assigned all of its right, title, and interest in and to the Contracts" to Andor in 2019. (Countercl., ¶ 169; Assignment Documents, p. 1.)  The SOW is specifically enumerated as a contract assigned to and assumed by Andor as well as "any and all other contracts, agreements, purchase orders, statement of works, change order forms, etc., by and between Allscripts (or any of its affiliates)" and Mahathi.  (Exhibit A to Assignment Documents, p. 4.)  Mahathi lacks standing to bring a claim for breach of the SOW where Mahathi assigned its rights and obligations pursuant to the SOW to Andor.  *Livingston v. State Farm Mut. Auto Ins. Co*., 774 So. 2d 716, 718 (2d Fla. Dist. Ct. App. 2000) ("an unqualified assignment transfers to the assignee all the interest of the assignor under the assigned contract, and that the assignor has no right to make any claim on the contract once the assignment is complete, unless authorized to do so by the assignee").[6]

---

[6] Movants cite Florida law because the SOW selects Florida law.  *See* Stover Decl. Ex. 3 at p. 3.

## VI.    Claim of violation under Florida Computer Crime Acts lacks condition precedent and fails to satisfy the statutory requirements for a claim.

Mahathi asserts a claim of alleged violations of the Florida Computer Crime Act (Fla. Stat. § 815.01 *et seq*.) in Counterclaim XI against Allscripts and the Individuals.  (2nd Am. Countercl., ¶¶ 327-333.)   However, neither Allscripts nor any of the Individuals have been convicted of violations of the Florida Computer Crime Act, which is a precondition to standing to bring a civil action for the same. "In addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, computer equipment or supplies, electronic device, or computer data **may bring a civil action against a person convicted under this section for compensatory damages**." Fla. Stat. § 815.06(5)(a) (emphasis added).

Allscripts and the Individuals are not aware of any criminal investigation in Florida relating to alleged violations of the Florida Computer Crime Act (or any grounds for one), let alone a conviction.  Accordingly, Mahathi's Counterclaim XI fails to state a claim upon which relief may be granted and should be dismissed.

Further, similar to the CFAA claim addressed above, Mahathi cannot establish that the tenant is a "computer," "computer system," "computer network," or "electronic device" under Fla. Stat. § 815.03.  Under the Florida Computer Crime Act, those terms have the following definitions:

- "computer" means an internally programmed, automatic device that performs data processing.

- "computer network" means a system that provides a medium for communication between one or more computer systems or electronic devices, including communication with an input or output device such as a display terminal, printer, or other electronic equipment that is connected to the computer systems or electronic devices by physical or wireless telecommunication facilities.

- "computer system" means a device or collection of devices, including support devices, one or more of which contain computer programs, electronic instructions, or input data and output data, and which perform functions, including, but not limited to, logic, arithmetic, data storage, retrieval, communication, or control.  The

17

term does not include calculators that are not programmable and that are not capable
of being used in conjunction with external files.

- "electronic device" means a device or a portion of a device that is designed for and
  capable of communicating across a computer network with other computers or
  devices for the purpose of transmitting, receiving, or storing data, including, but
  not limited to, a cellular telephone, tablet, or other portable device designed for and
  capable of communicating with or across a computer network and that is actually
  used for such purpose.

Fla. Stat. § 815.03(2), (4), (7) & (9). Other than a conclusory recitation of the elements of a claim,

Mahathi fails to address how a "tenant" falls within any of these definitions—nor could it.

Mahathi claim for a violation of the Florida Computer Crimes Act fails and should be

dismissed.

## **CONCLUSION**

Wherefore, Allscripts and the Individuals respectfully request this Court grant their motion

to dismiss Counts I (CFAA); II (tortious interference); III (unfair competition); IV (Illinois DTPA);

V (DTSA); VI (Breach of the Reseller Agreement); VII (Breach of the Covenant of Good Faith

and Fair Dealing); X (Breach of the UI License); and XI (Florida Computer Crimes Act).


Dated:  September 3, 2021          BARNES & THORNBURG LLP

                                   */s/  Chad S.C. Stover*
                                   Chad S.C. Stover (No. 4919)
                                   1000 N. West Street, Suite 1500
                                   Wilmington, DE 19801
                                   Tel:  (302) 300-3474
                                   E-mail:  chad.stover@btlaw.com

                                   Mark L. Durbin (*pro hac vice* admitted)
                                   Scott T. Peloza (*pro hac vice* admitted)
                                   BARNES & THORNBURG LLP
                                   One North Wacker Drive, Suite 4400
                                   Chicago, Illinois 60606

Tel: (312) 357-1313
E-mail:  mark.durbin@btlaw.com
E-mail:  speloza@btlaw.com

*Attorneys for Plaintiff Allscripts Healthcare, LLC*