## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| Allscripts Healthcare, LLC,<br>a North Carolina LLC, Health Grid Holding<br>Company, LLC, Health Grid, LLC, Health Grid<br>Coordinated Care Solutions, Inc., and Mahathi<br>Software, LLC, | : : : : : : | |
| Plaintiff, | : : | C.A. No. 1:21-cv-00704-MAK |
| v. | : : | |
| Andor Health, LLC, a Delaware<br>Corporation; Mahathi Software Pvt., Ltd.;<br>Raj Toleti, individually and as Representative of<br>the Participating Equityholders under the Merger<br>Agreement; Paul Tyriver, individually; and Amar<br>Bulsara, individually, | : : : : : : | |
| Defendants. | : : | |
| Andor Health, LLC, Mahathi Software Pvt., Ltd.,<br>and Raj Toleti, | : : : | |
| Counterclaim Plaintiffs, | : : | |
| v. | : : | |
| Allscripts Healthcare, LLC, James Hewitt, Jeff<br>Franks, Warren Nash, and Bryan Seaborn, | : : : | |
| Counterclaim Defendants. | : : | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO
## <u>MOTION TO DISMISS COUNTERCLAIMS</u>

# <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION AND SUMMARY OF THE ARGUMENT .........................................1

II.     NATURE AND STAGE OF PROCEEDINGS ..................................................................2

III.    FACTUAL BACKGROUND ...........................................................................................3

    A.  The HealthGrid Acquisition..........................................................................................3

    B.  The May 18, 2018 SOW and the UI License..................................................................4

    C.  The Reseller Agreement and Allscripts' End-Run Around Andor to Obtain Config Tool Files and Code........................................................................................................................4

    D.  Allscripts' Lawsuit and Subsequent Invasion of Mahathi's Azure Tenant ....................5

    E.  Allscripts Files this Lawsuit in Bad Faith, With the Intention to Engage in a Publicity Campaign Designed to Malign and Disparage Defendants. ...........................................5

IV.     ARGUMENT ...................................................................................................................7

    A.  Count I States a Claim Under Multiple Sections of the CFAA. ....................................7

        1.  Mahathi's Azure tenant is a "protected computer" as defined by the CFAA. ............8

        2.  Movant's unauthorized activities within Mahathi's Azure Tenant violated Sections (a)(2)(C), (a)(5)(A), and (a)(5)(C) of the CFAA. .......................................................9

    B.  Andor has Plausibly Alleged Both Tortious Interference (Count II) and Unfair Competition (Count III). ...............................................................................................12

    C.  Andor has Alleged a Claim for Commercial Disparagement Under the Illinois Deceptive Trade Practices Act (Count IV). ...................................................................................15

    D.  Andor Has Stated a Claim for both Misappropriation of Trade Secrets Under the DTSA (Count V) and Breach of the Reseller Agreement (Count VI). ....................................15

    E.  Andor Has Stated a Claim for Allscripts' Breach of the Covenant of Good Faith and Fair Dealing in Count VII. ...................................................................................................17

    F.  Mahathi Has Alleged Breach of the UI License in Count X. ........................................18

    G.  If the Court Grants Any Part of the Motion, Defendants Respectfully Request Leave to Replead Any Dismissed Count. ....................................................................................20

V.      CONCLUSION................................................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amirsaleh v. Bd. of Trade of City of New York, Inc.*,
  C.A. No. 2822-CC, 2008 WL 4182998 (Del. Ch. Sept. 11, 2008) ............................17, 18, 19

*British Telecomm. PLC v. IAC/InterActiveCorp*,
  381 F. Supp. 3d 293 (D. Del. 2019) ................................................................................................7

*Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*,
  624 A.2d 1199 (Del. 1993) ...........................................................................................................18

*Dunlap v. State Farm Fire & Cas. Co.*,
  878 A.2d 434 (Del. 2005) ..............................................................................................................17

*eCommerce Indus., Inc. v. MWA Intelligence, Inc.*,
  C.A. No. 7471–VCP, 2013 WL 5621678 (Del. Ch. Sept. 30, 2013) ...............................19, 20

*Envolve Pharmacy Solutions, Inc. v. Rite Aid Headquarters Corp.*,
  C.A. No. N19C-12-214 PRW CCLD, 2021 WL 140919 (Del. Super. Ct. Jan.
  15, 2021) ........................................................................................................................................15

*Estes Forwarding Worldwide LLC v. Cuellar*,
  239 F. Supp. 3d 918 (E.D. Va. 2017) ...................................................................................8, 9, 10

*Garrett v. Wexford Health*,
  938 F.3d 69 (3d Cir. 2019) ............................................................................................................20

*Hardwire, LLC v. Zero Int'l, Inc.*,
  No. CV 14-54-LPS-CJB, 2014 WL 5144610 (D. Del. Oct. 14, 2014) ..................................13

*Herman Miller, Inc. v. Teknion Furniture Sys., Inc.*,
  No. CIV.A. 93 C 7810, 1996 WL 341541 (N.D. Ill. June 20, 1996) ......................................13

*McDermott v. Clondalkin Grp., Inc.*,
  649 Fed. Appx. 263 (3d Cir. 2016) ...............................................................................................16

*Par Pharm., Inc. v. QuVa Pharma, Inc.*,
  764 Fed. Appx. 273 (3d Cir. 2019) ........................................................................................15, 16

*Phillips v. Cnty. of Allegheny*,
  515 F.3d 224 (3d Cir. 2008) ..........................................................................................................14

*Rypac Packaging Mach. Inc. v. Coakley*,
  No. CIV. A. 16069, 2000 WL 567895 (Del. Ch. May 1, 2000) .........................................13, 14

*Soterion Corp. v. Soteria Mezzanine Corp.*,
 C.A. No. 6158–VCN, 2012 WL 5378251 (Del. Ch. Oct. 31, 2012)................................13, 14

*U.S. Bank Nat'l Ass'n. v. Gunn*,
 23 F. Supp. 3d 426 (D. Del. 2014) ................................................................................12

*U.S. v. Sanofi-Aventis U.S. LLC*,
 226 A.3d 1117 (Del. 2020) ..........................................................................................17

*USAA Cas. Ins. Co. v. Carr*,
 225 A.3d 357 (Del. 2020) ............................................................................................17

*Van Buren v. United States*,
 141 S. Ct. 1648 (2021) .................................................................................................11

**Statutes**

815 ILCS 510/2(a)(8)........................................................................................................2, 7, 15

18 U.S.C. § 1030 (a)(2)(C) ....................................................................................................9

18 U.S.C. § 1030(a)(5)(A) ...................................................................................................10

18 U.S.C. § 1030 (a)(5)(C) ..................................................................................................10

**Other Authorities**

Rule 12(b)(6)........................................................................................................................14

Andor Health, LLC ("Andor"), Mahathi Software Pvt., Ltd. ("Mahathi"), and Raj Toleti ("Toleti," collectively "Defendants") submit this Response in Opposition to the Motion to Dismiss of Allscripts Healthcare, LLC ("Allscripts"), James Hewitt, Jeff Franks, and Bryan Seaborn (together with Allscripts, "Movants").

## I.    INTRODUCTION AND SUMMARY OF THE ARGUMENT

As detailed in Defendants' Counterclaims, Allscripts' motives for filing this baseless lawsuit have nothing to do with seeking redress from the Court for alleged "damage" to Allscripts and everything to do with Allscripts' orchestrated efforts to malign and disparage Defendants, to unlawfully interfere with the business relationships of Andor and Mahathi, to cover up Allscripts' own flagrant and unlawful misconduct, including its efforts to hack into Mahathi's cloud storage system (which Allscripts knew full well it had no right to do), and to use unlawful means to stifle lawful competition from Andor, a smaller, more innovative company.

The instant Motion should be denied because Defendants have plausibly stated a claim for relief in Counts I-VII, and X of the Counterclaims, based on Allscripts' flagrant misconduct, which is detailed in the Counterclaims:

1.    Mahathi's Azure tenant meets the definition of a "computer" and "protected computer" in the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and the unauthorized and unlawful actions taken by Movants on May 14, May 20, and May 21, 2021 violate Sections 1030(a)(2)(C), 1030(a)(5)(A), and 1030(a)(5)(C) of the CFAA.

2.    Andor plausibly alleges that Allscripts brought this litigation in bad faith, with the intent to harass Andor and without the intention of actually seeking definitive adjudication of its rights, and thus has stated claims for both tortious interference with prospective economic advantage (Count II) and unfair competition (Count III).

1

3.      Allscripts presents no argument for dismissal on Andor's claim under the Illinois Deceptive Trade Practices Act (Count IV), nor could it. Andor has plausibly alleged that Allscripts has been telling customers that Andor's Config Tool does not work, which is a false statement of fact that disparages Andor's goods and services.

4.      Andor has supported its allegations of reverse engineering with factual allegations that Allscripts acquired the Config Tool files and code under false pretenses and are misappropriating Andor's trade secrets. Furthermore, the Reseller Agreement expressly prohibits reverse engineering. Thus, Andor has stated claims for both misappropriation of trade secrets under the DTSA (Count V) and breach of the Reseller Agreement (Count VI).

5.      The implied covenant of good faith and fair dealing required Allscripts to exercise its contractual discretion in good faith, which it did not do by sitting on its rights under the Reseller Agreement for nearly two years with the intention of sidelining Andor's ability to sell the Config Tool directly to Allscripts customers. Thus, Andor stated a claim for breach of the implied covenant of good faith and fair dealing (Count VII).

6.      Allscripts materially breached the UI License by taking actions that converted its non-exclusive license to an exclusive one. Mahathi has standing to assert a claim for this breach because it never conveyed title to its intellectual property rights in the Standard UI to Andor or anyone else. Thus, Count X states a claim for relief.

7.      Accordingly, the Court should deny Movant's Motion in its entirety. Should the Court grant any part of the Motion, however, Defendants respectfully request leave to file amended counterclaims.

## II.    NATURE AND STAGE OF PROCEEDINGS

On August 6, 2021, Allscripts Healthcare, LLC ("Allscripts") and several affiliated entities

filed a Second Amended Complaint against Andor, Mahathi, Toleti, Paul Tyriver, and Amar Bulsara. (D.I. 41.) On August 20, 2021, Defendants filed their Answer to Second Amended Complaint, Defenses, and Second Amended Counterclaims ("Counterclaims"), asserting claims against Movants. (D.I. 59.) On September 2, 2021, Movants filed the pending Motion to Dismiss Counterclaims, seeking dismissal of Counts I-VII, X, XI of the Counterclaims. (D.I. 74, 75)

## III.    FACTUAL BACKGROUND

### A.    The HealthGrid Acquisition.

The relationship between Allscripts Healthcare and Defendants began with Allscripts Healthcare's acquisition of a company called Health Grid Corp. ("HealthGrid") that Toleti co-founded. (Second Amended Counterclaims, D.I. 59, ¶ 4.) Toleti is a healthcare technology visionary with a history of building breakthrough provider and patient-facing technologies that are ahead of their time. (*Id.*, ¶ 5.) HealthGrid is a healthcare technology company co-founded by Toleti in 2014. (*Id.*, ¶ 8.) Under the leadership of Toleti and HealthGrid's other co-founders, HealthGrid developed an innovative mobile patient engagement platform that was focused on streamlining and improving patient engagement with respect to in-person visits with healthcare providers and ensuring patient compliance with post-visit instructions. (*Id.*, ¶¶ 8-9.) HealthGrid did not offer products or services in the virtual care or telehealth space at the time Allscripts acquired it, nor had it actively considered providing virtual care or telehealth products or services in the year prior to the transaction. (*Id.*, ¶ 11.)

As part of the acquisition, Toleti agreed that he would not compete with Allscripts in the areas of patient engagement on which HealthGrid's product focused for four years after the transaction closed. (*Id.*, ¶ 10.) Andor and Mahathi later agreed that they likewise would not compete with the functions of HealthGrid's patient engagement platform for the same period of

time. (*Id.*) Defendants have honored this agreement. (*Id.*) None of the Defendants ever agreed that they would not compete in areas in which HealthGrid did <u>not</u> offer products at the time of the transaction, including telehealth and virtual care. (*Id.*, ¶ 11.)

**B.    The May 18, 2018 SOW and the UI License.**

On May 18, 2018, the same date the transaction closed, Allscripts entered into a Statement of Work ("SOW") with Mahathi, a technology company based in India that provides software implementation and other technical services in a number of industries including healthcare technology. (*Id.*, ¶¶ 7, 24, 36.) As part of the SOW, Mahathi provided to Allscripts a non-exclusive license to use Mahathi's standard User Interface ("Standard UI"). (*Id.*, ¶ 167.) In 2020, Mahathi assigned to Andor certain contract and billing-related issues under the SOW. (*Id.*, ¶ 169.) Mahathi never transferred ownership of its intellectual property rights in the Standard UI. (*Id.*)

**C.    The Reseller Agreement and Allscripts' End-Run Around Andor to Obtain Config Tool Files and Code.**

On or about September 30, 2019, Allscripts and Andor entered into a Reseller Agreement, through which Andor granted to Allscripts a non-exclusive, non-transferable license that would allow Allscripts to use components of Andor's Config Tool to configure certain functionalities of Allscripts' FMH patient engagement platform. (*Id.*, ¶¶ 88-89.) The Reseller Agreement does not specifically allow for Allscripts to make no attempt to resell or otherwise use the Config Tool. (*Id.*, ¶¶ 93-96.) What the Reseller Agreement does specify is that Allscripts is prohibited from reverse engineering the Config Tool. (*Id.*, ¶ 140.) Despite the Reseller Agreement being in place for nearly two years, Allscripts has never used the Config Tool, and likely has not even tested or validated it. (*Id.*, ¶ 141, 250.) Instead, Allscripts has attempted to reverse engineer the Config Tool to create a competing product. (*Id.*, ¶ 263.) To kick off this attempted reverse engineering, Jeff Franks of Allscripts requested JSON output files and proprietary code related to Andor's Config Tool. (*Id.*,

¶ 143.) Rather than request this from Andor, Franks went behind Andor's back and emailed his request directly to an unwitting engineer at Mahathi. (*Id.*) There was no legitimate business purpose for this request, as those files and code were unnecessary to test the Config Tool.

### D.    Allscripts' Lawsuit and Subsequent Invasion of Mahathi's Azure Tenant

Allscripts filed its initial Complaint in this lawsuit on May 17, 2021. (*Id.*, ¶ 113.) One business day before filing this lawsuit, on May 14, 2021, Allscripts sent a letter to Mahathi stating that Allscripts would not extend the SOW past the initial term ending May 17, 2021 and demanding that Mahathi delete any HealthGrid data to which Mahathi had access within 30 days. (*Id.*, ¶ 177.) Fifteen minutes prior to sending that demand, and while the SOW was still in effect, Allscripts began executing a premediated, surreptitious, and illegal attack on Mahathi's Azure tenant (Microsoft cloud storage system),[1] through which Allscripts Healthcare seized control of Mahathi's tenant and removed Mahathi's administrative access to its own Azure tenant. (*Id.*, ¶¶ 178-84.) Mahathi spent the next six days trying to regain control of its tenant, with support from Microsoft and its channel partners in India. (*Id.*, ¶¶ 189-90.) After Mahathi regained control of the tenant, and after the SOW expired, Allscripts *again* accessed Mahathi's tenant on May 21, 2021. (*Id.*, ¶¶ 203-05.) Mahathi did not authorize this access. (*Id.*) Once inside the tenant, Allscripts removed the HealthGrid subscription and related data, and also removed all of the contents of the Azure DevOps repository. (*Id.*, 206-07.)

### E.    Allscripts Files this Lawsuit in Bad Faith, With the Intention to Engage in a Publicity Campaign Designed to Malign and Disparage Defendants.

Since acquiring HealthGrid, Allscripts has repeatedly confirmed, through its words and

---

[1] According to Microsoft's website, "[a] tenant represents an organization in Azure Active Directory. It's a dedicated Azure AD service instance that an organization **receives and owns** when it signs up for a Microsoft cloud service such as Azure, Microsoft Intune, or Microsoft 365. Each Azure AD tenant is distinct and separate from other Azure AD tenants." *See* https://docs.microsoft.com/en-us/power-bi/developer/embedded/create-an-azure-active-directory-tenant (emphasis added), attached hereto as **Exhibit A**.

actions, that Andor can market and sell virtual care and telehealth products and services without violating any non-competition agreements between Allscripts and Defendants. (*Id.*, ¶ 12.) For example, in September 2019, Allscripts entered into the Reseller Agreement with Andor to sell and to license the right to use certain functionalities of one of Andor's Config Tool to configure certain features for Allscripts' FMH customers. (*Id.*, ¶ 13.) In the March 31, 2020 Settlement Agreement between Allscripts and Defendants, Allscripts expressly agreed that Andor's flagship products, ThinkAndor and AndorNow, do not compete with Allscripts and also agreed that Toleti could work for Andor "in any capacity," without violating previously negotiated non-compete agreements. (*Id.*, ¶ 14.) Taking it one-step further, in May 2020, after Toleti had voluntarily left Allscripts and joined Andor, Allscripts entered into a marketing agreement with Andor that specifically permits Andor to sell its flagship virtual care and telehealth products <u>directly to</u> Allscripts customers, in exchange for a fee. (*Id.*, ¶ 15.)

The products and services offered by Andor today are the same products and services that Allscripts: (a) has been fully aware of since late 2018, when Toleti began discussing the capabilities of Andor products with Allscripts, (b) already agreed do not compete with Allscripts' FMH product, and (c) has permitted Andor to sell directly to Allscripts customers since May 2020, without ever claiming these products "violate" any of the parties' agreements. (*Id.*, ¶ 16.)

Despite repeated admissions to the contrary, Allscripts sent a letter to Andor and Toleti on February 26, 2021, accusing them of having breached their non-compete and non-solicitation obligations. (*Id.*, ¶ 111.) Andor and Toleti replied promptly on March 4, 2021, denying Allscripts' meritless allegations. (*Id.*, ¶ 112.) More than two months after receiving that reply, Allscripts filed a lawsuit in this Court claiming that Andor is selling products and services in "violation" of the parties' non-compete agreements. (*Id.*, ¶ 17.) Making matters worse, Allscripts is repeating the

false statements in its lawsuit to Andor's existing and prospective customers in a transparent effort

to damage Andor by attempting to discourage and dissuade these customers from doing business

with Andor. (*Id.*) Allscripts' unlawful competition claims are objectively baseless. (*Id.*, ¶ 18.)

Allscripts' true intention in filing this lawsuit is twofold: (a) to engage in unfair competition and

tortious interference by repeating baseless and disparaging allegations to customers and

prospective customers to damage Andor, Mahathi, and Toleti in the market, and (b) to distract

from its own breaches and unlawful conduct. (*Id.*)

## IV.     ARGUMENT

"In considering whether a complaint should be dismissed for failure to state a claim upon

which relief can be granted, courts accept all factual allegations as true, construe the complaint in

the light most favorable to the plaintiff, and determine whether, under any reasonable reading of

the complaint, the plaintiff may be entitled to relief." *British Telecomm. PLC v.

IAC/InterActiveCorp*, 381 F. Supp. 3d 293, 299 (D. Del. 2019) (internal quotation marks omitted).

As demonstrated below, Andor and Mahathi have more than sufficiently alleged claims for relief

in Count I (CFAA), Count II (tortious interference with prospective economic advantage), Count

III (unfair competition), Count IV (Illinois Deceptive Trade Practices Act), Count V

(misappropriation of trade secrets), Count VI (breach of contract), Count VII (breach of the

covenant of good faith and fair dealing), and Count X (breach of the UI License). Accordingly,

Movants' Motion should be denied with respect to each of these counts.[2]

### A.     Count I States a Claim Under Multiple Sections of the CFAA.

A party can violate the CFAA in multiple ways. Count I states a claim for relief under

---

[2] As stated at the Initial Pre-trial Conference on September 13, 2021, Mahathi has voluntarily withdrawn its related state-law claim in Count XI for violation of the Florida Computer Crimes Act.

Sections (a)(2)(C), (a)(5)(A), and (a)(5)(C) of the CFAA. Movants do not address most of the elements of CFAA claims under these sections, but rather limit their arguments to two points: (1) an Azure tenant is "not a computer;" and (2) "none of the alleged actions fall within the definition of 'unauthorized' under the CFAA." (D.I. 75 at 7-9.) Movants' arguments on both points are dispensed with easily: Mahathi's Azure tenant is a "protected computer" under the CFAA, and Movants' did access Mahathi's Azure tenant "without authorization."

　　　　1.　　*Mahathi's Azure tenant is a "protected computer" as defined by the CFAA.*

Movants argue that a cloud computing service "is not a device or a facility, and therefore, [it] does not fall within the definition of a 'computer' for purposes of CFAA claims." (D.I. 75 at 8.) In what has now become a pattern, Movants cite <u>no case law</u> supporting their narrow, antiquated notion of what qualifies as a "computer" under the CFAA <u>and</u> ignore numerous federal cases that have interpreted the CFAA's definitions of "computer" and "protected computer" as encompassing cloud-based computing services like a Microsoft Azure tenant.

For example, in *Florida Atlantic University Board Of Trustees v. Parsont*, the plaintiff university operated its email server as a "virtual tenant," with Google managing the server's actual physical location. 465 F. Supp. 3d 1279, 1290 (S.D. Fla. 2020). The district court held that the university's virtual email tenant qualified as a "protected computer" under the CFAA and that the university could pursue a CFAA claim against a student who had allegedly accessed an email account on the university's virtual email tenant, without authorization. *Id.*

In *Estes Forwarding Worldwide v. Cuellar*, the plaintiff EFW created a Google Drive account[3] to store certain of the company's business records and alleged that a former employee

---

[3] Google Drive is a cloud-based storage solution offered by Google (similar to Microsoft's Azure cloud service) that allows users to save files online and access them anywhere from any smartphone, tablet, or computer. *See* "What is Google Drive? A guide to navigating Google's file storage service and collaboration tools," *available at* https://www.businessinsider.com/what-is-google-drive-guide, attached hereto as **Exhibit B**.

violated the CFAA when he accessed EFW's Google Drive account after his employment with the company ended. 239 F. Supp. 3d 918, 920-21 (E.D. Va. 2017). The district court held that EFW's Google Drive account qualified as a "protected computer" under the CFAA, noting that "the [EFW] account itself was located exclusively on the Internet, in the cloud." *Id.* at 926.

In *Calendar Research. LLC v. StubHub, Inc.*, the plaintiff alleged that the defendant, a former employee, violated the CFAA when he accessed the plaintiff's "accounts on services such as Google Drive, Dropbox, and Evernote, among others, after his authorization to do so had been terminated." No. 2:17-cv-04062-SVW-SS, 2017 WL 10378336, at *7 (C.D. Cal. Aug. 16, 2017). The district court rejected the defendant's argument "that cloud-based, third-party services— Google Drive, Dropbox, and Evernote—do not constitute the use of a 'protected computer'" under the CFAA and held that this was an "incorrect understanding of the CFAA," unsupported by federal case law. *Id.*

Like the cloud-based accounts of the plaintiffs in each of the above-cited cases, Mahathi's Microsoft Azure tenant plainly qualifies a "protected computer" under the CFAA.

> 2.    *Movant's unauthorized activities within Mahathi's Azure Tenant violated Sections (a)(2)(C), (a)(5)(A), and (a)(5)(C) of the CFAA.*

To allege a claim under Section (a)(2)(C) of the CFAA, a plaintiff must allege that the defendant: "(1) intentionally (2) accessed a computer (3) without authorization or in such a way that exceeded [the defendant's] authorized access, and (4) obtained information (5) from any 'protected computer,' (6) resulting in a loss to one or more persons during any one-year period aggregating at least $5,000 in value." *See Estes Forwarding Worldwide LLC v. Cuellar*, 239 F. Supp. 3d 918, 922–23 (E.D. Va. 2017); 18 U.S.C. § 1030 (a)(2)(C). To allege a claim under Section (a)(5)(C) of the CFAA, a plaintiff must allege that the defendant: "(1) intentionally (2) accessed a 'protected computer' (3) without authorization, and, as a result of such conduct, (4) caused damage

9

and loss (5) to one or more persons during any one-year period aggregating at least $5,000 in value." *Estes Forwarding Worldwide*, 239 F. Supp. at 923; 18 U.S.C. § 1030 (a)(5)(C). Section (a)(5)(A) of the CFAA imposes liability on anyone who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer." 18 U.S.C. § 1030(a)(5)(A).

Mahathi has already demonstrated in part IV.A.1 above that its Azure tenant qualifies as a "protected computer" as required by all of these sections. Movants do not dispute their access was "intentional" or that they obtained "information," as those terms are used in these sections. Nor do Movants dispute that Mahathi has alleged it suffered damage and/or loss in a one-year period aggregating at least $5,000. Movants challenge only whether Count I alleges that the actions Movants took within Mahathi's Azure tenant qualify as "unauthorized access." (D.I. 75 at 8-9.) Mahathi has more than adequately alleged that Movant's actions within Mahathi's Azure tenant on May 14 and May 21, 2021 satisfy the "without authorization" element of a CFAA claim under Sections (a)(2)(C), (a)(5)(A), and (a)(5)(C). (*See* D.I. 59, ¶¶ 157, 178-84, 199-206.)

On May 14, 2021, Allscripts' employees knowingly transmitted commands within the Mahathi tenant that removed Mahathi's ability to access the DevOps repository and removed administrative access for all of Mahathi's administrators. (D.I. 59, ¶¶ 181-182.) Movants took these actions without authorization from Mahathi. (*Id.*) The commands transmitted by Movants, or at their direction, damaged Mahathi's Azure tenant by impairing the availability to Mahathi of data, including the DevOps folder, and global administrative access to its Azure tenant for six days. (*Id.*, ¶¶ 178-90.) These allegations easily state a claim for relief under Section (a)(5)(A).

After May 17, 2021, the SOW had expired, and thus Allscripts no longer had authorization to access Mahathi's Azure tenant for any purpose. (*Id.*, ¶ 177.) Nevertheless, on May 21, 2021,

Movants used back doors to access Mahathi's tenant and removed the HealthGrid Subscription and the Azure DevOps repository from Mahathi's Azure tenant, again without Mahathi's authorization. (*Id.*, ¶¶ 203-07.) Movants admit they took these actions on May 21 but argue no violation of the CFAA occurred because what they took allegedly belonged to Allscripts. (D.I. 75 at 9). The Supreme Court rejected Movant's exact argument in *Van Buren v. United States*, 141 S. Ct. 1648, 1656 (2021). There, the Supreme Court held that the CFAA "is concerned with what a person does on a computer; it does not excuse hacking into an electronic personnel file if the hacker could have walked down the hall to pick up a physical copy." *Id.* (emphasis added). The same is true here – on May 21, 2021, Movants were not authorized to access Mahathi's Azure tenant to remove information or data, even if that information did belong to Allscripts and could have been obtained by Allscripts during the term of the SOW.

By way of analogy, a renter (Allscripts) may lawfully be given access to an apartment (space within Mahathi's Azure tenant) for the duration of the lease and may lawfully store their personal belongings (the HealthGrid Subscription) in that apartment and use utility services within that apartment (like the Azure services for which Mahathi billed Allscipts). But once the lease (the SOW) terminates, the renter no longer has permission to access their former apartment, continue using any utilities (such as cable or internet) or take away the keys that provide the landlord access to any or all facilities within the apartment for any reason whatsoever. Moreover, once the lease ends, the landlord (Mahathi) has every right to change the locks and take over the utilities, and any effort by the renter after the lease terminates to break into the apartment is trespass, plain and simple. If the renter later decides they want to retrieve personal property they left behind in the apartment they had previously been leasing (in Allscripts case, knowingly left behind), the renter may work out an arrangement with the landlord to retrieve the renter's belongings at a mutually

11

convenient time. But the renter does not have the right to engage in self-help by breaking into the apartment in the dead of the night to retrieve the property.

That is exactly what Movants did on May 21, 2021 when they hacked into Mahathi's Azure tenant after the SOW had terminated and their permission to be in Mahathi's Azure tenant ended—broke into Mahathi's tenant and removed data without permission. Movants' brazenly argue they had the "right" to hack into Mahathi's tenant to retrieve HealthGrid data that Movants had left behind in their haste to terminate the SOW, seize control of Mahathi's Azure tenant, and initiate this litigation against Defendants (all of which was carefully planned and timed by Allscripts to take place between May 14, 2021 and May 17, 2021 for maximal leverage). Movants are wrong as a matter of law—their actions blatantly violate Sections (a)(2)(C) and (a)(5)(C) of the CFAA.

## B.    Andor has Plausibly Alleged Both Tortious Interference (Count II) and Unfair Competition (Count III).

Movants inexplicably ignore the choice of law question regarding the state-law tort Counterclaims asserted by Andor in Counts II and III. As discussed in detail in Defendants' Opening Brief in Support of their 12(b)(6) Motion to Dismiss Counts I through VI of the First Amended Complaint, each of Delaware, Illinois, and Florida similarly define the elements of tortious interference with a prospective business opportunity. (D.I. 26 at 15.) Thus, under Delaware choice-of-law rules, the Court can apply the laws of all three states interchangeably in discussing the law applicable to the case. (*Id.* at 7.) Here, Counterclaim Plaintiffs primarily cite Delaware law. The elements of tortious interference with a prospective business opportunity are "(1) the reasonable probability of a business opportunity; (2) the intentional interference by defendant with that opportunity; (3) proximate causation; and (4) damages, all of which must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." *U.S. Bank Nat'l Ass'n v. Gunn*, 23 F. Supp. 3d 426, 436 (D. Del. 2014). Litigation filed

by a party constitutes improper interference "if the actor has no belief in the merit of the litigation **_or_** if, though having some belief in its merit, he nevertheless institutes or threatens to institute the litigation in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication." *Soterion Corp. v. Soteria Mezzanine Corp.*, C.A. No. 6158–VCN, 2012 WL 5378251, at \*14 (Del. Ch. Oct. 31, 2012) (quoting Restatement (Second) of Torts § 767 cmt. c (1979)) (emphasis added).

As for choice of law with respect to Andor's unfair competition claim in Count III, Movants choose Illinois law, without explanation. (D.I. 75 at 10.) Both Delaware and Illinois recognize claims for unfair competition, though only Delaware law appears to set forth specific elements for this claim. *Compare Agilent Technologies, Inc.*, C.A. No. 3512-VCS, 2009 WL 119865, at \*5 (Jan. 20, 2009) with *Herman Miller, Inc. v. Teknion Furniture Sys., Inc.*, No. CIV.A. 93 C 7810, 1996 WL 341541, at \*4 (N.D. Ill. June 20, 1996). Because Andor is alleging that Allscripts is using a District of Delaware lawsuit to interfere with the business of Andor, a Delaware company, Delaware law is more likely to apply to Count III. *See Hardwire, LLC v. Zero Int'l, Inc.*, No. CV 14-54-LPS-CJB, 2014 WL 5144610, at \*7 (D. Del. Oct. 14, 2014) (Delaware applies the "most significant relationship" test if there is an actual conflict between the laws of competing jurisdictions). The elements of unfair competition under Delaware law are "a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." *Rypac Packaging Mach. Inc. v. Coakley*, No. CIV. A. 16069, 2000 WL 567895, at \*8 (Del. Ch. May 1, 2000).

Movants acknowledge that, even under the Illinois cases they cite, if Andor plausibly alleged that Allscripts brought this lawsuit in bad faith, then Andor has stated a claim for both

tortious interference with prospective economic advantage and unfair competition. (D.I. 75 at 10.) What Movants ignore are the numerous allegations that give rise to a reasonable inference of Allscripts' bad faith in bringing the lawsuit. For example, Andor alleges that James Hewitt—an Executive Vice President of Allscripts—told his son that the purpose of this lawsuit was "to launch a media campaign against Andor, Mahathi, and Toleti." (D.I. 59, ¶ 2.) Andor also alleges that "Allscripts made similar comments about using this lawsuit as a 'public relations campaign' to customers and prospective customers of Andor." (*Id.*) Based on these allegations (none of which were made on information and belief), Andor is entitled to the reasonable inference that Allscripts filed this lawsuit not for any legitimate purpose, but rather to gain a competitive advantage over Andor by making the lawsuit a tent pole in Allscripts' public relations smear campaign against Andor. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (in deciding a Rule 12(b)(6) motion, reasonable inferences are to be drawn in favor of the non-moving party).

Movants attempt to distract the Court by arguing that Andor has not moved to dismiss Allscripts' claims and has admitted certain allegations. (D.I. 75 at 10.) But Andor's admission of certain non-dispositive facts does not prove the good-faith nature of the denied facts (or even the admitted ones), nor does it prove that Allscripts brought these claims in good faith. Even filing an allegedly "meritorious claim" constitutes tortious interference if it is brought in bad faith, <u>without</u> the intention to resolve the litigation and <u>with</u> the intention to harass the opponent. *Soterion.*, 2012 WL 5378251, at *14. This bad-faith litigation has damaged Andor through the loss of customers and significant business opportunities. (D.I. 59, ¶¶ 124.36, 151-55.) Andor has plausibly alleged that Allscripts brought this lawsuit in bad faith and thus has stated claims for both tortious interference with prospective economic advantage (Count II) and unfair competition (Count III).

**C.      Andor has Alleged a Claim for Commercial Disparagement Under the Illinois Deceptive Trade Practices Act (Count IV).**

Under the Illinois Deceptive Trade Practices Act ("IDTPA"), "[a] person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person: … (8) disparages the goods, services, or business of another by false or misleading representation of fact." 815 ILCS 510/2(a)(8). Movants mention Count IV among those they seek to have dismissed. (D.I. 75 at 1). But they offer no substantive argument that Count IV should be dismissed. Nor could they. Andor alleged that Allscripts told Andor's customers that Andor's Config Tool does not work. (D.I. 59, ¶ 251.) This is a false representation of fact because the Config Tool does work, and Allscripts knows it. (*Id.*, ¶ 252.) Allscripts' false statement concerning Andor's Config tool was intended to and in fact has caused damage to Andor. (*Id.*, ¶ 252-56.) This is more than sufficient to state a claim for commercial disparagement under the IDTPA.

**D.      Andor Has Stated a Claim for both Misappropriation of Trade Secrets Under the DTSA (Count V) and Breach of the Reseller Agreement (Count VI).**

Under the Federal Defend Trade Secrets Act ("DTSA"), the elements of misappropriation of trade secrets are (1) existence of a trade secret and (2) misappropriation of that secret. *See Par Pharm., Inc. v. QuVa Pharma, Inc.*, 764 Fed. Appx. 273, 278 (3d Cir. 2019). The following elements constitute breach of contract under Delaware law: "(1) a contractual obligation, (2) a violation of duty under the contract by the defendants, and (3) resulting damage to the plaintiff." *Envolve Pharmacy Solutions, Inc. v. Rite Aid Headquarters Corp.*, C.A. No. N19C-12-214 PRW CCLD, 2021 WL 140919, at *9 (Del. Super. Ct. Jan. 15, 2021).

Movants' argument with respect to the claims for violation of the DTSA (Count V) and breach of the Reseller Agreement (Count VI) boil down to two points: (1) Andor did not plausibly allege that Allscripts has attempted to reverse engineer the Config Tool; and (2) the Reseller

15

Agreement allows Allscripts to reverse engineer to Config Tool using the code it obtained from a Mahathi engineer under false pretenses. (D.I. 75 at 11-12.) Both of these arguments fail.

Andor alleged upon information and belief that Allscripts has attempted to reverse engineer the Config Tool. (D.I. 59, ¶¶ 147, 149, 263, 271.) This "information and belief" allegation is permissible because the facts showing that Allscripts has engaged in reverse engineering are uniquely within Allscripts' possession. *See McDermott v. Clondalkin Grp., Inc.*, 649 Fed. Appx. 263, 267-68 (3d Cir. 2016) (pleading upon information and belief is permissible where "it can be shown that the requisite factual information is peculiarly within the defendant's knowledge or control"). Moreover, contrary to Movants' argument, Andor supported this allegation with specific facts. Andor alleged that Jeff Franks requested JSON output files and proprietary code related to the Config Tool from a Mahathi engineer. (D.I. 59, ¶ 143.) This was—to put it mildly—a strange choice. Mahathi was not a party to the Reseller Agreement. (*Id.*, ¶ 88.) Andor was. (*Id.*) Yet Franks chose not to ask Andor for the files and code. (*Id.*, ¶ 143.) Fundamentally, there was no legitimate business purpose for requesting the files and code, and Allscripts has not even attempted to assert one. But even if Franks had wanted the files and code for a legitimate purpose, it stands to reason that he would have asked Andor to provide them. The fact that Franks went behind Andor's back to obtain the files and code gives rise to a reasonable inference that Allscripts sought to use them for an illegitimate purpose—namely, to reverse engineer the Config Tool so Allscripts could create a competing product and avoid paying Andor under the terms of the Reseller Agreement. Thus, Andor's "information and belief" allegation regarding reverse engineering is supported.

Movants' argument based on the language of the Reseller Agreement fares no better. They read Section 2.1 as permitting Allscripts' "request for and receipt of the code and its use of that code." (D.I. 75 at 12.) Allscripts has missed the point. Reverse engineering is expressly prohibited

by Section 2.2, which states that "Except as expressly permitted by this Agreement, Allscripts will not . . . reverse engineer, decompile, disassemble, or otherwise attempt to derive the source code for Company Product." (D.I. 59, ¶ 140.) The Reseller Agreement—like any contract—should be "interpreted in a way that does not render any provisions illusory or meaningless." *USAA Cas. Ins. Co. v. Carr*, 225 A.3d 357, 363 (Del. 2020) (internal quotation marks omitted); *see also U.S. v. Sanofi-Aventis U.S. LLC*, 226 A.3d 1117, 1129 (Del. 2020) (stating that when interpreting contracts, Delaware courts "give each provision and term effect, so as not to render any part of the contract mere surplusage"). Thus, the Court should reject Movants' argument that the Resller Agreement actually gives Allscripts the right to do something that Section 2.2 explicitly prohibits.

Andor's allegation of reverse engineering is sufficiently supported, and the Reseller Agreement means what it says when it prohibits reverse engineering. Accordingly, Andor has stated claims for both misappropriation of trade secrets under the DTSA (Count V) and breach of the Reseller Agreement (Count VI).

### E.    Andor Has Stated a Claim for Allscripts' Breach of the Covenant of Good Faith and Fair Dealing in Count VII.

The implied covenant of good faith and fair dealing "exists to protect the parties' reasonable expectations." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 447 (Del. 2005) (internal quotation marks omitted). "The implied covenant is particularly important in contracts that endow one party with discretion in performance; *i.e.*, in contracts that defer a decision at the time of contracting and empower one party to make that decision later. Simply put, the implied covenant requires that the 'discretion-exercising party' make that decision in good faith." *Amirsaleh v. Bd. of Trade of City of New York, Inc.*, C.A. No. 2822-CC, 2008 WL 4182998, at *8 (Del. Ch. Sept. 11, 2008). "[A] fairly pleaded claim of good faith/bad faith raises essentially a question of fact which generally cannot be resolved on the pleadings or without first granting an

adequate opportunity for discovery." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 (Del. 1993).

Here, Andor reasonably expected that Allscripts would test and validate the Config Tool and would then proceed with attempts to market, sell, and otherwise use the Company Product in accordance with the Reseller Agreement. (D.I. 59, ¶¶ 278.) Instead, Allscripts has sat on its rights for nearly two years, and made no efforts to test, validate, or sell the Company Product to its customers. (*Id.*, ¶¶ 141, 146, 154, 281.) Count VII alleges that Allscripts entered into the Reseller Agreement, not with the good faith intention to actually sell the Company Product to its customers, which would benefit both Andor and Allscripts, but rather with the bad faith intention to sideline Andor and prevent it from selling this product directly to Allscripts' customers so that Allscripts could attempt to sell a competing product instead. (*Id.*, ¶¶ 273-83.) Andor has plausibly alleged that Allscripts has exercised its discretion not to use or sell the Company Product in violation of the covenant of good faith and fair dealing. *See Amirsaleh*, 2008 WL 4182998, at *8.

The provision in the Reseller Agreement that sets forth the parties' agreement as to what would happen if Allscripts "sold" the Config Tool at no cost does not absolve Allscripts from its contractual duty of good faith. That provision does not mean that the parties contemplated Allscripts would make no attempt whatsoever to market, sell, or otherwise use the Company Product to its customers. If anything, it shows that the parties contemplated myriad ways in which Allscripts would attempt to make use of the licensed products. Accordingly, Count VII alleges a claim for breach of the covenant of good faith and fair dealing.

### F.    Mahathi Has Alleged Breach of the UI License in Count X.

In their arguments related to Count X (D.I. 75 at 14-16), Movants play coy about what Mahathi alleges Allscripts to have breached. Paragraph 320 of the Counterclaims makes it clear:

Allscripts breached the license that Mahathi granted with respect to the Standard UI. (D.I. 59, ¶ 320.) Allscripts claims to "own[] the code it is alleged to have taken steps to protect." (D.I. 75 at 15.) But this simply isn't the case with respect to Mahathi's Standard UI, which Allscripts agreed "is the intellectual property of MAHATHI." (D.I. 59, ¶ 320.) Critically, the license that Mahathi granted to Allscripts was non-exclusive, and it was not "irrevocable." (*Id.*) On May 14, 2021, Allscripts took control of Mahathi's Azure tenant and removed Mahathi's access to the Standard UI. (*Id.*, ¶ 178-84.) In so doing, Allscripts breached the license by converting a non-exclusive license into an exclusive one by ensuring that only Allscripts had access to the Standard UI source code. (*Id.*, ¶ 323.) That Allscripts (after rejecting multiple demands to do so) eventually provided Mahathi with a copy of Mahathi's own code does not erase Allscripts' material breach. Mahathi was damaged by Allscripts' breach, and thus, it has stated a claim for breach of the UI License.

Allscripts' breach gave Mahathi the right to terminate the license entirely. *See eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, C.A. No. 7471–VCP, 2013 WL 5621678, at *3, 20 (Del. Ch. Sept. 30, 2013) (holding that a perpetual, irrevocable license was properly terminated based on the licensee's material breach). Mahathi did terminate the license on June 18, 2021. (D.I. 59, ¶ 219.) So Allscripts has further violated the UI License through its continued use of its Standard UI after June 18, 2021. (*Id.*, ¶ 325.) This is an independent reason that Mahathi has stated a claim for breach of the UI License.

Movants claim that Mahathi "lacks standing" due to a purported assignment of Mahathi's intellectual property rights in the UI License, (D.I. 79 at 16), but this argument fails for two reasons. First, the document on which Movants rely was never executed by Andor (the purported assignee). (*Id.*, ¶ 169.) Second, Mahathi specifically alleged that no assignment of anything relating to the SOW occurred until 2020, and even then Mahathi never transferred to Andor the

19

underlying intellectual property rights in the Standard UI. (*Id.*) Rather, the assignment in 2020 related only to certain contract and billing issues. (*Id.*) Thus, Mahathi has alleged it is the owner of the Standard UI and underlying code and remains the licensor. Accordingly, Mahathi has alleged a claim for breach of the UI License in Count X.

### G.    If the Court Grants Any Part of the Motion, Defendants Respectfully Request Leave to Replead Any Dismissed Count.

Movants do not seek dismissal with prejudice, nor would they have a basis to do so. The Federal Rules set forth a "policy of liberal pleading amendment by ensuring that an inadvertent error in, or omission from, an original pleading will not preclude a party from securing relief on the merits of his claim." *Garrett v. Wexford Health*, 938 F.3d 69, 82 (3d Cir. 2019) (citations omitted). Defendants maintain that the Motion should be denied in full. Should the Court dismiss any of the Counterclaims, however, Defendants respectfully request leave to file amended counterclaims.

## V.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court deny Movants' Motion to Dismiss Counterclaims in its entirety and grant any other such relief the Court deems appropriate. If this Court dismisses any of the Counterclaims, Defendants respectfully request leave to file amended counterclaims.

<table>
<tr><td></td><td>**COLE SCHOTZ P.C.**</td></tr>
<tr><td>Of Counsel:</td><td></td></tr>
<tr><td></td><td>*/s/ Andrew L. Cole*</td></tr>
<tr><td>Jennifer A. Kenedy (admitted *pro hac vice*)</td><td>Andrew L. Cole (No. 5712)</td></tr>
<tr><td>Bilal Zaheer (admitted *pro hac vice*)</td><td>500 Delaware Avenue, Suite 1410</td></tr>
<tr><td>LOCKE LORD LLP</td><td>Wilmington, DE 19801</td></tr>
<tr><td>111 South Wacker Drive, Suite 4100</td><td>(302) 652-3131 (Phone)</td></tr>
<tr><td>Chicago, IL 60606</td><td>acole@coleschotz.com</td></tr>
<tr><td>Tel: (312) 443-0377</td><td>*Attorneys for Defendants*</td></tr>
<tr><td>Jkenedy@lockelord.com</td><td></td></tr>
<tr><td>Bilal.zaheer@lockelord.com</td><td>Dated: <u>September 17, 2021</u></td></tr>
</table>