IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALLSCRIPTS HEALTHCARE, LLC, *et al.* | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | NO. 21-704-MAK |
| | : | |
| ANDOR HEALTH, LLC, *et al.* | : | |

## <u>MEMORANDUM</u>

KEARNEY, J.                                                              July 29, 2022

Two healthcare technology companies working together since 2018 blame each other for disputes destroying their short-lived business relationship last spring. Their disputes ended up before us and later involved the Indian police. Their relationship began in spring 2018 when Allscripts Healthcare, LLC purchased a company, Health Grid, from Raj Toleti who then became an Allscripts's employee. Allscripts's relationship with Mr. Toleti and his entities later expanded when Allscripts signed contracts with two of Mr. Toleti's other companies, Mahathi Software PVT., LTD. and Andor Health, LLC. The relationship began to sour in spring 2020 resulting in Mr. Toleti and high-level employee Amar Bulsara leaving Allscripts within months of each other. Allscripts ended its relationship with Mahathi by spring 2021 and immediately sued alleging breaches of agreements, sharing confidential and trade secret information, and a variety of commercial torts against Andor, Mahathi, and Messrs. Toleti and Bulsara.

Allscripts's filing the case last spring started another round of conduct now about to proceed to trial. Each party alleges the other engaged in a week-long cyberattack on the parties' once-shared virtual workspace within days of Allscripts filing this case. The parties allege stealing, destroying, or preventing access to each other's confidential and proprietary information. Mahathi reported Allscripts to the Indian police leading to criminal charges against Allscripts's employees

in the United States and its affiliates in India. The parties continued to allegedly disparage and tortiously interfere with each other's business relationships.

The parties are now preparing for trial on claims for breaches of various agreements, claims surrounding the cyberattack, misappropriation of trade secrets and other confidential information, and various torts including tortious interference, abuse of process, unfair competition, and defamation to merely name a few. Funded by apparently sizable litigation budgets, the parties hired purported experts to presumably help the jury understand this healthcare technology industry, Indian criminal process, and damages. They now move to preclude a total of fourteen experts from offering varied opinions largely relating to the nature of the shared workspace in high tech (hint: not a brick-and-mortar office), alleged lost profits caused by the other's alleged conduct, and how Indian criminal process works.

All parties declined our offer for an evidentiary hearing so we could better explore their wide-ranging objections and meet their burdens. We did our best to understand these issues which counsel claim are subjects of expertise. We will not hamstring the trial lawyers, but we must preclude some of the opinions cloaking as lawyer advocacy and conclusions rather than qualified opinions fitting the issues based on reliable methods and data.

We specifically preclude experts on Indian criminal law and procedure from opining as to corruption or police abuse in India, Mahathi's state of mind, or whether Mahathi's conduct violated Indian law. These experts may generally describe—consistent with Federal Rule of Evidence 611—the Indian criminal justice process, how it generally works, and opine whether Mahathi's conduct varies from the standard role and practices of an alleged victim of a cyberattack under Indian law. We allow the lost profits and damages experts to opine subject to rigorous cross-examination and consistent with Rule 611. We largely permit the parties' technology experts to

testify but exclude opinions beyond their qualifications and to the extent the opinions constitute improper legal opinions or opinions on intent or state of mind. We permit Andor's rebuttal expert Aneesh Chopra to testify over Allscripts's objection, permit one of Allscripts's expert John Cauthen's opinions on a purportedly fabricated document, and permit some but not all of Allscripts's expert Dr. Yael Harris's opinions.

## I.   We are mindful of the balancing in our gatekeeping role.

We must ensure a witness offering an expert opinion possesses adequate "knowledge, skill, experience, training, or education" to support the opinion.[1] We act "as a 'gatekeeper' to ensure that 'any and all expert testimony or evidence is not only relevant, but also reliable.'"[2] Congress, through Rule of Evidence 702, "usually favors admissibility."[3] Rule 702 embodies a "trilogy of restrictions on expert testimony: qualification, reliability[,] and fit."[4] The burden is on the party offering expert testimony to show it meets the standards for admissibility.[5]

The first category of restrictions—qualification—requires "that the witness possess specialized expertise."[6] Our Court of Appeals interprets this requirement "liberally."[7] "[A] broad range of knowledge, skills, and training qualify an expert."[8] We should not "impos[e] overly rigorous requirements of expertise"; "more generalized qualifications" suffice.[9]

The second category—reliability—requires us to examine "the process or technique the expert used in formulating the opinion."[10] The opinion must be based on "the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'"[11] "In other words, the expert must have 'good grounds' for his belief."[12] In cases not involving scientific testimony, "the relevant reliability concerns may focus upon personal knowledge or experience."[13]

The third category—fit—requires we ask "whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[14] "Put another way, this is a question of relevance, and Rule 702, which governs the admissibility

of expert testimony, has a liberal policy of admissibility if it has the potential for assisting the trier of fact."[15] "The standard is not that high, but is higher than bare relevance."[16]

Rule 702's trilogy of restrictions "incorporates to some extent a consideration of the dangers, particularly the danger of unfair prejudice, enumerated in" Rule 403.[17] But Rule 403 still independently applies to expert testimony.[18] We should exclude evidence under Rule 403 if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."[19]

Under Federal Rule of Evidence 704(a), an expert's opinion "is not objectionable just because it embraces an ultimate issue."[20] Although Rule 704 permits an expert to give testimony embracing the ultimate issue to be decided by the fact finder, an expert may not render a legal opinion.[21] Because the "boundaries of Rule 704 are often hazy," our Court of Appeals will not permit expert testimony if the expert's opinion will interfere with the district court's "pivotal role in explaining the law to the jury."[22]

We group the *Daubert* motions into four broad categories: (A) the Indian criminal justice system experts; (B) damages experts; (C) technology experts; and (D) miscellaneous experts.

## II. We allow limited opinions offering expertise into the Indian criminal justice system but preclude legal conclusions or opinions which otherwise invade our or the jury's province.

Allscripts will proceed to trial on a claim Mahathi and its agents abused lawful Indian cybercrime process for the ulterior purpose of affecting Allscripts's earlier-filed claims before us. There are two elements of an abuse of process claim under Delaware law: "(1) an ulterior purpose; and (2) a willful act in the use of the process not proper in the regular conduct of the proceedings."[23] The tort of abuse of process is "perversion of the process after it has been issued."[24] The tort "addresses a litigant's use of the legal system to perpetuate an improper purpose

4

to sue by using, or abusing, the imposition of proceedings that accompany litigation upon an individual."[25]

Andor moves to exclude Allscripts's proffered experts Mark Jenkins, Zulfiquar Memon, and Harry Brandon who opine on the conduct of the Indian police in the criminal investigation. Allscripts moves to exclude Andor's proffered experts Srividhya Ragavan and Susanah Naushad, two attorneys of the Indian bar, who opine on the Indian criminal justice system. We review the parties' *Daubert* motions within the context of Allscripts's abuse of process claim.

The opinions are buried in extended "reports" leaving us without clear direction on the anticipated opinions. But we have enough to clarify: The qualified witnesses can tell the jury about the Indian cybercrime process and whether Mahathi's conduct (as the alleged victim) is consistent with how the Indian process operates. But the qualified experts cannot opine as to whether the Indian police or system is corrupt or whether the police acted inappropriately nor can a witness tell the jury what is in another person's mind.

### A. Allscripts's experts Mark Jenkins, Attorney Zulfiquar Memon, and Harry Brandon.

#### 1. We exclude Mark Jenkins's proffered opinion testimony.

Andor moves to exclude the opinion of Mark Jenkins.[26] Mr. Jenkins is a certified fraud examiner and is the Director of Forensic Investigations for The Kreller Group, providing professional consulting services.[27] Mr. Jenkins prepared three expert reports: an original report,[28] an amended report,[29] and a supplemental report analyzing expense documentation showing expenses paid by Mahathi for travel-related costs incurred by the Indian cybercrime police.[30] He defines the scope of his retention by Allscripts to review and analyze travel documents and travel cost reimbursement documents relating to trips sponsored, paid for, and taken by Mahathi employees with Indian cyber unit police officers.[31]

Mr. Jenkins offers six "conclusions/opinions":[32]

1. Mahathi employees directly purchased or directed a travel agency to book air or rail tickets for Vizag cyber police officers. The support documents for airfare were provided by the defendants that only indicate partial reimbursement by Vizag cyber unit police officers in cash to the travel agency. No verifiable or objective records kept in the normal course of business was provided for rail ticket reimbursement by Vizag police officers.

2. Of the total trips Mahathi Software employees booked for and were taken by the Vizag police officers, assuming the support documents are authentic (I am unaware if these documents have been authenticated by a document expert as they were copies), 11 out of 33 trips taken had support documents and 10 cancellation fees had support for potential reimbursement. According to the documents provided, the 11 trips with support cost totaled INR (Indian Rupees) 82,240 out of a total [Indian Rupees] 112,762 (73.0%). The travel agency that booked the 11 trips show cash receipts were received from the Vizag police officers approximately one month and then three months after the travel dates. I was not provided support by the defendants for the remaining [Indian Rupees] 30,522 in travel related costs.

3. I was not provided additional travel related costs such as lodging, meals or other travel related costs (such as parking, taxis, and COVID travel tests-only the tests results were provided) nor support documents that would indicate whether or not those costs for the Vizag police officers were paid by Mahathi Software and then reimbursed by Vizag police officers or paid directly by Vizag police officers.

4. I reviewed three handwritten notes with Mahathi Software PVT. LTD. stamps/seal on Mahathi Software letterhead that stated: "Received amount of 1.549 Rupees by way of cash on 17/08/2021 towards train tickets" from VSKP to BZA." The names of each of three Vizag police officers were included in these notes. I do not consider these notes valid support for cash received from the officers. The company should provide bank statements and deposit slips as well as travel receipts as proof of reimbursement. The police officers would or should have requested reimbursement from the Vizag police department for these trips and, if so, those records should be available.

5. The Vizag "Certified Copy of the Chargesheet" dated 9/20/2021 does not mention the 43 trips that Mahathi booked for the Vizag police officers. Two trips mentioned in the Chargesheet were on 9/2/2021 to 9/4/2021. One trip to Allscripts India LLP in Vadadora, India by V. Gopinath and during the same time to Pune by M. Avataram. Conversely, these two trips were not included in the 43 trips that Mahathi booked on behalf of the Vizag polices officers that I was provided the details and support.

6. Although I do not have direct evidence for why the production of the travel support documents was delayed and provided in batches by the defendants, typically in my experience as a fraud investigator this behavior is an indicator of potential manipulation or creation of support to defend a narrative.

Andor objects to Mr. Jenkins's methodology, arguing Mr. Jenkins acted as a "human calculator" who simply added up receipts to show only seventy-three percent of the trips booked by Mahathi employees for Indian police were reimbursed—meaning the Indian police did not reimburse Mahathi for twenty-seven percent of the travel expenses incurred during the investigation.[33] Andor argues experts are not needed to perform simple math, and we must exclude Mr. Jenkins's opinion. We agree with Andor as to Mr. Jenkins's calculations of reimbursement and travel costs and who paid for what. He is reciting the contents of documents and adding and subtracting expenses. There are no complicated extrapolations. He offers no specialized expertise. We exclude this opinion.

Mr. Jenkins also offers an opinion as to Andor's state of mind without direct evidence suggesting delay in production could indicate potential manipulation. Andor argues we must exclude Mr. Jenkins's opinion, in his experience as a fraud investigator, the delayed production of documents by Andor regarding the travel expenses "is an indicator of potential manipulation of create of support to defend a narrative."[34] Andor considers this an impermissible opinion on state of mind. We agree and exclude Mr. Jenkins's opinion the delay in production of documents is an indicator of manipulation. Any delay by counsel for Andor in producing documents cannot be attributed to it in the context of Allscripts's abuse of process claim. Such an opinion does not "fit" the abuse of process claim. We prelude Mr. Jenkins's proffered opinions.

### 2. We admit Zulfiquar Memon's proffered opinion testimony as to Indian criminal procedure and Mahathi's participation in the criminal process but exclude  opinions on the conduct of the Indian police.

Andor moves to exclude the opinion of Indian attorney Zulfiquar Memon.[35] Attorney Memon is the founder and managing partner of a law firm in Mumbai and New Delhi, India.[36] Attorney Memon defines the scope of his retention by Allscripts to: (1) "[explain] … Indian criminal procedure, including an explanation of a private citizen or company's role in Indian

criminal procedure;" (2) "[explain] … what qualifies as legal process in India;" (3) "[summarize]… Mahathi Software Pvt., Ltd.'s initiation of and participation in criminal proceedings in … India;" and (4) "[opine] on any procedural violations that may have taken place during the investigation carried out in India."[37]

Attorney Memon summarizes his opinion in eleven paragraphs, with the tenth paragraph containing twenty sub-paragraphs, concluding it is his opinion "there have been numerous violations by the Cyber Crime [Police Station] and Mahathi India of Indian law and procedure, as detailed in my report."[38] Andor objects to Attorney Memon's opinion for two reasons: (1) it is duplicative of Mr. Jenkins's opinion on the issue of Mahathi's payment of police travel expenses; and (2) it "nitpicks" the Indian police investigation and does not fit the issues of the case.

We disagree Attorney Memon's opinion is duplicative of Mr. Jenkins's opinion. Attorney Memon identified deviations from lawful processes in the investigation based, in part, on Mahathi's funding and sponsoring of a "substantial portion of the investigation."[39] Attorney Memon relied on Mr. Jenkins's report addressing the travel documents. Attorney Memon's opinion is not duplicative of Mr. Jenkins's opinion; Mr. Jenkins's opinion reviewed the financial documents and concluded the Indian police never reimbursed a portion of the travel expenses paid by Mahathi. This is entirely different than Attorney Memon's opinion the Mahathi-funded travel is impermissible under Indian law. But disagreeing with Andor on this duplicative argument does not necessarily mean we will allow this testimony as to violations of Indian law.

Andor next argues Attorney Memon's opinion "nitpicks" the Indian police investigation, citing, as examples, Attorney Memon's findings the Indian police:

- improperly treated the statements of Mr. Wakankar—the subject of Andor's criminal complaint—as a "confession statement" which can only be recorded before a Magistrate (rather than police) under India's rules of criminal procedure;[40]

- engaged in improper searches and seizures of Mr. Wakankar's laptop and mobile phone without a search warrant in violation of India's rules of criminal procedure;[41]

- provided an "unusual" letter to Mahathi confirming police paid for all their own travel;[42] and

- improperly prepared and promulgated two versions of the First Information Report for the case.[43]

Attorney Memon relied on these—and other findings in his 102-page report—to conclude Mahathi "participated in the legal process" and there were "numerous violations" of Indian law and procedure by the Indian cybercrime police and Mahathi. These are not "nitpicks" having nothing to do with case; these findings serve as the bases for Attorney Memon's opinion. It is sufficiently tied to the facts of the abuse of process claim and will aid the jury in resolving factual disputes. He may opine as to Mahathi's conduct assuming a foundation. But the conduct of the Indian police is not before us. The issue is whether Mahathi abused lawfully issued process in India. We preclude Attorney Memon opining on whether the Indian police did their job; Allscripts and its agents may be able to dispute the police conduct in the Indian proceedings in India, but not before us. Those arguments and opinions do not fit this case.

Attorney Memon may opine generally and only as previewed in his disclosed opinions, as to Indian criminal procedure, including an explanation of a private citizen or company's role in Indian criminal procedure and explaining what qualifies as legal process in India. We do not need him to summarize evidence of what Mahathi did in India. Fact witnesses will swear to the conduct. But he may opine as to whether Mahathi's conduct is consistent with his understanding of an alleged victim's rights under Indian cybercrime law without opining as to Mahathi's state of mind or the nature of the Indian police's conduct.

### 3. We exclude Harry Brandon's proffered opinion testimony except as to Mahathi's deviation from expected standards in arranging and paying for police travel.

Andor moves to exclude the opinion of Harry Brandon, a former Special Agent of the Federal Bureau of Investigation.[44] Mr. Brandon is a founder and current Chief Operating Officer of Kreller Smith Brandon, Inc., a professional consulting firm providing services including global due diligence, risk avoidance, corporate investigations, political risk assessments, security and safety assessments of operations, and business intelligence counsel and plans of action for international operations.[45] He is familiar with investigations in India through his work with the FBI and for Kreller Smith Brandon.

Mr. Brandon vaguely defines the scope of his retention by Allscripts to: (1) "provide background and opinions on the conduct and operations of the Indian police force ... generally and of the [Visakhapatnam City, India] police force specifically;" (2) "investigate the background of the police personnel involved in the Indian investigation of Allscripts and provide my conclusions and opinions from that investigation;" and (3) "offer my opinions on the India criminal investigation based on my background, education, experience, and training, and my review of the results of (a) my investigation[,] (b) the analysis of travel documents performed by Mark Jenkins, and (c) the description of India law provided by Zulfiquar Memon."[46]

It appears Mr. Brandon hopes to offer seven opinions/conclusions:[47]

100.    Having reviewed the travel details and documentation and investigated the background information of the members of the Vizag police force concerning the Allscripts investigation conducted in India, and the reports of Mark Jenkins and Zulfiquar Memon, it is my opinion that the investigation was not consistent with the ethics or expectations of police investigations in the U.S. Instead, the India criminal investigation was consistent with the often corrupt and heavily influenced investigations of the [Indian Police Force] generally and the Vizag police force more specifically.

101.    Based on my experience and knowledge, travel for Vizag cybersecurity investigations when there are cybersecurity units in the cities visited does not follow proper Indian police procedures.

102.    I have worked with Indian law enforcement at times for over 20 years and have never observed a complainant making flight reservations and/or paying for travel for police officers to investigate their complaint. In my opinion, this is a conflict of interest and inappropriate.

103.    The analysis of the travel documents and deposition testimony relating to the [*sic*] Mahathi's participation in the criminal investigation of Allscripts in India shows the indicia of corruption common in Indian criminal investigations. In my opinion, based on my background and experience, the investigation was corrupted by Mahathi's influence in the process and by the Indian police allowing themselves and their investigation to be corrupted (assuming they were not active participants in the corruption).

104.    Based on my experience and knowledge, the deviations from proper Indian legal procedure identified by Zulfiquar Memon further support and reinforce my opinion that the Indian investigation of Allscripts was corrupted and unreliable.

105.    The investigations we performed on litigation and adverse media on the individuals involved in the criminal investigation of Allscripts in India further support my opinion that the criminal investigation of Allscripts in India was corrupt and unreliable.

106.    To the extent Allscripts made any representations that the India criminal investigation was corrupt and/or that Defendants supported and participated in that investigation, or engaged in criminal or fraudulent conduct, it is my opinion that any such conclusions are reasonable and more likely than not true based on my education, training, and experience, and my review of the factual record, our investigation, and the conclusions of Mark Jenkins and Zulfiquar Memon, as described herein.

Andor moves to exclude these opinions because Mr. Brandon "retracted" his opinion Mahathi improperly influenced the criminal investigation and his opinions do not fit the issues.[48] Andor argues Mr. Brandon's "recantation of opinions … leaves only irrelevant opinions about generalized corruption in India, which don't fit the issues in this case."[49]

This is not a proper "fit" argument; it is the subject of cross-examination at trial. If Andor believes Mr. Brandon recanted his opinion, it may examine him at trial. The "fit" prong is satisfied when the expert's testimony is sufficiently tied to the facts to aid the jury in resolving the factual dispute. We apply Rule 702 liberally to admit expert testimony if it has the potential for assisting the jury as fact finder.

Mr. Brandon offers one opinion at paragraph 102 which we permit if not duplicative of Attorney Memon. Mr. Brandon may opine Mahathi's conduct in paying for police travel is not consistent with his understanding of the Indian cybercrime process. But the remainder of his opinions are wildly speculative and do not fit. The issue on the abuse of process claim is whether Mahathi and its affiliates used the Indian police or criminal justice system for an improper purpose in <u>this</u> case. Allscripts can persuade the jury as to this claim regardless of whether or how the Indian police did their job. Allscripts's fact witnesses can swear what happened in India but the jury is not deciding whether the Indian police are corrupt or whether the police abused the Indian criminal justice system. We are also not interested in whether Mahathi or the Indian police had some conflict of interest under Indian law. We are interested in whether Mahathi abused the system and Attorney Memon can set the standards.

We will allow Mr. Brandon to opine only as the payment of the police's travel expenses is not typical by alleged victims in the Indian cybercrime process. We otherwise preclude Mr. Brandon's proffered opinions.

**B. Andor's experts Attorneys Srividhya Ragavan and Susanah Naushad.**

**1. We allow limited portions of Attorney Ragavan's proffered opinion as to standards of the Indian criminal justice system and whether Mahathi deviated from those standards.**

Andor hopes to adduce an opinion from Attorney Srividhya Ragavan describing the Indian legal and criminal justice system. Andor retained Attorney Ragavan both as an affirmative expert and as a rebuttal expert to Allscripts's proffered expert Harry Brandon who opines India and its criminal justice system are systematically corrupt.[50] Attorney Ragavan's report identifies the scope of her retention: "I have been asked to respond to Allscripts' contention that the Indian legal and criminal justice system is susceptible to … alleged manipulation and abuse."[51] She offers her

opinion "India has a robust legal and judicial system which is well-equipped to deal with cyber breach and is not subject to the sort of improper influence and misuse Allscripts alleges here."[52]

Attorney Ragavan's report offers six "conclusions" which we construe as her opinion:[53]

(a) India has a robust, independent criminal justice system with protections for accused persons similar to due process protections in the U.S. India's criminal justice system is not susceptible to improper manipulation or abuse based on influence and connections, as Allscripts alleges;

(b) India has strong and well-developed protections for intellectual property and against cybercrimes, including hacking. These protections strongly encourage, and even require, victims of cybercrimes to report them to the relevant authorities, including by filing [a] [First Information Report], as Mahathi did here;

(c) Once the victim of a cybercrime files [a] [First Information Report], government authorities are responsible for pursuing the investigation and prosecution, much like in the US. Accused persons have ample "due process" protections, and decisions whether to move forward with, drop or dismiss a criminal charge rest with investigating authorities and the judicial system, not private parties such as the Defendants;

(d) State Government in India encourages reporting of violations because strong protection against cybercrime enhances states' abilities to attract jobs and economic benefits;

(e) International and Indian corporations value strong cybercrime protections and have recognized that India maintains a strong system; and

(f) The IT Act of India has detailed procedures for filing a complaint and for conducting an investigation.

Allscripts moves to exclude Attorney Ragavan's opinion for three reasons: (1) Attorney Ragavan is not qualified to offer an opinion on India's criminal procedure and criminal justice system; (2) her opinions are not relevant; and (3) her opinions are based on speculation.

Attorney Ragavan is qualified to render the opinion.[54] Allscripts argues Attorney Ragavan's opinions are not relevant and do not "fit" the allegations of either Andor's defense to Allscripts's abuse of process claim or Andor's counterclaims. Allscripts considers Attorney Ragavan's opinion as "character evidence of an entire country's legal and judicial system to argue that those specific individuals could not have done those specific things."[55] Andor responds

Attorney Ragavan will **not** offer an opinion applying "legal principles" to the facts of the case, and specifically will not offer an opinion on: (1) "whether a cyberattack occurred"; (2) "whether a crime occurred in this case"; (3) "whether Mahathi was a victim of a crime"; or (4) "what entity committed any purported crime."[56]

We will allow Attorney Ragavan to opine solely on the general framework of the Indian criminal justice system, including how a complaint is filed under India's Code of Criminal Procedure and the investigation procedure employed by the Indian police after a complainant files a criminal complaint. We will allow Attorney Ragavan to testify generally to India's Information Technology Act. Attorney Ragavan's general description of the Indian criminal process without her characterizations or suppositions (e.g., the Indian criminal justice system "is not susceptible to improper manipulation or abuse based on influence and connections, as Allscripts alleges"),[57] and conclusions at § G.(c) and (f) are sufficiently tied to the facts of Allscripts's abuse of process claim providing context to the jury to resolve the factual dispute.

We will not allow expert opinions characterizing India's legal system (conclusions at §G.(a) or (b)), the reasons why India state government encourages reporting of cybercrime (conclusion at § G.(d)), or the "value" International and Indian corporations place on India's "strong cybercrime protections and have recognized that India maintains a strong system" (conclusion at § G.(e)).

As a specific aid to the parties, we allow Attorney Ragavan to opine:

- "The registration of a complaint, initiates the role of § 156(1) of the [Indian Code of Criminal Procedure] which requires a police officer to investigate without any order from the magistrate.";[58]

- "When Mahathi filed a complaint, it necessarily triggered the events that Allscripts allege amount to an abuse of process under Delaware law, when in fact they were necessary steps to the statutory procedures in India.";[59]

14

- "[W]hen a criminal activity under a special enactment is suspected, reporting it by filing a complaint is the norm and practice.";[60]

- "[M]ahathi's actions were in line with §§ 66B & 66E of the IT Act, which outlines the punishment for 'retaining [] stolen computer resource or information, or violating privacy of others' [quoting the Information Technology Act]. Reporting the breach puts Mahathi in a good position to assert compliance of § 64 and § 66 read with § 8 of the IT Rules of sufficiently protecting the data involved";[61]

And Attorney Ragavan cannot opine:

- Mahathi, as a hacking victim, would construe the alleged hack as a cognizable offense mandating reporting to the police;[62]

- Mahathi's reporting can be construed as required under Indian law to show it did not knowingly or negligently cause a data violation nor ignore a breach of data;[63]

- "It does not seem plausible that Mahathi could use their 'influence' to improperly drive a prosecution action against an affiliate of a Fortune 500 company (Allscripts) – a company with a market capital of $2.583 billion and thousands of Indian employees, and with the means to hire one of the most prominent criminal attorneys in India";[64] and,

- "While the allegation is that Mahathi/Raj Toleti *bought* the system, it is Allscripts that is putting up the most expensive defense of corruption."[65]

Attorney Ragavan also seems to opine as to whether a fact is true: Mahathi did not sponsor either travel or lunch or cabs for the police."[66] We will not allow Attorney Ragavan to lend expertise to whether a fact is true; Andor must show this fact. Attorney Ragavan may opine as to whether the alleged payment of travel or lunch or cabs for the police is consistent with the practices in the Indian criminal justice system. Attorney Ragavan may rebut Harry Brandon's opinion as to the propriety in paying for these types of police costs but cannot make a fact finding as to whether it occurred. Harry Brandon assumes it did and opines the payments are not typical; Attorney Ragavan can also assume the payments occurred and opine on the propriety of Mahathi's conduct in the Indian criminal process. But Attorney Ragavan cannot tell the jury the payments did not occur.

### 2. We allow limited portions of Susanah Naushad's proffered opinion testimony.

Andor retained attorney Susanah Naushad to: (1) describe applicable Indian law; (2) "show" the investigation by the Indian police "was appropriate under the law" based on the facts as Attorney Naushad understands them; and (3) respond to "specific conclusions" of Allscripts's expert Attorney Memon. Allscripts concedes Attorney Naushad may testify to a "neutral description of Indian law" but seeks to preclude her testimony regarding the appropriateness of the Indian police investigation and to rebut certain opinions of Attorney Memon. [67] We again remind counsel the Indian police are not on trial. We will allow non-duplicative expert testimony on how the Indian criminal justice system operates and whether Mahathi's conduct varied from those standards.

Attorney Naushad identifies the scope of her retention: "I have been retained by [Andor] … to provide my statement on the Indian law pertaining to the legal framework of criminal investigation and trial in India, more specifically on the investigation of cybercrimes [sic] in India."[68] Attorney Naushad offers eighteen "conclusions" we consider her opinions:[69]

1. The complaint filed by Mahathi (revised on June 12, 2021 per the request of the investigating officers), and the commencement of investigation by the cyber-crime police in Vishakhapatnam pursuant to the [First Information Report], are in line with the procedure established by the [Code of Criminal Procedure in India].

2. Once the complaint or [First Information Report] is filed, the Indian criminal law machinery is set into motion. Police has [sic] the power to investigate crimes, and this is an independent inquiry. The Complainant can only assist in this investigation by providing necessary documents or information, however the Complainant can in no way influence the process of investigation.

3. There is no anomaly in the process of investigation followed by the cybercrime police in Vishakhapatnam. The powers of conducting investigation that are conferred on the police in accordance with the provisions of the [Code of Criminal Procedure] are exclusive to the police and are unfettered as long as the power is exercised within the provisions of the law. The present case has been investigated within the contours of the [Code of Criminal Procedure], and thus there is no reason to discredit the investigation.

16

4. Mahathi is a company registered under the (Indian) Companies Act, 1956 and has its registered office in Visakhapatnam. Thus, if Mahathi faced data breach pursuant to a hacking incident, Mahathi rightly filed the criminal complaints in Vishakhapatnam, India.

5. In fact, had Mahathi not filed a complaint after the incidence of data breach, it would likely fall afoul of its obligations under Section 43A of the [Information Technology] Act.

6. As per the [Code of Criminal Procedure], where certain elements of an offence are committed within India (even if all elements of the offence were not completed within Indian territory), the offence can be deemed to be an offence committed within India and may be tried by Indian Courts. Further, the both [sic] [Indian Penal Code] and the [Information Technology] Act provide that Indian courts will have jurisdiction to try cases where the the [sic] offence targets a computer resource located in India. Thus, Indian courts have the jurisdiction to try the present matter.

7. As per the Chargesheet, the Indian entity of Allscripts – M/s Allscripts India LLP was actively involved in the transactions relating to the [Statement of Work]. The nexus between M/s Allscripts India LLP and its American parent company, with respect to the [Statement of Work] and the alleged hacking is clear, basis the [sic] exchange of emails between the two companies with regard to a project that Mahathi executed for M/s Allscripts India LLP under the same [Statement of Work], the lack of financial autonomy of M/s Allscripts India LLP, and through emails of Ms. Catherine Spector, an employee of the parent M/s Allscripts Healthcare Solutions Inc, USA, giving instructions to Mr. Nihar Sheth who is an employee of M/s Allscripts India LLP, *vide* [sic] email dated 2 September 2021 to stay somewhere apart from his residence to avoid the police.

8. Therefore, on the basis of this nexus, it would be justifiable for the Vishakhapatnam police to investigate M/s Allscripts India LLP and its officials. The investigation by the cyber-crime unit into M/s Allscripts India LLP revealed enough *prima facie* evidence for them to continue investigating further, especially Mr. Wakankar who was the Director and Managing Partner of M/s Allscripts India LLP, for discerning relevant information and facts for the purposes of conducting a thorough investigation.

9. Further, as per the Chargesheet, Allscripts was found to be obstructing investigation and deleting evidence.

10. During investigation by the police, it was found that many emails which established the alleged breach and the involvement [sic] Mr. Wakankar and M/s. Allscripts India LLP in the entire scheme, were deleted.

11. The police tried to gather relevant information for the investigation in the case through issuing Section 91 and Section 41A notices. However, those notices were not complied

with. Mr. Wakankar and Mr. Pandya failed to appear before the police several times in violation of Section 41A notices.

12. Further, an email dated 2 September 2021 from Ms. Catherine Spector to Mr. Nihar Sheth telling to him [sic] to stay somewhere apart from his residence to avoid the police, in fact, shows *malafide* on part of Allscripts, and its intent to evade investigation.

13. Thus, by evading investigation, Allscripts left the police with little choice but to visit the Allscripts offices physically and procure the relevant information for the investigation. As per Indian law, the Indian police can carry out a surprise inspection, mainly at the premises of the accused, if they suspect that the accused is withholding information or other evidence.

14. A police officer, pursuant to the evaluation of the materials collected during the investigation, can file the charges/Chargesheet even if a *prima facie* case against the accused is being made out. At this stage, the police officer need not have enough evidence to prove that the accused is guilty beyond a reasonable doubt.

15. Based on the averments in the Chargesheet, there is *prima facie* cause to charge the accused persons under Sections 43, 65, 66, 66-B, 66-C, 66-D of the [Information Technology] Act and 204, 120B of the [Indian Penal Code], and proceed for trial.

16. Allscripts Healthcare Technologies (India) Private Limited filed a quashing petition titled *Allscripts Healthcare Technologies (India) Private Limited & Anr. v. State of Andhra Pradesh & Ors*., numbered Criminal Petition No. 4157 of 2021 before the Hon'ble High Court of Andhra Pradesh praying for quashing of the FIR. However, the Hon'ble Court was not aligned to grant Allscripts any relief, and the Chargesheet was eventually filed on 20 September 2021. This demonstrates that Allscripts claim [sic] that the FIR was based on false information given by Mahati [sic] and discloses no probable cause to investigate further, was dismissed by the Hon'ble the High Court of Andhra Pradesh.

17. After the Chargesheet was filed on 20 September 2021, *vide* order dated 22 September 2021, the Ld. Chief Metropolitan Magistrate, Vishakhapatnam took cognisance of the Chargesheet and issued summons to the accused persons. This demonstrates that even the Ld. Chief Metropolitan Magistrate, Vishakhapatnam found probable cause in the Chargesheet to proceed with the trial.

18. The burden of proof in criminal cases in India is on the prosecution. If the prosecution is not able to prove beyond reasonable doubt that the accused persons committed the offenses they have been charged with, the case will be dismissed. However, even if the case if [sic] dismissed at trial later, the same would not imply improper or biased investigation.

Allscripts moves to exclude Attorney Naushad's opinion for three reasons: (1) she is not qualified to offer an opinion on Indian criminal procedure;[70] (2) her opinions are not relevant;[71] and (3) her opinions are unreliable as based on speculation.[72] Allscripts argues even if Attorney Naushad's opinions are otherwise admissible, they must be excluded under Federal Rule of Evidence 403 because any probative value of her opinions is outweighed by confusion of the issues, misleading the jury, and unfair prejudice. Andor's response is, essentially, because Allscripts's expert Attorney Memon renders similar opinions, Attorney Naushad should be allowed to do the same.[73]

As we found with Attorney Ragavan, we will allow Attorney Naushad to opine solely on the general framework of the Indian criminal justice system, including how a complaint is filed under India's Code of Criminal Procedure and the investigation procedure employed by the Indian police after a complainant files a criminal complaint. We allow Attorney Naushad's opinions identified in conclusion one; the first sentence only of conclusion two; the first two sentences only of conclusion three; the first sentence only of conclusion four; conclusions six and fourteen; the first sentence only of conclusion seventeen; and the first sentence only of conclusion eighteen. All other sentences in conclusions two, three, four, seventeen, and eighteen are excluded. The opinions identified in conclusions five, seven, eight, nine, ten, eleven, twelve, thirteen, fifteen, and sixteen are excluded in their entirety as impermissible legal opinion.

### III.    We admit the lost profit opinions but preclude the damages experts from opining as to causation or simple mathematical calculations.

Each side proffers a damages expert. Allscripts proffers Ian Ratner and Andor proffers Brent Bersin. Each side makes the same principal argument to preclude the other side's expert: Their opinions are unreliable because the experts did not verify the data they entered into their damages calculations.

### A.  Allscripts's expert Ian Ratner.

Allscripts proffers damages expert Ian Ratner. Mr. Ratner is a certified public accountant with thirty years' experience in forensic accounting.[74] He reviewed filings, contracts between the parties, customer databases, Andor's pipeline reports, internal business presentations and financial documents occasioning the merger between Health Grid and Allscripts, and internal Allscripts payroll data to form his lost profits opinions.[75]

Mr. Ratner proffers five opinions:

1) Allscripts incurred $156,831 in costs to develop a new Config Tool after Andor failed to deliver a functioning Config Tool;[76]

2) Allscripts incurred $1,828,128 in costs to fix the functionality issues of the Mobile Patient Experience application acquired from Health Grid;[77]

3) Allscripts incurred $184,175 in costs to defend and mitigate the attacks on its technology;[78]

4) Allscripts lost between $92.8 million and $107.6 million in profits because of Andor's conduct;[79] and,

5) Andor received value of at least $53 million in unjust enrichment by avoiding research and development costs it would have incurred had it not misappropriated Allscripts's trade secrets.[80]

We admit Mr. Ratner's fourth opinion regarding Allscripts's lost profits. We also admit his fifth opinion regarding the value Andor received in unjust enrichment from misappropriating Allscripts's trade secrets. But we exclude his first three opinions, which require only basic math and do not help the jury.

### 1.  We admit Mr. Ratner's fourth and fifth opinions regarding Allscripts's lost profits.

Andor argues we must exclude Mr. Ratner's lost profits analysis as unreliable because Mr. Ratner relied upon Allscripts's internal projections without verifying them. Allscripts responds Mr. Ratner relied on documents regularly used by valuation experts which underwent extensive testing and research before their publication. We agree with Allscripts as to lost profits.

Mr. Ratner used "Merger Projections" included in a valuation of Health Grid conducted by Valuation Research Corporation in 2018 to calculate lost profits.[81] Valuation Research in turn based the Merger Projections on Health Grid's internal projections of revenues for 2018 to 2020 included in a PowerPoint presentation of Health Grid.[82] Mr. Ratner did not know the assumptions undergirding Health Grid's projections. Mr. Ratner did not know when the Merger Projections were created, who created them, the training and experience of those who created them, the information used to create the projections, and the purpose of the projections.[83] He did not know who at Health Grid provided Health Grid's projections to Valuation Research and did not know whether they were provided before or after the merger; he assumed someone on the "leadership team" provided the projections to Valuation Research.[84]

Valuation Research incorporated Health Grid's projections, which projected years 2018 to 2020, with slight changes. Valuation Research then extended the projections from 2021 to 2025.[85] Mr. Ratner assumed the validity of the Merger Projections from 2021 to 2025 by reading the Valuation Research report, his knowledge an "extensive review process" occasioned the report, and his "conversations with management" showing "everybody relied on" the Valuation Research projections.[86]

Valuation Research "relied on certain information furnished by" Health Grid which Valuation Research did not verify.[87] Mr. Ratner did not think Valuation Research accepted the Merger Projections "without any analysis" because Valuation Research did "whatever the standards call for" to review them.[88] Mr. Ratner has "general[]" familiarity with such "standards" as an accredited appraiser.[89] Mr. Ratner swore the people at Valuation Research who produced the report were "professional," so they must have "believe[d] that the information is reliable for accuracy [and] completeness."[90] Mr. Ratner did not review any papers of Valuation Research or

speak to the Valuation Research representatives who prepared the report.[91] Mr. Ratner swore he did not know "what all the material assumptions are" undergirding Health Grid's projections, but Valuation Research knew the material assumptions because it "reviewed the merger plan, [and] had discussions" as part of its "due diligence."[92] Mr. Ratner did not know what Valuation Research "specifically" did other than what it "said" it did.[93] Valuation Research "said" in its report it reviewed information "as deemed appropriate by" it; developed value for intangible assets of Health Grid; discussed intangible assets with Health Grid management; and, discussed past, present, and future operating and financial conditions with Health Grid management.[94] Mr. Ratner concluded "nothing unusual" existed in Valuation Research's report because it performed purchase price allocation consistent with his understanding of industry standards.[95] Mr. Ratner also deemed the Valuation Research numbers reliable because they went through the "valuation review process," in which another entity reviews the file for accuracy.[96]

To calculate lost profits, Mr. Ratner increased Allscripts's 2021 revenue of $16.868 million and assumed the revenue would increase each year "at the same growth rate as the yearly growth rates for the Merger Projections."[97] This assumption created a figure Mr. Ratner called the "Expected Actual Revenues." Mr. Ratner subtracted Allscripts's actual revenues from the Expected Actual Revenues, subtracted the costs Allscripts avoided, and multiplied by a discount factor to determine Allscripts's lost profits.[98] Mr. Ratner calculated one estimate of about $93 million in lost profits using lower avoided cost data; he calculated a second estimate of about $108 million in lost profits using high avoided cost data.[99]

Where an expert witness "rel[ies] upon the estimates of others" to form a lost damages opinion, "the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable."[100] The expert's reliance upon others' estimates need not be

"correct," it must only be "reliable."[101] Whether the expert "relied on the best data in forming his opinions is a question for the jury."[102] If a "rational connection" exists "between the data and the opinion . . . an expert's reliance on [allegedly] faulty information is a matter to be explored on cross-examination; it does not go to admissibility."[103]

We find Mr. Ratner's lost profits opinions admissible. Mr. Ratner's opinion implicates two decisions of our Court of Appeals regarding when a lost profits expert may rely upon "the estimates of others" to calculate lost profits.[104] We first explain our Court of Appeals's guidance regarding reliability of lost profit opinions. We then apply the guidance to Mr. Ratner.

First, in *ZF Meritor, LLC v. Eaton Corp.*,[105] our Court of Appeals affirmed exclusion of an expert's lost profits analysis where the expert simply "relied on a one-page set of profit and volume projections without knowing the circumstances under which such projections were created or the assumptions on which they were based."[106] Our Court of Appeals acknowledged experts "regularly and reasonably rel[y] upon" a "company's internal financial projections" because "[b]usinesses are generally well-informed about the industries in which they operate, and have incentives to develop accurate projections."[107] But an expert's reliance upon such projections is appropriate only if the expert can "explain why he relied on such estimates" and "demonstrate why he believed the estimates were reliable."[108] Our Court of Appeals affirmed Judge Robinson's exclusion of the expert's lost profits analysis because the expert "was unaware of the qualifications of the individuals who prepared" the estimates and "the assumptions on which the estimates were based."[109] While the expert "was generally aware of the circumstances under which" the one-page estimate "was created and the purposes for which it was used, he lacked critical information" necessary for effective cross-examination.[110] For example, the expert knew "experienced management professionals" presented the estimates to the board of a company, but he "did not

know who initially calculated" the estimates, the "methodology used to create" the estimates, or "the assumptions on which the" estimates were based.[111] Several judges have reasoned similarly to *ZF Meritor* by excluding lost profits opinions where the experts lack "personal knowledge of the assumptions" or "qualifications of those persons in charge of making the assumptions."[112]

About four years after *ZF Meritor*, our Court of Appeals in *In re SemCrude L.P.* affirmed Judge Robinson's order admitting a lost profit expert's report where the expert relied on a company's business plan to calculate lost profits.[113] The expert opined on the insolvency of a company by relying on a valuation prepared by well-known investment bank Goldman Sachs.[114] Our Court of Appeals distinguished the expert's analysis from the *ZF Meritor* analysis in three ways: (1) Goldman Sachs valuated the company in anticipation of a securities offering, which required Goldman Sachs to perform "significant due diligence in connection with its valuation efforts" not prepared in anticipation of litigation; (2) the expert previously worked for Goldman Sachs and possessed familiarity with its valuation practices; and (3) the expert "did not simply adopt the Goldman Sachs' evaluation as his own"; rather, he "used his own analysis and judgment to adjust" the report to account for facts in the case.[115] Our Court of Appeals concluded by reminding us expert testimony need not be "correct," it must only be "reliable."[116] Our colleagues cite similar reasons to admit expert testimony which does not uncritically adopt others' estimates.[117]

We apply the guidance found in these two appellate decisions to find Mr. Ratner adequately explains his reasons for relying on the Merger Projections adopted by Valuation Research. Mr. Ratner explained at his deposition he found the Merger Projections valid because Valuation Research adopted them after performing due diligence. Mr. Ratner noted the Valuation Research Merger Projections constituted a GAAP-compliant valuation of a publicly traded company's

merger. Mr. Ratner cited an "extensive review process" preceding the Valuation Research report which included a third party's review of Valuation Research's work. Mr. Ratner's conversations with Allscripts's management showed "everybody relied on" the Merger Projections to effectuate the merger. Mr. Ratner felt satisfied Valuation Research verified the Merger Projections using industry standards with which he possesses familiarity. For example, the Valuation Research report confirmed it reviewed information "as deemed appropriate by" Valuation Research; developed value for intangible assets of Health Grid; discussed intangible assets with Health Grid management; and discussed past, present, and future operating and financial conditions with Health Grid management. Valuation Research disclosed the qualifications and certifications of the two professionals who led the valuation, which Mr. Ratner confirmed in his sworn testimony. Mr. Ratner concluded "nothing unusual" existed in Valuation Research's report because its valuation is consistent with Mr. Ratner's understanding of industry standards.

Mr. Ratner's lost profits analysis resembles the analysis admitted in *SemCrude*. The three bases upon which our Court of Appeals distinguished *SemCrude* from *ZF Meritor* exist in some form here. First, Mr. Ratner did not "simply 'rel[y] on a one-page set of profit and volume projections' to calculate damages."[118] He, like the expert in *SemCrude*, relied on Valuation Research's adoption of those projections "contemporaneously prepared" around Health Grid's merger with Allscripts not "in anticipation of litigation."[119] Mr. Ratner, like the *SemCrude* expert, relied on Valuation Research's use of the Merger Projections because Valuation Research undertook "significant due diligence" to publish a GAAP-compliant valuation of a publicly traded company's merger. Valuation Research's stamp of approval distinguishes this case from the one-page set of unverified projections upon which the expert relied in *ZF Meritor*. Second, Mr. Ratner possesses experience comparable to the experience of the valuators who prepared the Valuation

Research report. While Mr. Ratner never worked at Valuation Research like the *SemCrude* expert worked at Goldman Sachs, Mr. Ratner still possesses enough experience in the field to know the methods undergirding Valuation Research's due diligence. Third, Mr. Ratner "did not simply adopt the [Valuation Research report] as his own."[120] Mr. Ratner swore as to his reasons for finding the data in the Valuation Research report reliable. He applied his judgment and experience in the field to determine Valuation Research's adoption of the Merger Projections made the Merger Projections reliable. This satisfies us Mr. Ratner's methods are reliable enough to be admitted.

To be sure, Mr. Ratner's opinion bears several similarities to the opinion excluded in *ZF Meritor*. Mr. Ratner's opinion, for example, relies on underlying Health Grid projections which are themselves only one page. And Mr. Ratner did not know who at Health Grid created the Health Grid projections or the methodology undergirding the Health Grid projections. But these similarities do not warrant exclusion. Our Court of Appeals in *ZF Meritor* did not hold an expert's opinion is always unreliable when the expert does not know the methodology ungirding the projections. Our Court of Appeals rather found the district court did not err under a "deferential abuse of discretion standard" by excluding such testimony.[121] This analysis does not mean judges *do* abuse their discretion by admitting evidence possessing some of the same flaws as the evidence in *ZF Meritor*.[122] Indeed, our Court of Appeals in *ZF Meritor* reminded us economists "regularly and reasonably" rely upon "a company's internal financial projections" to calculate lost profits because such projections "often serve as legitimate bases for expert opinions."[123] As Judge Sannes in the Northern District of New York recently found, "*ZF Meritor* is not the typical case; rather, it represents an extreme category of cases in which the data relied on by an expert is so patently unreliable as to render it inadmissible."[124] We must interpret *ZF Meritor* in the context of our Court of Appeals's broader interpretation of the Federal Rules of Evidence: to "encourage the use

of expert testimony to render trials more rational and efficient."[125] Andor can vigorously cross-examine Mr. Ratner about his reliance on the Merger Projections. The jury will decide whether Mr. Ratner's reliance is "correct,"[126] or relies upon the "best data."[127]

### 2. We admit Mr. Ratner's opinions regarding Andor's avoided costs from allegedly misappropriating Allscripts's trade secrets.

Mr. Ratner also opined regarding the value of the trade secrets Andor allegedly misappropriated from Allscripts. He measured the value to Andor by measuring the value of its avoided costs by misappropriating the trade secrets.[128] To do so, Mr. Ratner reviewed HealthGrid's "historical financial statements" before its sale to Allscripts to identify HealthGrid's research and development costs. Mr. Ratner concluded Andor avoided $53 million in costs.[129] Mr. Ratner swore he did not allocate the avoided costs among different trade secrets.[130] He instead used "an expansive definition of trade secrets" to value "[a]ll of the things acquired" by Allscripts.[131]

Andor moves to exclude Mr. Ratner's opinion regarding costs Andor avoided by misappropriating trade secrets because Mr. Ratner did not identify individual trade secrets which Andor misappropriated, but instead quantifies the value of Health Grid's entire business as a trade secret. Andor argues Mr. Ratner did not limit its avoided costs simply to trade secrets: He instead assumed the entirety of Health Grid's business constituted a trade secret. Allscripts responds no requirement exists experts must allocate damages among the specific trade secrets at issue. We agree with Allscripts.

Andor's argument to exclude Mr. Ratner's opinion amounts to a disagreement with his valuation of the trade secrets at issue. Mr. Ratner essentially evaluated Health Grid's entire business as a trade secret. While this might constitute grounds for effective cross-examination, it does not render his opinion unreliable because experts need not apportion damages among different trade secrets.[132] Requiring Mr. Ratner to apportion the damages for misappropriating

27

trade secrets among the trade secrets would require Mr. Ratner to offer opinions regarding technical trade secret analysis which he appears unqualified to provide. Allscripts must provide fact evidence Andor misappropriated specific trade secrets before the jury may consider Mr. Ratner's opinion on trade secrets. We may offer a limiting instruction if requested.[133]

### 3. We exclude the opinions in sections 7.1, 7.2, and 7.3 of Mr. Ratner's report because they do not help the jury.

Andor challenges Mr. Ratner's damages calculations which simply perform math. In Sections 7.1, 7.2, and 7.3 of his report, Mr. Ratner respectively calculates damages for Allscripts's payments to develop a "Config Tool" after Andor failed to deliver a functioning Config Tool; Allscripts's payments to fix the functionality of the Mobile Patient Experience; and Allscripts's costs to defend against Andor's alleged mobile app attacks.[134]

Andor argues Mr. Ratner's calculations are mere math. Allscripts does not respond to this portion of Andor's motion. We agree with Andor.

In Section 7.1 of his opinion, Mr. Ratner analyzed two things to calculate Allscripts's damages for developing a "Config Tool": (1) a "data export" from Allscripts's "time keeping system . . . summarizing the hours worked by Allscripts' employees to develop the Config Tool"; and (2) "[p]ayroll data" showing "the pay rates for Allscripts programmers."[135] Mr. Ratner used the payroll data to "calculate[] an average pay rate" for Allscripts's programmers.[136] Mr. Ratner then multiplied the average pay rate by the number of hours shown in the data export. Mr. Ratner opined this calculation resulted in $156,831 in damages for Allscripts to develop its own Config Tool.[137] In Section 7.2 of his opinion, Mr. Ratner performed a similar equation to calculate Allscripts's payments to fix the Mobile Patient Experience applications. Mr. Ratner reviewed a "data export" of time Allscripts's employees worked and "[p]ayroll data" about pay rates.[138] He calculated an average pay rate, multiplied it by hours worked, and concluded Allscripts spent

$1,828,128 to fix the Mobile Patient Experience functionality.[139] And in Section 7.3, Mr. Ratner calculated Allscripts's costs to respond to the mobile app attacks by reviewing a data export, results of an Allscripts investigation revealing how many hours higher-level employees worked, and payroll data.[140] He concluded it cost Allscripts $184,175 to respond to the attacks.

We exclude these opinions because they constitute basic mathematics which do not help the jury. An expert witness is not required to perform basic addition and multiplication because those tasks do not require "specialized knowledge outside a juror's common understanding."[141] Counsel asked Mr. Ratner at his deposition if he did anything "other than add[ing] the amounts that Allscripts provided" to determine the Config Tool damages.[142] Mr. Ratner answered: "No."[143] He simply added the hours provided, calculated an average pay rate from the pay rate provided, and multiplied those two totals to determine damages. Mr. Ratner's report discloses the same methodology to calculate Allscripts's costs to fix its Mobile Patient Experience functionality and to respond to the attacks. It required no specialized knowledge to gather the input data used for these calculations: Allscripts provided the data to Mr. Ratner and he simply calculated it. Our colleagues regularly exclude such testimony because "[m]ultiplication is not a specialized form of knowledge that a jury lacks or a scientific technique that a jury is incapable of performing."[144]

Allscripts provides no reason why we should admit this evidence; its Response to Andor's Motion says nothing about Sections 7.1, 7.2, and 7.3 of Mr. Ratner's opinion.

We exclude these opinions.

### B. Andor's expert Brent Bersin.

Brent Bersin proffers opinions on Andor's lost profits from losing four opportunities but for Allscripts's alleged interference. Mr. Bersin opines Andor lost "at least four significant business opportunities" with companies Optum and Northwell "due to Allscripts' lawsuit and related alleged conduct and interference."[145]

Mr. Bersin concluded Andor lost $6.68 million from losing the Optum telehealth opportunity. Optum is a company which provides "technology-enabled healthcare solutions and services."[146] Andor evidently had two business opportunities with Optum: an opportunity to "provid[e] telehealth services" and an opportunity to replace "its installed base of GrandPad tablets," a telehealth device senior patients use to "increase engagement and connections between caregivers and older adults."[147] Mr. Bersin described five steps he used to calculate lost profits from Andor missing out on the telehealth services opportunity: (1) calculating a contractual period of three years "based on the representations of Andor's executives regarding expected start date and proposed agreement length consistent with terms of Andor customer agreements"; (2) finding Andor would have licensed at least 10,000 Optum physicians at a certain cost per physician per month "[b]ased on discussions with Andor's executives, Andor's pricing model, and its sales pipeline report;" (3) finding Andor would need a full-time development/solution engineer to support physicians to whom Andor licensed its telehealth at a certain cost per physician based on "analysis and investigation of Andor's projections and 2022 financial data and discussions with Shane Streufert," Andor's chief financial officer; (4) calculating hosting fees per physician per month based on "analysis and investigation of Andor's projections and 2021 financial data, and discussions with" Mr. Streufert; and (5) applying a discount rate of 10% to account for present value.[148]

Mr. Bersin also opined Andor lost $15.41 million from losing the Optum GrandPad opportunity. Mr. Bersin also used a similar five-step process to calculate these lost profits: (1) calculating a three-year period; (2) opining Andor would have replaced and supported 50,000 GrandPad users at a certain cost per month based on "discussions with Andor's executives," "communications from Microsoft," "and deposition testimony of Noel Khirsumkhani," Andor's

chief growth officer; (3) needing one full-time development/solution engineer for licensed physicians at a certain cost per physician, plus licensed physicians to support the GrandPad users requiring an additional full-time engineer; (4) certain hosting fees of per physician; and (5) applying a 10% discount rate.[149]

Andor also had two opportunities to do business with Northwell, the largest healthcare provider in New York: an opportunity to license Andor's telehealth module to Northwell physicians, and an exclusive licensing arrangement to develop and market Northwell's proprietary product "Nora," a virtual assistant for clinicians.[150] Mr. Bersin concluded Andor lost $1.95 million in profits from losing the Northwell telehealth opportunity. Like the Optum opportunities, Mr. Bersin described five steps he used to calculate Andor's lost profits from the Northwell telehealth opportunity: (1) calculating a three-year time period based on conversations with Andor executives, (2) opining Andor would have licensed 3,504 Northwell physicians at a certain cost per physician per month based on discussion with Andor executives, (3) opining a full-time engineer would be required to support physicians at a certain cost per engineer based on his analysis and investigation of Andor's projections and 2021 financial data and discussion with Andor's chief financial officer Streufert, (4) calculating hosting fees of per physician per month based on his analysis and investigation of Andor's projections and 2021 financial data and discussions with Andor's Streufert, and (5) applying a 10% discount rate.[151]

Mr. Bersin concluded Andor lost $42.4 million from the lost Nora opportunity.[152] Mr. Bersin described six steps he used to calculate lost profits from the Nora opportunity: (1) calculating annual lost revenue using target sales from a term sheet between Northwell and Andor based on negotiations to determine "realistically achievable sales targets"; (2) considering royalties to Northwell of 50% of Andor's gross sales during the initial term of the would-be licensing

agreement with Northwell, followed by a 5% royalty in the next three years of the agreement, according to the term sheet; (3) considering sales commissions to Andor for the first year of the agreement; (4) calculating no expense to Andor related to maintenance or research and development; (5) calculating five engineers at a certain cost each to support the Nora software; and (6) applying a 10.5% discount rate.[153]

We admit Mr. Bersin's opinions regarding Andor's lost profits. We exclude his opinions to the extent he attempts to opine as to the legal causes of Andor's alleged harms.

### 1.   We admit Mr. Bersin's lost profits opinions.

Allscripts argues Mr. Bersin employed unreliable methodology. As to the Optum telehealth deal, Allscripts argues Mr. Bersin simply accepted what Andor told him to calculate his lost profit input data. Allscripts argues Mr. Bersin used an inflated monthly fee per physician even though Optum itself projected a lower monthly fee per physician. Allscripts makes the same arguments as to the other three opportunities Mr. Bersin evaluated: he simply accepted what Andor told him about its prospects regarding the Optum GrandPad, Northwell's telehealth licensing, and Northwell's Nora opportunities, and used Andor's unverified projections to form his input data.

We disagree and find Mr. Bersin's lost profits opinions reliable subject to fulsome cross-examination. Mr. Bersin's lost profit opinions, like Mr. Ratner's opinion, also implicate our Court of Appeals's findings in *ZF Meritor* and *SemCrude*. Mr. Bersin's opinion is analogous to the admissible opinion in *SemCrude*. Mr. Bersin did not "blindly accept" Andor's profit estimates "without question."[154] Mr. Bersin instead analyzed Andor's internal data prepared in the regular course of business and not for litigation to determine its estimated profits from its projections. Mr. Bersin discussed the projections with Andor executives, reviewed deposition testimony regarding the deals, and reviewed the paperwork prepared explaining the goals of the deals. Mr. Bersin explained the documents and data he relied upon during his deposition. Judges regularly admit

opinions like Mr. Bersin's where the expert explains what data he relied upon to form his lost profit opinion.[155] We join our colleagues and admit Mr. Bersin's opinion.

Allscripts argues Andor's data is wrong because Andor, a relatively young company which had never turned an annual profit, could not have made as much money as the data projected. But as we explained in admitting Mr. Ratner's opinion, we must not decide whether Mr. Bersin's reliance on Andor's data is "correct," only whether it is reliable.[156] Mr. Bersin provided sufficient reasons for his reliance on Andor's data. Allscripts may explore the correctness of the data on cross-examination.[157]

### 2. Mr. Bersin cannot testify as to the legal cause of Andor's harms.

But Mr. Bersin tries to go too far. We exclude Mr. Bersin's opinions to the extent he opines regarding the legal cause of Andor's harms. Allscripts also moves to exclude portions of Mr. Bersin's opinion in which he opines regarding the cause of Andor's harms. We agree Mr. Bersin cannot opine regarding causation. Andor concedes Mr. Bersin may not offer opinions regarding the cause of the lost business opportunities. It is unclear at points of Mr. Bersin's opinion whether he opines regarding the cause of the lost business opportunities or assumes Allscripts caused the lost opportunities. The former is improper; the latter is proper.[158] Mr. Bersin cannot opine regarding the cause of the lost business opportunities.

### IV.   We permit portions of expert testimony about Microsoft Azure, the May 2021 "attack," and portions of the parties' source code experts' opinions, but we exclude improper legal opinions and opinions on intent or state of mind.

#### A.  Allscripts's experts Terry Rankhorn and Sam Youness.

Allscripts engaged two experts to offer opinions about Microsoft Azure and the May 2021 "attack" on the shared workspace: Terry Rankhorn and Sam Youness. Mr. Rankhorn offers eight "opinions" regarding the May 2021 attack and who owns the Microsoft Azure "environment" or "tenant."[159] He generally opines Andor, Mahathi, and Messrs. Toleti and Tyriver attacked

33

Allscripts's applications, making them inaccessible to Allscripts's customers and causing damage to them; they did so without consent or authorization; they do not own the environment or tenant; they caused damage in excess of $5,000; and their conduct violated various statutes.[160] Mr. Youness offers six opinions regarding Microsoft Azure, Microsoft Azure tenants including who owns a tenant, and whether Allscripts had authorization to block Mahathi from accessing the tenant.[161] Andor moves to preclude Messrs. Rankhorn and Youness' opinions because: (1) Mr. Rankhorn is unqualified; (2) Messrs. Rankhorn and Youness' opinions are unsupported and thus unreliable; and (3) both offer improper legal opinions.[162] There is much to unpack as the lawyers hope to explain complicated computer programming and engineering to eight jurors.

      **1.**   **Mr. Rankhorn is not qualified to opine broadly about Microsoft Azure tenants but may opine as to the nature of the conduct by the parties affecting the tenant.**

Andor first argues Mr. Rankhorn is not qualified to offer opinions regarding Microsoft Azure tenants, specifically the "multiple opinions regarding Microsoft Azure tenants including what tenants are, the relationship between tenants and subscriptions, ownership of tenants, and whether Defendants' actions regarding the tenant were 'lawful.'"[163] Andor contends Mr. Rankhorn merely took a ninety-four-minute online course on "Azure fundamentals" and then experimented online using a tenant for the purposes of this litigation.[164] Thus, Mr. Rankhorn's opinions regarding the tenant are inadmissible because he is unqualified to opine on them.[165] Allscripts does not specifically address Andor's argument regarding the online course taken on Azure tenants.[166] Allscripts instead argues Mr. Rankhorn is a "former special agent with the" Federal Bureau of Investigation (FBI) who retired recently "after more than [twenty years of service]" during which time he "investigated cyber-attacks . . . reviewed and analyzed log files, databased [*sic*], metadata, and other digital information, and interviewed witnesses and reviewed other information as part of

those investigations."[167] Allscripts contends he formed his opinions based on his FBI-related expertise.[168]

Experts are qualified if they "possess specialized expertise," and our Court of Appeals interprets this requirement "liberally."[169] "[A] broad range of knowledge, skills, and training qualify an expert."[170] We should not "impos[e] overly rigorous requirements of expertise"; "more generalized qualifications" suffice.[171] But while generalized qualifications are sufficient, "more specific knowledge is required to support more specific opinions."[172]

Andor does not challenge Mr. Rankhorn's qualifications to offer *any* opinions in this case; just those regarding Microsoft Azure tenants. We agree Mr. Rankhorn is not an expert on Microsoft Azure tenants and cannot opine about "what tenants are, the relationship between tenants and subscriptions, [and] ownership of tenants."[173]

Mr. Rankhorn served as a special agent in the FBI for twenty-one years.[174] During his employment he investigated cybercrime matters including violations of the Computer Fraud and Abuse Act.[175] Mr. Rankhorn also worked as a computer forensic examiner and computer forensic laboratory manager with the FBI.[176] Mr. Rankhorn has experience "locating and analyzing logs, databases and file metadata" as well as "collecting and reviewing log files showing evidence of unauthorized access to data."[177] He developed and taught various courses regarding cybercrimes and attacks.[178] Mr. Rankhorn wrote "multiple log analysis tools for use on complex investigations where thousands of pages of logs required analysis."[179] Mr. Rankhorn also served on the FBI's "Black Bag" team "tasked with court-sanctioned break-ins into the hardest targets of the FBI."[180] His "specific function was to penetrate the secure network of the targets and disable their security system or install authorized monitoring software tools."[181] Mr. Rankhorn holds a "Bachelor of Science degree in occupational technology . . . and a Master of Science degree in Information

Systems."[182] Mr. Rankhorn started providing "security, investigative consulting services" in September 2021 through his business, Rankhorn & Associates.[183]

Allscripts argues without citation Mr. Rankhorn's opinions are "based on [his FBI] experience."[184] But Mr. Rankhorn's sworn testimony confirms the opposite. The opinions Andor seeks to exclude focus on "what tenants are, the relationship between tenants and subscriptions, [and] ownership of tenants."[185] Mr. Rankhorn swore he never consulted on a case involving Azure tenants, never performed investigations regarding Microsoft Azure tenants, and is not an expert in the infrastructure and setup of Microsoft Azure tenants.[186] He swore he is "an expert in analyzing the logs, looking at the information, and consolidating that as [he] did in the FBI to provide a picture of what happened."[187]

Mr. Rankhorn's knowledge about Microsoft Azure did not come from the FBI; it rather came from taking an introductory course of Microsoft Azure, creating a tenant and experimenting with it, and consulting with Allscripts's other expert, Mr. Youness.[188] He swears his understanding of tenants and subscriptions is "informed by Mr. Youness," not by his experience as an FBI agent or as a cybersecurity consultant.[189] Mr. Rankhorn offers specific opinions about Microsoft Azure tenants and subscriptions for which he lacks qualifications. His general qualifications for investigating computer hacking and/or cybercrimes do not lend themselves to his specific opinions here. We exclude his specific opinions about "what tenants are, the relationship between tenants and subscriptions, [and] ownership of tenants" because he lacks qualifications to offer them.[190]

But Andor also seeks to exclude Mr. Rankhorn's opinions about "whether Defendants' actions regarding the tenant were 'lawful'" arguing he is unqualified.[191] Andor cites Mr. Rankhorn's sworn testimony it is important to understand the Microsoft Azure infrastructure when analyzing the actions which occurred within the tenant but acknowledging he is not an expert in

the infrastructure.[192] Andor thus argues Mr. Rankhorn is unqualified to offer his opinions regarding what happened during the May 2021 cyberattacks alleged to have occurred by both sides in this case.

We disagree; Andor is asking for too much. Andor is correct Mr. Rankhorn cannot opine as to whether actions are lawful. But Mr. Rankhorn is undoubtedly qualified to offer his opinions about what happened in and/or surrounding the Microsoft Azure tenants and subscriptions during the "attack" in the May 2021 timeframe (without explaining what a tenant is, subscription is, or who owned the tenant). His general qualifications qualify him to testify to these matters. Andor's objection is functionally requesting we require Mr. Rankhorn to have a subspecialty of investigating cybercrime which specifically occurs in and/or surrounding a Microsoft Azure tenant. This is not required under *Daubert*; we would abuse our discretion if we required it.[193] Andor's argument is really a reliability challenge. But we deny Andor's challenge to Mr. Rankhorn's qualifications in this regard. Mr. Rankhorn is qualified to testify as to the actions constituting the May 2021 cyber "attacks" alleged by each side but not as to whether those actions are lawful.

### 2. Mr. Youness' and Mr. Rankhorn's opinions are supported.

Andor argues Mr. Youness' and Mr. Rankhorn's opinions are unsupported. Andor argues Mr. Youness' opinions about Microsoft Azure are unsupported because they are premised on "unsupported assertions."[194] Andor argues Mr. Youness cites no studies, surveys, or other documents to support his "*ipse dixit* about what people in the industry 'mean' when they refer to a tenant."[195] Andor lastly argues Mr. Youness fails to square his "unsupported views with official and contradictory Microsoft documents."[196] Allscripts counters Mr. Youness is a highly qualified expert who worked for Microsoft for twelve years and as a Microsoft consultant after leaving Microsoft, specifically in the Azure cloud computing space.[197] Mr. Youness testified on behalf of

Microsoft as an expert, and his expertise comes from his experience working with Microsoft Azure.[198] Allscripts argues Mr. Youness relies upon documents to support his opinions, and even if he did not, Mr. Youness can rely upon his experience to form his opinions.[199] Allscripts lastly argues any reference to contradictory documents is a matter for cross examination.[200] We agree with Allscripts.

Andor's argument Mr. Youness' opinion is unsupported and thus unreliable is based on the false premise Mr. Youness cannot form an opinion based on his knowledge and experience in a specific field. Andor demands Mr. Youness' opinions be supported by "studies, surveys, or other documents."[201] But the Supreme Court and our Court of Appeals make clear the non-exhaustive *Daubert* factors used to assess an expert's methodology for non-scientific testimony "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony."[202] And when an expert testifies about non-scientific matters, as here, our inquiry on reliability focuses on "personal knowledge and experience of the witness" and how the expert applies the experience to the facts of the case.[203] Mr. Youness' opinions are reliable.

Mr. Youness swore in response to Andor's extensive questioning his opinions are based on his "significant" experience working in the industry "for more than [twenty-six] years, working on Microsoft Azure for more than a dozen years," working with "literally hundreds of partners and customers over the years and working with literally hundreds, if not thousands of IT professionals."[204] We agree Mr. Youness has extensive qualifications.[205] He worked for Microsoft for over twelve years with five years specifically focused on cloud computing including Microsoft Azure; he led a project at Microsoft to accelerate adoption of Microsoft Azure leading to commitments of $80 million during the first year; after leaving Microsoft he worked as an Azure

expert consultant for a company in Michigan "helping their staff and customers on many projects build the best architectural solutions for their requirements and use cases"; he currently consults with a large automotive original equipment manufacturer on a project for which the "system backend is built on Microsoft Azure cloud services and infrastructure"; he has had multiple speaking engagements relating to Microsoft Azure; and he teaches classes in which he uses Microsoft Azure to instruct his students.[206] Based on this experience, Mr. Youness opines about who owns tenants and what people mean when they use the word "tenant" in the IT industry. Mr. Youness' opinions are not *ipse dixit*; they are grounded in his industry experience and thus reliable.[207]

Andor next argues Mr. Youness fails to "square his unsupported opinions with official and contradictory Microsoft documents."[208] Allscripts disagrees and counters this is grounds for cross-examination, not a basis for exclusion. We agree with Allscripts. We disagree with Andor's contention Mr. Youness does not square his opinions with documents Mahathi perceives as contradictory to Mr. Youness's opinions.[209] Andor's argument better reads "Mr. Youness fails to square his opinions with contradictory documents *to our satisfaction*." Andor thus takes issue with "the facts underlying [Mr. Youness'] opinions and on his opinions to the extent [they] . . . ignore purportedly contrary facts of record."[210] As our colleague Judge Mariani recently found, this is proper grounds for cross-examination, not a basis for exclusion.[211]

Andor next argues Mr. Rankhorn's opinions are "entire[ly] bas[ed]" on Mr. Youness' unsupported assertions.[212] Allscripts disagrees, arguing Mr. Rankhorn formed his opinions based on his experience and knowledge and could rely on Mr. Youness' opinions regarding Microsoft Azure in forming his own. We agree with Allscripts. We already concluded Mr. Youness' opinions are not unsupported. We disagree with Andor's characterization of Mr. Rankhorn's "unblinking

reliance" or "blindly adopt[ing]" Mr. Youness' opinions.[213] Mr. Rankhorn formed his opinions based on his own expertise while using Mr. Youness' opinions and expertise about Microsoft Azure, an area in which Mr. Rankhorn is admittedly not an expert. This opinion is permitted.[214]

### 3. We exclude improper legal opinions, state of mind opinions, and interpretations of contracts.

Andor argues we should exclude Messrs. Youness' and Rankhorn's opinions about who owned the Microsoft Azure tenant based on their interpretations of the Merger Agreement.[215] Allscripts counters with a long-winded argument which boils down to "they did it, so we can too."[216] We agree Messrs. Rankhorn and Youness cannot testify about their interpretations of the Merger Agreement. But to the extent their opinions about who owns the Azure tenant are based on sources other than the Merger Agreement, we do not exclude the opinion. Messrs. Rankhorn and Youness simply may not testify about their interpretation of a contract and the rights and obligations of the parties based on their interpretation.

Experts are not permitted to render a legal opinion or testify as to "legal duties, standards or ramifications arising from a contract."[217] Experts may, however, testify about an agreement where the testimony does not constitute a legal opinion or where the expert does not offer opinions as to "the scope and meaning of the Agreement and its terms."[218] An expert cannot offer an opinion as to the "legal effect of the [contract]."[219]

The opinions Andor seeks to exclude are opinions about the legal effect of the Merger Agreement, *i.e.* the Merger Agreement transferred certain assets to Allscripts. Messrs. Rankhorn and Youness offer opinions as to the scope and meaning of the Merger Agreement.[220] We exclude this testimony. We are not persuaded by Allscripts's response—they did it, so we can too. We will not permit an expert to testify as to the meaning of, and rights and obligations arising from, the

Merger Agreement or any other contract. This is improper expert testimony which invades the jury's province.

Andor next moves to exclude opinions about Andor's "ill motive" and "intent."[221] Andor cites testimony and Messrs. Rankhorn and Youness' written reports where they opine Andor acted with ill intent.[222] Allscripts responds it does not know what "state of mind" testimony Andor seeks to exclude, but it is permitted in any event.[223] We agree with Andor. "Expert testimony as to intent, motive, or state of mind offers no more than the drawing of an inference from the facts of the case . . . and permitting expert testimony on this subject would be merely substituting the expert's judgment for the jury's and would not be helpful to the jury."[224] We exclude any opinion relating to intent, motive, or state of mind.

Andor last moves to exclude opinions it violated statutes or acted illegally.[225] Allscripts counters the experts may testify to ultimate issues. We agree expert opinions concluding Andor acted illegally or in violation of a statute are not permitted.[226] It is the jury's job to determine whether Andor's conduct violated the statutes Allscripts sues under, not the expert's.[227] This is not to say the experts cannot opine about Andor's conduct in relation to elements of the statutes. The expert may not, however, go so far as to conclude an element is met or Andor violated the statute. This is the jury's province.

### B.  Allscripts's source code expert Robert Zeidman.

Andor moves to exclude Allscripts's source code expert Robert Zeidman.[228] Mr. Zeidman opines Andor copied Allscripts's FollowMyHealth Mobile Patient Experience platform source code into its AndorNow and ThinkAndor applications.[229] Andor argues Mr. Zeidman's opinion must be excluded because it is unreliable and does not fit.[230] Allscripts counters Mr. Zeidman employed reliable methodology and his opinion fits.[231] We agree with Allscripts.

### 1.   Mr. Zeidman's opinion is reliable.

Andor argues Mr. Zeidman's opinion is unreliable because he does not employ reliable methodology due to improper "filtering" and by concluding Andor copied Allscripts's source code *en masse* rather than just copying 260 lines of source code.[232] We disagree on both grounds.

Mr. Zeidman holds two Bachelor's degrees from Cornell University, one in Electrical Engineering and one in Physics, and a Master's degree in electrical engineering from Stanford University.[233] He has over forty-eight years of experience in software development.[234] He has written extensively in this area, including the "seminal" book in the software forensics field, *The Software IP Detective's Handbook, Measurement, Comparison, and Infringement Detection*.[235] He holds twenty-three patents, including patents for software tools used to detect plagiarism in source code.[236] Mr. Zeidman is the originator of "source code correlation," which is "the measure of the similarity of one program's source code to another program's source code."[237] Mr. Zeidman first presented this technique at a peer-reviewed International Conference and has continued to present and write on this topic extensively.[238] The "source code correlation" technique has gained widespread acceptance in engineering and law.[239]

To assist in a source code correlation analysis, Mr. Zeidman developed the product, "CodeSuite."[240] CodeSuite includes a function called "CodeMatch" to calculate source code correlation by analyzing each source code file and using specific algorithms to find similarities which may otherwise be difficult to manually detect.[241] CodeMatch's algorithms compare the source code's statements, comments/strings, identifiers, and instruction sequences to determine source code correlation.[242] Although CodeMatch automates a process which would otherwise be done manually, "[a]n expert is required to examine the CodeMatch results to determine whether the source code correlations are due to copying or other reasons."[243] The "other reasons" for the same or similar source code as identified by Mr. Zeidman include: third-party source code, code

generation tools, commonly used identifier names, common algorithms, or common author.[244] "The process of running CodeMatch, examining the results, and filtering out those results that are not relevant is simply automating the process known in legal terms as the 'abstraction-filtration-comparison test.'"[245]

CodeSuite contains other programs as well, including CodeCross and SourceDetective.[246] CodeCross "cross-compares statements in one set of files to comments in the other set of files, and vice versa in order to find code that has been commented out . . . [it] finds sections of source code that were used as guides to develop other source code; it finds signs of copying that CodeMatch can miss."[247] An expert similarly must review the CodeCross results to determine whether the matches are due to copying or some other reason.[248] SourceDetective is a filtering tool which "automatically measures the number of times each identifier, comment, string, and statement can be found on the Internet ('hits') as determined by the Microsoft Bing search engine."[249] The results of running SourceDetective are "particularly important as signs of copying when program elements can be found in both programs that were compared but rarely found, or not found at all, during an Internet search."[250]

Mr. Zeidman through his business, Zeidman Consulting, used the CodeSuite products in over 100 lawsuits to date resulting in no successful challenges to his conclusions about copying.[251] Mr. Zeidman also licenses CodeSuite to other experts to use in source code analysis with fifty people trained in its use worldwide.[252] CodeSuite's products are primarily used for litigation, but CodeSuite has other versions–"LT and [] academic" with the academic version "designed for universities and teaching institutions, testing their students for – their students' assignments, the programming assignments for plagiarism."[253]

Mr. Zeidman performed a CodeMatch and CodeCross comparison of Allscripts's FollowMyHealth MPE platform and Andor's ThinkAndor and AndorNow applications.[254] He then "utilized an iterative step-by-step method" to filter and "evaluate the correlations identified by CodeMatch and CodeCross" to identify whether the correlations were due to third-party code, code generation tools, common identifier names, common algorithms, and common authors.[255] If the correlation cannot be explained by any of the above, Mr. Zeidman concludes copying occurred.[256]

Mr. Zeidman found correlation between the products' source code remained unexplained, *i.e.* the correlations remaining were not due to third-party code, code generation tools, common identifier names, common algorithms, or common authors.[257] He concluded "the only reasonable explanation for the remaining correlation is that code was copied"—*i.e.* Andor copied Allscripts's code for its ThinkAndor and AndorNow applications.[258]

Andor first argues Mr. Zeidman's opinion is unreliable because Mr. Zeidman did not adequately filter the correlation results to exclude other reasons besides copying for the correlations the CodeSuite products identified.[259] Andor argues Mr. Zeidman did not run the CodeSuite program "SourceDetective," relied "entirely on Google searches" to determine if open or third-party source code caused correlations, failed to filter out commonly used identifier names, failed to account for common authors, and failed to take into account the use of an "Integrated Development Environment."[260] We disagree. Mr. Zeidman ran his programs and then filtered to exclude other reasons besides copying for the correlations identified.[261] Andor's gripes about the adequacy of Mr. Zeidman's filtering is proper for cross-examination, not a basis to exclude the opinion. For example, Andor complains Mr. Zeidman failed to properly filter because he failed to account for common authors, concluding "with no explanation" the fact common authors worked on both codes did not explain any code correlations found. This is not true. Mr. Zeidman testified

how he reached this conclusion at his deposition.[262] Andor evidently does not agree the explanation constitutes adequate filtering. Andor may cross-examine Mr. Zeidman about the adequacy of the filtering. Andor's argument Mr. Zeidman's filtering is inadequate, largely relying on its own expert's report, is not a basis for exclusion.

Andor's next contention Mr. Zeidman cannot infer widespread copying based on 260 copied lines of source code is based on Andor's continued mischaracterization, or misapprehension, about Mr. Zeidman's opinion. Andor continuously questioned Mr. Zeidman about the "segments or lines" of copied source code.[263] But Mr. Zeidman continuously pushed back, explaining the specific instances he identifies in his reports are not *instances of copying* as Andor characterizes them; they are *indicators* of copying.[264] He explained: "When I find indications of copying, the process is to err on the side of eliminating – well, to be sure to eliminate false positives. In other words, I never want to accuse a party of copying code if I – if there are other reasonable explanations for the correlation that I'm finding . . . The analogy would be if I compared two novels. Of course the word 'the' will appear many, many times. You know, common words will appear throughout the novel, and I can't use that as an indication of copying. So I have to find something unique that can't be described. And what I've done is, I've indicated lines or elements of code that can only be described by copying, only be explained by copying. And in that case, it's not my accusation that only those elements were copied, which is – logically makes no sense; but, rather, that the code in full was copied, or at least sections of it were copied, and – because I find conclusive evidence of unique code elements that can only be explained by copying."[265] Mr. Zeidman's opinion based on his methodology is Andor copied significant portions of Allscripts's source code.[266]

Mr. Zeidman's conclusion about significant copying is further illuminated by his explanation of correlation scores.[267] Mr. Zeidman explained correlation scores range from zero to 100, but he explained he does not rely on the numerical value of the correlation score to form his opinion about copying because the value is not meaningful.[268] He explained correlation scores are assigned pre-and post-filtering.[269] Once filtering occurs, the only thing that matters for determining whether copying occurred is whether the correlation score is zero or non-zero.[270] He explained "[a]fter filtering out everything that can be explained for reasons other than copying, if the correlation score is zero, then there was no – there's no indication of copying. And if the correlation is non-zero, regardless of the value, then copying occurred."[271] Andor questioned Mr. Zeidman about whether he could determine "the amount of copying" between two programs without filtering.[272] Andor proposed: "Without filtering, you can't give a correlation score that validly represents the amount of copying that went on between two programs; is that fair?"[273] Mr. Zeidman responded: "I would adjust that slightly. Without filtering, I would not be able to determine conclusively that code was copied."[274]

In other words, Mr. Zeidman's conclusion here is black and white: copying occurred if the correlation score is anything except zero, or no copying if the correlation score is zero. He identifies *indicators* of copying which lead him to the conclusion Andor significantly copied source code from Allscripts.

He explained it is impossible to copy one line or a few lines of code from one program to another.[275] To explain to counsel—a lay person in this regard—why his analysis is black and white—*i.e.*, copying or no copying—he used several analogies, such as copying a paragraph from a novel into another novel or reviewing a partial fingerprint at the crime scene but concluding the perpetrator's whole body was there, not just the fingerprint.[276] It is disingenuous to argue Mr.

46

Zeidman relied on these analogies as the basis for his opinion on significant copying. Mr. Zeidman used the analogies to explain to a lay person why one cannot merely copy 260 lines of source code, which Andor continuously represented is what occurred here during Mr. Zeidman's deposition.

Andor's argument Mr. Zeidman used no reliable methodology to conclude widespread copying occurred is incorrect because it starts from the improper premise of assuming Mr. Zeidman only found 260 lines of copied source code. Mr. Zeidman employed his software and then filtered the results to conclude widespread copying occurred. Mr. Zeidman does not merely conclude 260 lines of source code are copied; he found 260 *indicators* of copying and concluded significant copying occurred based on this methodology. Andor does not challenge Mr. Zeidman's scientific methodology in general, *i.e.* employment of the CodeSuite applications and filtering process after running the programs; Andor only argues Mr. Zeidman's opinion is unreliable because he inadequately filtered *here* during the filtering step. Mr. Zeidman used reliable methodology; Andor merely disagrees with his conclusion. Andor may cross-examine Mr. Zeidman. But we will not exclude his opinion as unreliable.

### 2. Mr. Zeidman's opinion fits.

Andor next argues Mr. Zeidman's opinion does not fit because he does not opine whether the "260 lines" of copied code is a trade secret. We disagree. First, we already explained why Andor's reliance on "260 lines" of copied code as the basis of its arguments to exclude Mr. Zeidman's opinion is unfounded. Second, Allscripts can lay the foundation at trial for the jury to determine whether the source code is a trade secret. Mr. Zeidman does not himself need to testify it is a trade secret for his opinion to fit. He is opining Andor copied Allscripts's source code. This is one element of the trade secret misappropriation claim. Allscripts can prove the trade secret prong through other witness testimony besides Mr. Zeidman's. We deny Andor's motion as to fit subject to Allscripts laying a foundation at trial.

### C.  Andor's source code expert Brad Ulrich.

Andor's expert Brad Ulrich opines Allscripts reverse engineered the Config Tool, and the value of Andor's Config Tool.[277] Allscripts moves to preclude arguing: Mr. Ulrich's opinions about reverse engineering are unreliable, do not fit, or he is not qualified to offer them; he is not qualified to offer his general opinions about economic value; and he offers improper opinions on Allscripts's state of mind.[278] Andor counters Mr. Ulrich's reverse engineering opinions are reliable, he is qualified to offer them, and they fit; he is qualified to generally offer non-quantitative opinions about economic value; and he does not offer improper state of mind opinions.[279] We address each argument in turn.

### 1.  Mr. Ulrich's reverse engineering opinions are admissible.

Allscripts first argues we should exclude Mr. Ulrich's reverse engineering opinion because he is "unable to provide any coherent definition of reverse engineering."[280] Allscripts argues Mr. Ulrich could not opine whether a product is needed to reverse engineer something or whether Allscripts could reverse engineer the Andor Config Tool without access to it, and Mr. Ulrich abandoned his definition of reverse engineering provided in his report.[281] We disagree with Allscripts's characterization of Mr. Ulrich's testimony. Allscripts's concerns with Mr. Ulrich's opinions are proper cross-examination issues.

Mr. Ulrich provides a definition of reverse engineering in his affirmative report, which he applied in this case.[282] He provided substantially the same definition at his deposition.[283] It is true Mr. Ulrich refused to provide an opinion about whether something can be reverse engineered without a final product, and whether Allscripts needed the Andor Config Tool to reverse engineer it.[284] But Mr. Ulrich also explained his inability or refusal to provide an opinion on the question(s) asked.[285] This is an issue for the jury to weigh in assessing Mr. Ulrich's credibility and the veracity of his opinions. It is not a basis to exclude his opinions. Mr. Ulrich opined Allscripts reverse

engineered the Andor Config Tool by applying the definition in his report to the facts. To the extent Allscripts disagrees with the application of the definition, whether reverse engineering is possible without a final product, or his conclusions, Allscripts can cross-examine him at trial and present its own rebuttal evidence.

Allscripts next seemingly makes a qualifications argument, arguing Mr. Ulrich cannot provide a coherent definition of reverse engineering because he has never been qualified as an expert on reverse engineering.[286] We disagree Mr. Ulrich fails to provide a coherent definition of reverse engineering for the reasons already discussed. We also disagree with Allscripts's characterization of Mr. Ulrich's testimony. Allscripts asked Mr. Ulrich if he considers himself an expert in reverse engineering software.[287] Mr. Ulrich explained his areas of expertise and why he feels he is qualified to offer his opinion.[288] Mr. Ulrich testified he reverse engineered products throughout his career but did not have a list prepared to provide at his deposition.[289] A jury may weigh this failure to recall in assessing Mr. Ulrich's testimony if Mr. Ulrich cannot provide an example at trial. But he is not unqualified because he cannot name a product he reverse engineered off the top of his head. We are unpersuaded Mr. Ulrich is unqualified based on Allscripts's arguments, which notably do not challenge his extensive experience as a computer scientist in the healthcare technology field.[290]

Allscripts next argues Mr. Ulrich's opinions do not fit because he answers an inapplicable question.[291] Allscripts argues the Reseller Agreement, which Andor contends Allscripts breached by reverse engineering the Andor Config Tool, does not prohibit reverse engineering *the product*, only reverse engineering the *source code* for the product.[292] Thus, Mr. Ulrich answers the wrong question because he does not opine on whether Allscripts reverse engineered the source code for

the Andor Config Tool.[293] We disagree with Allscripts's reading of the contract and thus find Mr.

Ulrich's opinion fits.

Andor hitches its breach of the Reseller Agreement claim to Section 2.2 of the Reseller

Agreement.[294] We begin with the text:

> 2.2 **Restrictions**. Allscripts acknowledges that the Company Product(s) constitutes valuable trade secrets of Company. Except as expressly permitted by this Agreement, Allscripts will not: (a) modify, adapt, alter, translate or create derivative works for any Company Product; (b) merge any Company Product with any other service, product, equipment, data, or software, except that Allscripts may offer an [*sic*] Company Product as bundled with Allscripts' products or services; (c) sublicense, distribute, sell, use for service bureau use or outsourcing purposes, lease, rent, loan, or otherwise transfer Company Product or Documentation to any third party (other than to Sublicensed Customers as permitted above); (d) obtain order for Company Product outside of the Territory or transmit or distribute Company Product outside of the Territory; (e) reverse engineer, decompile, disassemble, or otherwise attempt to derive the source code for Company Product; (f) remove or alter any copyright or any other proprietary rights notice included in Company Product or Documentation; (g) otherwise use Company Product except as expressly permitted hereunder; or (h) permit any third party to do any of the foregoing.[295]

Allscripts reads this provision as prohibiting it from "reverse engineer[ing] . . . the source

code for Company Product."[296] We disagree. The provision prohibits reverse engineering

Company Product, decompiling Company Product, disassembling Company Product, or otherwise

attempting to derive the source code for Company Product.[297] This reading is wholly consistent

with the phrasing of all other prohibitions in this section, all of which apply to Company Product

as defined in the Agreement. For example, subsection (a) of Section 2.2 prohibits Allscripts from

modifying Company Product, adapting Company Product, altering Company Product, translating

Company Product or creating derivative works for any Company Product.[298] Subsection (c)

prohibits Allscripts from, for example, sublicensing Company Product, distributing Company

Product, selling Company Product, leasing Company Product, renting Company Product, or

otherwise transferring Company Product.[299] Subsection (g) prohibits Allscripts from using

Company Product except as provided by the Reseller Agreement.[300] The prohibitions in each

subsection, including subsection (e), relate to what Allscripts may not do with the Company Product. It is illogical to conclude in subsection (e) the prohibitions relate to *the source code* for Company Product, rather than Company Product. There is no dispute the Company Product at issue is the Andor Config Tool. Mr. Ulrich's opinion fits because the Reseller Agreement prohibits reverse engineering the Andor Config Tool—the question upon which he opines.

Allscripts next argues Mr. Ulrich's opinion on reverse engineering is inadmissible because he bases his conclusions on an improper starting point.[301] Allscripts argues Mr. Ulrich assumes the Andor Config Tool and source code he reviewed was the deliverable contemplated by the Reseller Agreement but provides no independent analysis or evidence tying the files reviewed to the deliverables under the Reseller Agreement.[302] We deny Allscripts's argument without prejudice subject to Andor laying a foundation at trial the information reviewed by Mr. Ulrich is the deliverable contemplated by the Reseller Agreement.

Allscripts then argues Andor never delivered Allscripts the Config Tool so Allscripts did not have the product necessary to reverse engineer it.[303] This argument is appropriate for cross-examination. Allscripts merely disagrees Mr. Ulrich could have reached the opinion he reaches in this case because in Allscripts's view, one needs a product to reverse engineer. Mr. Ulrich opines Allscripts reverse engineered the Config Tool based on the facts before him. Allscripts may cross-examine Mr. Ulrich and may present rebuttal evidence from its own expert indicating reverse engineering cannot occur without a final product. This is an issue for the jury to consider, not grounds to exclude Mr. Ulrich's opinion.

Allscripts next argues Mr. Ulrich fails to tie his analysis to the information Allscripts possessed when it allegedly reverse engineered Andor's Config Tool.[304] Allscripts's entire argument relies upon its misinterpretation of the Reseller Agreement, namely its belief the Reseller

Agreement only prohibits reverse engineering the source code for the Andor Config Tool. Allscripts argues we must exclude Mr. Ulrich's opinion because the facts do not support a conclusion Allscripts reverse engineered the source code for the Andor Config Tool. We reject Allscripts's argument here for the reasons already stated herein.

Allscripts finally argues Mr. Ulrich employs no reliable methodology so we must exclude his opinion.[305] Allscripts posits Mr. Ulrich "fabricated from whole cloth a [nine-step] methodology solely for the purposes of this litigation."[306] Andor counters Allscripts oversimplifies the methodology Mr. Ulrich used.[307] Andor argues Mr. Ulrich employed industry-accepted standards and practices to reach his conclusion and thus his opinions as to reverse engineering are reliable.[308] We again note a *Daubert* hearing would have assisted us in making this determination. But the parties declined. We are thus left reviewing Mr. Ulrich's reports and testimony. We find based on the information before us today (and subject to review after hearing the evidence) Mr. Ulrich employed a reliable methodology.

Mr. Ulrich performed a "static analysis" of the source code at issue in this case to understand the products and their functions and compare the source code between the two Config Tools as part of his analysis to determine whether Allscripts reverse engineered Andor's Config Tool.[309] Allscripts does not argue "static analysis" is not an industry-accepted method to analyze source code. While Allscripts contends the nine steps Mr. Ulrich used to reach his conclusion are not scientifically accepted or peer-reviewed, Mr. Ulrich performed the analysis at each step using an accepted practice of static analysis to reach his conclusion. We do not see how Mr. Ulrich failed to employ a reliable methodology. Mr. Ulrich explained the sequential steps he took  and employed industry-accepted analysis at each step. Nor do we consider his opinions mere *ipse dixit* because he only "review[ed]" and "conclude[d]."[310] He used static analysis, which he explained is

"reviewing the source code itself and looking at various aspects of that source code that are familiar to a trained software engineer, and using that information to determine things about how software functions and operates."[311] Mr. Ulrich used static analysis to review and analyze the code here, then compared the Config Tools' code, reviewed other information the parties shared about the Config Tool, and concluded whether reverse engineering occurred. We disagree Mr. Ulrich failed to employ a reliable methodology to opine about whether Allscripts reverse engineered the Config Tool.

Allscripts also argues Mr. Ulrich offers a factual narrative of "cherry-picked facts" not tied to his analysis which is not permitted.[312] We largely disagree. But to the extent Mr. Ulrich attempts to narrate facts which did not inform his analysis, he may not do so, and Allscripts may object at trial.

We deny Allscripts's motion to exclude Mr. Ulrich's reverse engineering opinion because we find Mr. Ulrich's opinions reliable and relevant.

**2.   Mr. Ulrich may offer his non-quantitative opinion on whether Allscripts saved time and money by reverse engineering the Config Tool but not the value of the Andor Config Tool or the value of limited lines of Allscripts's source code.**

Allscripts argues Mr. Ulrich cannot opine on the value of Andor's Config Tool because he is not qualified. Allscripts also argues Mr. Ulrich cannot opine on whether Allscripts saved time and money by reverse engineering the Config Tool because his opinion is unreliable.[313] Allscripts finally argues Mr. Ulrich's opinion about the value of the specific lines in its source code is inadmissible because he is unqualified.[314]

We start with Mr. Ulrich's opinions on the value of the 260 lines of Allscripts's source code. We exclude Mr. Ulrich's opinion. As we explained, Mr. Zeidman does not merely opine Andor copied 260 lines of Allscripts's source code; he opines Andor significantly copied

53

Allscripts's code. Mr. Ulrich rebuts Mr. Zeidman's report by concluding no copying occurred.[315] The value of the 260 copying *indicators* Mr. Zeidman found in his analysis to conclude significant copying occurred is not at issue based on Mr. Zeidman's admissible opinion finding widespread copying. Thus, the opinion regarding the value of 260 lines of source code does not fit, regardless of whether he is qualified to provide it.

Allscripts also argues Mr. Ulrich is unqualified to opine on the value of Andor's Config Tool.[316] Allscripts contends Mr. Ulrich provides no methodology or metrics to estimate the value of the Config Tool.[317] Allscripts's argument appears to implicate Mr. Ulrich's qualifications and the reliability of his opinion. Andor counters Mr. Ulrich provides no quantitative opinion as to the value of the Config Tool; rather he opines it has significant value based on his experience, review of the code, and understanding of the developers used, time spent, and prevailing wages in the industry to make this non-quantitative conclusion.[318]

We start with Mr. Ulrich's opinion. Mr. Ulrich opines:

> The source code for the Andor Config Tool, as a whole, has significant economic value. Based on the staffing information above,[319] it would have cost more than several hundred thousand dollars, (likely significantly more), based on current prevailing wages and rates for health IT software designers, developers, testers, and similar. In addition, the software has value because it allows healthcare providers to create the ability to expand, scale and manage MPE campaigns efficiently and effectively from a technical perspective – and specifically campaigns utilizing the HealthGrid platform – the platform owned and marketed by Allscripts – a large EHR vendor in the U.S. The value of MPE campaigns in general is well understood and it is a national strategy supported and followed by CMS, the National Health Council, and EHR vendors groups.[320]

Allscripts asked Mr. Ulrich what formed the basis of his opinion the Andor Config Tool has significant economic value.[321] Mr. Ulrich swore: "So there's a few—a few parts to that. You know, one is – is the time and money it would take to develop the product. And the second half of that is, you know, based on my understanding of the value of mobile – mobile patient engagement campaigns and the value in rolling those out to customers on scale, which is the primary purpose

54

of the Andor Config Tool. And then I provide some citations here that establish where I develop my understanding of, you know, why mobile patient engagement campaigns are a very lucrative and very important to the health care of the country and supported by CMS and the National Health Council, and so on and so forth."[322] To be clear, despite Andor's argument in its brief suggesting Mr. Ulrich's opinion is partially based on his source code analysis, Mr. Ulrich himself did not explain in his report or testimony his source code review informed his analysis of significant value. Thus, we proceed with the two prongs Mr. Ulrich explained informed his analysis: (1) time and money to develop the Config Tool; and (2) the value mobile patient engagement campaigns have in the health care industry.

Allscripts asked Mr. Ulrich how he determined the cost to develop the Andor Config Tool––the first prong which informed his conclusion the Config Tool has significant value.[323] He responded: "So I don't have the equation in front of me. But basically by looking at the time that it would take the staff above, assuming they were working nearly full time on the project at current prevailing wages."[324] Allscripts questioned whether Mr. Ulrich used the eighteen-month timeframe it took Andor to develop the product in his equation.[325] He responded yes "as an input" but "not with an equal sign."[326] Allscripts asked if he used any other time period besides eighteen months.[327] Mr. Ulrich explained: "No. Like I said, it's not a time period. I think you're – I don't think you're understanding the equation. You – you can – you can use – or maybe you are. But anyway, I shouldn't say that. But there's, you know, you have a period of time and a number of people. You can shorten the time but increase the people to a certain extent. So the equation doesn't require a fixed assumption on the amount of time. It doesn't require a fixed assumption on the amount of people either . . . I didn't need to do that to make my estimate of several hundred thousand dollars."[328]

Allscripts pressed Mr. Ulrich to provide the inputs he used here to come up with his estimate of several hundred thousand dollars in development costs.[329] He answered: "I looked at a few different scenarios. I don't have all of those in front of me here. Because I kind of do a scenario analysis when I do something like this. I don't just sort of come up with one estimate. I sit down and kind of look at some different – different scenarios. So I apologize, I don't have an equation for you here right now."[330] Allscripts asked if the scenarios he analyzed are in his report, to which he responded "[n]o, they are not."[331] Andor directs us to Mr. Ulrich's report, not deposition testimony, to defend against his methodology here.[332] But Mr. Ulrich himself admits his methodology in reaching his conclusion does not appear in his report.

We have no idea how Mr. Ulrich derived his conclusion Andor's development costs of the Config Tool are "several hundred thousand dollars, (likely significantly more)."[333] Mr. Ulrich does not provide the basic equation he used in his report or at his deposition – all we have because the parties declined a *Daubert* hearing. He does not provide us with the "scenarios" he considered in his "scenario analysis" to come up with the amount of several hundred thousand dollars. We do not know what he does after his "scenario analysis" to reach the conclusion. Does he average the numbers? Determine the highest number? Lowest? Median? We have no clue how Mr. Ulrich came up with the amount it cost Andor to develop the Andor Config tool based on his report and testimony. Mr. Ulrich's opinion about the amount it cost Andor to develop the Config Tool is inadmissible as unreliable based on the record before us.

We review the second basis for his opinion. Mr. Ulrich testified his opinion on the "significant value" of the Config Tool also rested upon the value mobile patient engagement campaigns have in the healthcare industry. Mr. Ulrich testified his opinion here is informed by a review of multiple public documents explaining patient engagement in the healthcare field,[334] his

"extensive professional experience in the health IT field working with numerous electronic health vendors and patient – and providers,"[335] and "to some extent, on [his] own personal experience, which is [he] absolutely love[s] it when [he] get[s] an appointment reminder from [his] provider."[336] Mr. Ulrich continued about his own personal experience, explaining: "I know inherently that there's a lot of value in that feature. And I know inherently, based on my experience, not just as a patient, of course, but as a health care technology provider, that there's a lot of value in – in this functionality. Just about everybody that is in the industry that I know is aware of it, they're interested in it, and they're looking for a solution for it."[337]

We start with the citations to the documents in his report. Mr. Ulrich's citations in his report to the publicly available documents relate to "the value of MPE campaigns in general" — **not** the value of configuration tools as they relate to a mobile patient engagement campaign.[338] But the issue is not whether a mobile patient engagement campaign has value; the issue is the value of Andor's Config Tool in the context of a mobile patient engagement campaign. Mr. Ulrich explains why the Config Tool is valuable to MPE campaigns in his report: "[T]he software has value because it allows healthcare providers to create the ability to expand, scale and manage MPE campaigns efficiently and effectively from a technical perspective – and specifically campaigns utilizing the HealthGrid platform – the platform owned and marketed by Allscripts – a large [electronic health records[339]] vendor in the U.S."[340] He also explains he is informed by his years of experience in the healthcare technology field and his experience as a patient receiving appointment reminders, which he loves.

So Mr. Ulrich's opinion about the significant value of Andor's Config Tool is based on an unreliable calculation of development costs, the general value of mobile patient engagement campaigns, the fact a Config Tool assists providers in "expand[ing], scal[ing], and manag[ing]"

the campaigns efficiently and effectively, and his experience in the healthcare technology field and as a patient who receives appointment reminders. Based on all of this, he concludes the Config Tool has significant value. The development cost basis of this opinion is wholly unreliable, rendering his final opinion similarly unreliable. Andor comes up short even if we looked at the second proffered basis to determine whether this is itself sufficient to find the opinion on value reliable. It is unpersuasive Mr. Ulrich likes getting appointment reminders. We have no idea how his preference to receive appointment reminders extrapolates to a Config Tool used in a mobile patient engagement campaign having significant value. He offers no reason why his experience in the healthcare technology field informs his opinion as to the Config Tool's value. It is not immediately apparent how his experience qualifies him to offer an opinion on the value of the Config Tool. And he relies on publicly available documents which support his conclusion mobile patient engagement campaigns themselves have value, but he fails to tie in the value derived from the Config Tool. He instead merely concludes the Config Tool has significant economic value. We cannot allow this type of unsupported expert opinion based on the record we have before us. Perhaps a *Daubert* hearing may have clarified how Mr. Ulrich reached this conclusion, but the parties declined one. We exclude Mr. Ulrich's opinion on the significant value of Andor's Config Tool as unreliable.

Allscripts finally moves to exclude Mr. Ulrich's opinion as to whether Allscripts saved time and avoided risk by reverse engineering Andor's Config Tool.[341] Allscripts argues Mr. Ulrich disclosed no metrics, calculations, or standards to conclude Allscripts saved time and money in development.[342] Allscripts also argues Mr. Ulrich concedes he did not know many facts about Allscripts's development of the Config Tool.[343] Thus, Allscripts argues we should exclude his opinion. Andor counters Mr. Ulrich need not use metrics, standards, or calculations because he is

not offering a quantitative opinion, just a qualitative one based on his experience and his understanding of the software development lifecycle.[344]

We again begin with Mr. Ulrich's opinions. The essence of his opinions are: "Allscripts likely saved a significant savings in both time-to-market and level of effort (LOE) required by reverse engineering the Andor product," and "Allscripts likely avoided material technical risk during development of the Allscripts Products by drawing on know-how gained from Andor's Config Tool."[345] Mr. Ulrich formed his first opinion about time savings "[b]ased on the totality of [his] analysis of both [Config] tools, and the source code and other development artifacts made available to [him], and the considerations, based on [his] experience with similar projects, of work required under each phase of an industry-standard software development lifecycle."[346] His second opinion about avoiding material technical risk is based on his experience with risk management, which is one of his specialties,[347] as well as a review of the facts before him in this case, including Allscripts's "extensive exposure to Andor's Config Tool through documentation, detailed demonstrations, and the JSON files – and direct plans to utilize and to integrate with that Tool – as a basis from which to start from."[348]

Mr. Ulrich does not opine Allscripts saved time and avoided material risk. He opines Allscripts *likely* did those things. But Allscripts only challenges his methods to reach these equivocal conclusions, not the conclusions themselves. We disagree with Allscripts these opinions are mere *ipse dixit*. Mr. Ulrich did not merely pull opinions out of thin air about time saved or risks averted. He relied upon his experience, knowledge of the development process for this type of product, and his analysis of the source code and facts to conclude Allscripts saved time and avoided material technical risks by reverse engineering Andor's Config Tool. This is not *ipse dixit*.

Allscripts may cross-examine Mr. Ulrich about the facts underlying his opinion, including whether he ignored or failed to consider other facts.

### 3.   We exclude Mr. Ulrich's opinions about Allscripts's state of mind.

Allscripts finally moves to exclude Mr. Ulrich's opinions on Allscripts's state of mind as improper expert opinions. The parties do not dispute state of mind opinions are not proper expert testimony. Andor instead argues Mr. Ulrich's opinions are not about Allscripts's state of mind or intent.

Allscripts argues we must exclude this opinion as an improper state of mind opinion: "Allscripts set out with a direct and explicit goal of reverse engineering the Andor Config Tool and its output."[349] Mr. Ulrich cannot testify as to Allscripts's goals. It is the jury's role to determine Allscripts's goal, if relevant, when it started developing its own Config Tool. Mr. Ulrich then opines: "In fact, a major part of Allscripts['s] approach, which [it] did accomplish in code, was to mimic functionality and structure of the Andor tool so that [it] could seamlessly migrate customers and [its] prior HealthGrid configurations (which the Andor Config Tool was already designed to interface with), onto the new Allscripts Config Tool and updated MPE/FMH platform."[350] The first part of the opinion is admissible because it is not about Allscripts's state of mind or intent. Mr. Ulrich merely opines Allscripts's approach, which is discernable from his review of the source code and materials underlying his opinion, included mimicking the functionality and structure of the Andor tool. But Mr. Ulrich may not testify as to Allscripts's purpose—*i.e.* to seamlessly migrate customers and its prior Health Grid configurations onto the new Allscripts Config Tool and updated FollowMyHealth platform. This is not proper expert opinion because it goes to Allscripts's state of mind.

Allscripts also seeks to exclude the opinion: "It is clear from these statements and other emails in the record that Mr. Franks and the Allscripts team had the Andor Config Tool in mind

when designing their system."[351] There are multiple issues with this overreach. First, if it is clear from documents what Allscripts thought, the jury does not need an expert opinion. Second, Mr. Ulrich cannot opine on Allscripts's state of mind. A jury may infer or conclude from the very documents Mr. Ulrich relied on Allscripts had "the Andor Config Tool in mind when designing their systems." An expert need not, and cannot, tell them so.

### V.   We permit Andor's rebuttal expert Aneesh Chopra to testify and exclude some opinions of Allscripts's experts John Cauthen and Dr. Yael Harris.

#### A.  Andor's expert Aneesh Chopra.

Andor proffers Aneesh Chopra's rebuttal opinion about whether Andor's products compete with Allscripts's, formerly Health Grid's, product offerings.[352] Allscripts renews its *Daubert* motion to exclude this rebuttal opinion arguing we should exclude Mr. Chopra's opinions because he failed to disclose an expert report or because he fails to provide any analysis for his opinions and his opinions do not fit.[353] We must start with the brief background of this renewed motion.

Our April 15, 2022 Order required all *Daubert* motions "if warranted based on a good faith argument as to qualification, fit, or reliability" to be filed no later than May 16, 2022 with responses due no later than May 27, 2022.[354] Allscripts moved to exclude Mr. Chopra's testimony under Rule 37(c) because he failed to provide a written report consistent with Rule 26.[355] Allscripts presented no further argument regarding Mr. Chopra's qualifications or whether his opinions "fit" or are "reliable."[356] We reviewed the Motion and entered an Order providing Andor the opportunity to provide a written report, granting Allscripts the ability to re-depose Mr. Chopra on non-duplicative information contained in the report at Andor's expense, and permitted Allscripts "leave to challenge a new aspect of Mr. Chopra's opinion not earlier disclosed by no later than June 8, 2022."[357] Andor filed a notice compliant with our Order indicating it would serve Mr. Chopra's written report, and we denied Allscripts's motion as moot.[358] Our Order denying the first

Motion to exclude as moot again confirmed Allscripts could "seek[] relief on newly adduced information" consistent with our May 17, 2022 Order.[359]

Allscripts "renewed" its motion on May 31, 2022.[360] Allscripts now posits three reasons to exclude Mr. Chopra's testimony: (1) he must provide a written report, failed to do so, and we should exclude his testimony under Rule 37(c); (2) he failed to support his opinions with analysis; and (3) his opinions do not "fit."[361] Allscripts's renewed motion fails to comply with all three of the operative Orders. We required *Daubert* motions raising issues of qualifications, fit, and reliability be filed on or before May 16, 2022.[362] Allscripts moved to exclude Mr. Chopra's testimony on May 16 without challenging qualifications, fit, or reliability. Its "renewed" motion now raising these issues is fifteen days late under our Scheduling Order.[363] Its "renewed" motion is also noncompliant with our Orders addressing its first motion.[364] We denied Allscripts's first motion without prejudice permitting Allscripts "leave to challenge a new aspect of Mr. Chopra's opinion not earlier disclosed."[365] Allscripts's challenges are not based on new opinions not earlier disclosed; Allscripts itself admits there are no new opinions provided because Mr. Chopra merely submitted his deposition transcript as his report.[366]

We decline to consider arguments regarding reliability and fit as untimely and noncompliant with our Orders.

We turn to the merits of Allscripts's argument we should grant the extraordinary relief of excluding evidence under Federal Rule of Civil Procedure 37(c). Andor disclosed Mr. Chopra as a rebuttal expert on April 25, 2022 under Federal Rule of Civil Procedure 26(a)(2)(C). Andor maintains Mr. Chopra need not submit an expert report, and was otherwise properly disclosed, because he is not a "retained" or "specially employed" expert.[367] Andor argues Mr. Chopra serves on Andor's advisory board and acquired his knowledge forming the basis of his expert opinions

during his employment as Chief Technology Officer to then-President Obama as well as through the work for his company, CareJourney.[368] Andor also argues Allscripts elevates form over substance by renewing its motion arguing it did not submit an adequate expert report.[369] Allscripts disagrees, and argues Mr. Chopra needed to produce an expert report under Rule 26, failed to do so, and we should exclude his testimony under Rule 37(c).[370] We decline to follow the parties into the thicket of whether Mr. Chopra needed to produce an expert report and whether the materials produced satisfies Rule 26's requirements. We assume for the purposes of our analysis he needed to provide a report and his report did not comply with requirements. We nevertheless find his testimony admissible and not excludable under Rule 37(c).

Rule 37(c)(1) provides: "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless."[371] But we should not exclude evidence for technical non-compliance with the Federal Rules.[372] We should instead only exclude evidence for failing to comply with disclosure obligations after considering five factors: (1) "the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified or the excluded evidence would have been offered; (2) the ability of that party to cure the prejudice; (3) the extent to which allowing such witnesses or evidence would disrupt the orderly and efficient trial of the case or of other cases in the court; (4) any bad faith or willfulness in failing to comply with the court's order; and (5) the importance of the excluded evidence."[373]

Four of the five factors weigh heavily in favor of admitting Mr. Chopra's testimony. Factors one and two counsel admission. Allscripts's argument it suffered prejudice or surprise is inconceivable. Allscripts argues Andor disclosed Mr. Chopra as a rebuttal witness "at 6:00 pm on

April 25, 2022, the last possible moment to comply with the rebuttal expert disclosure deadline."[374] We are unpersuaded. The disclosure complied with our Order. The "last possible minute" disclosure is still timely. There is no way Allscripts had any more "surprise" at this witness's disclosure than any other witness's merely because the disclosure occurred at 6:00 pm on the due date. Allscripts's feigned argument it did not know Mr. Chopra's identity or area of expertise ahead of time is nonsensical. Mr. Chopra is disclosed as a rebuttal expert. Following receipt of the disclosure, Allscripts did not raise an objection arguing he needed to produce a report. Allscripts instead deposed Mr. Chopra learning of all his opinions and the factual bases for them.[375] Allscripts suffered no surprise or prejudice by Mr. Chopra's failure to produce a written report. Allscripts has full notice of Mr. Chopra's opinions and the bases for them as well as his qualifications, publications, compensation, and past expert testimony.[376] We permitted Allscripts the chance to re-depose Mr. Chopra on new opinions. No new opinions issued and no second deposition occurred. There is no surprise or prejudice and thus no need to cure prejudice. Factors one and two weigh in favor of admitting the testimony.

Allowing this testimony will not disrupt the orderly and efficient presentation of evidence. Allscripts does not even argue this prong.[377] Factor three weighs in favor of admission. Because we decline to decide whether Mr. Chopra needed to produce an expert report and whether the report produced sufficed, we weigh the "bad faith" or "willfulness in failing to comply" with our Order in Allscripts's favor. But this is wholly insufficient to warrant exclusion considering every other factor weighing heavily in favor of admitting the evidence. Mr. Chopra's testimony is important. It is rebuttal expert testimony regarding a key issue in the case—whether Andor's products compete with Health Grid's (now Allscripts's) products.

Exclusion of evidence under Rule 37 for failure to comply with Rule 26 is an extraordinary remedy not warranted today. Because we find the testimony admissible as expert testimony under Federal Rule of Evidence 702, we will not issue an advisory opinion about whether it is also admissible under Federal Rule of Evidence 701 as lay opinion testimony.[378]

### B.  Allscripts's expert John Cauthen.

Allscripts proffers John Cauthen's opinion regarding the authenticity or fabrication of three documents.[379] Andor moves to exclude this opinion on three bases: relevance; improper opinion on state of mind; and his opinion does not require specialized knowledge.[380] Allscripts counters Mr. Cauthen's opinions are relevant and admissible.[381]

Andor first argues Mr. Cauthen's opinions do not "fit" because they are irrelevant.[382] Andor contends Mr. Cauthen reviewed three documents—a statement of work between Health Grid and Nicklaus Children's Hospital, a letter from KGN Technologies to Mahathi confirming Mahathi owns the tenant, and a notice of intellectual property assignment from Mahathi—none of which give rise to the claims at issue.[383] Allscripts does not dispute the documents do not give rise to any claim or defense.[384] Allscripts instead counters Andor is asking for too much to establish "fit." Allscripts posits Mr. Cauthen's testimony is relevant to the claims and defenses as well as Defendants' credibility.

Our inquiry is "whether [the] expert testimony proffered . . . is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."[385] This is a question of relevance, and we apply "a liberal policy of admissibility if it has the potential for assisting the trier of fact."[386] The standard is more than "bare relevance" but not "that high."[387] We examine each document in turn.

### 1.   We exclude testimony regarding statement of work number five.

Allscripts argues Mr. Cauthen's testimony about the statement of work number five between Health Grid and Nicklaus Children's hospital is relevant because: both parties allege a breach of the settlement agreement; it goes to Mahathi, Andor, and Messrs. Toleti and Tyriver's credibility; and, it supports the "truthfulness" defense to the defamation counterclaims. Allscripts throws spaghetti at the wall and hopes it sticks. It does not.

Allscripts first argues this evidence fits because both parties allege breaches of the Settlement Agreement. Allscripts explains Andor submitted the statement of work to Allscripts to aid collection efforts from Nicklaus Children's Hospital, and if successful, would have resulted in payments to Andor under the Settlement Agreement. Allscripts's claim for breach of the Settlement Agreement is based on violations of the non-compete, non-solicitation, and confidentiality provisions incorporated into it.[388] Mahathi's counterclaim is based on the non-disparagement clause and Allscripts's officers' alleged comments about "swindl[ing]" or "dup[ing]" Allscripts into purchasing Health Grid.[389] Allscripts fails to show even bare relevance of this testimony to either sides' Settlement Agreement claims. Neither party even touches upon this issue in their allegations. Discussion of Nicklaus Children's Hospital only came up in summary judgment for Allscripts's tortious interference claim.[390] We are unpersuaded this testimony "fits."

We similarly reject this testimony is relevant to credibility. Allscripts provides no argument besides "all of [the documents] are relevant to the Defendants' credibility."[391] But Mr. Cauthen admits he does not know who fabricated the statement of work. His opinion has no actor.[392] Andor points us to Mr. Cauthen's admissions he cannot identify an actor.[393] Allscripts fails to identify contrary testimony; we will not search the hundreds of pages of appendix relating to Mr. Cauthen for contrary testimony. Allscripts did not even attempt to identify an actor who we or a jury may

*infer* from the facts surrounding this statement of work. Allscripts chooses to argue the alleged fabrication goes broadly to all Defendants' credibility. Allscripts functionally seeks to argue Andor, Mahathi, and Messrs. Toleti and Tyriver are all liars because one of them (or someone else) might have fabricated a document. We decline to permit this testimony as relevant to "the [collective] Defendants'" credibility.

We finally reject Allscripts's argument Mr. Cauthen's testimony about the statement of work number five fits because Andor's defamation claim involves an allegation of swindling. First, Mr. Cauthen fails to identify an actor. Second, Andor alleges Allscripts breached the non-disparagement clause in the Settlement Agreement by telling individuals at Northwell Mr. Toleti "swindled" and "duped" Allscripts into buying Health Grid.[394] It appears this allegation carries over to Andor's defamation claim.[395] None of the allegations involve Allscripts's telling anyone Andor, Mahathi, and Messrs. Toleti and Tyriver are swindlers because they fabricate documents (even if they did). Thus, we do not see how this "fits" Allscripts's truth defense to the defamation claim.

Mr. Cauthen's testimony about the statement of work number five does not "fit" and is excluded. Because we exclude testimony about the allegedly fabricated statement of work number five, we need not address Andor's argument about improper opinion on an individual's state of mind.

### 2.   We exclude testimony about the KGN Technologies letter.

We turn to the second document reviewed by Mr. Cauthen—the letter from KGN Technologies. Andor challenges the admissibility of this testimony as irrelevant and because Mr. Cauthen's analysis requires no specialized knowledge.[396] Andor's argument this letter is irrelevant and unhelpful to the jury is baseless. Ownership of the tenant—and whether anyone can own a tenant at all—is central to all claims arising from the "attack" both Allscripts and Andor say the

other side orchestrated in May 2021, including the Computer Fraud and Abuse Act claims and Allscripts's abuse of process claim. Andor posits this letter came from KGN Technologies and confirms it owns the tenant at issue. Testimony opining the letter is fabricated is helpful to the jury. But we do not have such testimony here. We exclude Mr. Cauthen's opinion on this issue.

Mr. Cauthen's original report opined "Mahathi modified a file received from KGN Technologies (KGN) to include additional language."[397] Allscripts asked him to analyze "the facts and circumstances surrounding the modification of a file labeled MahathiSoftware_Letter.pdf on or about May 27, 2021."[398] He concluded based on his examination Mahathi modified it. In reaching this conclusion, Mr. Cauthen reviewed and analyzed multiple emails and attachments, analyzing the attachments' metadata and other characteristics to determine whether they were the same or different as other documents circulated as attachments to various communications.[399] His first opinion clearly required specialized knowledge.

But Mr. Cauthen filed a supplemental report walking back his first opinion. He now opines: (1) "A file labeled MahathiSoftware_Letter.pdf was received by Mahathi on or about May 27, 2021 from KGN. The verbiage in this letter originated with Mahathi"; (2) "A second version of the MahathiSoftware_Letter.pdf was received by Mahathi. This second version contained verbiage which originated with Mahathi. This second version was created shortly after Venkat Deepak had asked Raj Toleti if he needed to modify anything in the first version"; (3) "Venkat Deepak, at the direction of Raj Toleti and/or others caused the original letter from KGN to be updated with additional language"; and (4) "The second version was then sent back to Raj Toleti twice. The first time asking if any further modifications were needed and the second time in an email omitting any references to modifications."[400] To reach this opinion Mr. Cauthen created a timeline of emails between Mahathi and KGN, and messages between Mahathi and KGN sent on the messaging

platform "WhatsApp."[401] Mr. Cauthen did not have the "WhatsApp" messages at the time of his first report.

Mr. Cauthen details no comparable analysis of metadata and document comparison between the original KGN letter and modified KGN letter in reaching his supplemental opinion about the origin of the modified letter.[402] This makes sense. The mystery of who created the modified document was solved by the smoking gun evidence provided to Mr. Cauthen. He had the "WhatsApp" messages between a Mahathi employee and KGN with the Mahathi employee sending the exact language Mahathi wanted on KGN's letterhead, and KGN sending the letters to Mahathi shortly thereafter.[403] The emails and messages confirm KGN did in fact create both letters following Mahathi's input on the language to use without any type of specialized analysis. This is not proper expert testimony.[404] An expert cannot simply narrate internal documents and form a conclusion evident to a lay person from their face. This is the jury's province.

Perhaps a *Daubert* hearing may have led us to a different result. Maybe Mr. Cauthen could have explained what exactly he needed from his first report regarding this issue to reach his amended conclusions in his supplemental report. Allscripts merely points us to his *first* report as evidence of his specialized knowledge in forming his conclusion.[405] We fail to see Mr. Cauthen employed specialized knowledge to reach his conclusions in his supplemental report. The parties declined a *Daubert* hearing. We must exclude Mr. Cauthen's testimony regarding the KGN letter.

### 3.  We permit testimony regarding the Intellectual Property Notice Clarification letter.

Andor's only argument regarding Mr. Cauthen's testimony on the Intellectual Property Notice Clarification letter is the letter is not helpful to the jury because it is irrelevant.[406] Andor fails to address this document in its reply.[407] Allscripts counters this document is wholly relevant

because a central issue in the case is who owns the Standard User Interface which is expressly addressed in this document.[408]

Mr. Cauthen generally opines the Intellectual Property Notice of Assignment and Assumption "was not created on or around September 6, 2019" or executed by Dr. C S Padmavathi and Mr. Toleti contemporaneously with the assignment and assumption agreement.[409] He opines it "appears to have been made at a later in time, perhaps in October 2021, and was digitally signed."[410] We agree with Allscripts this testimony "fits" at this stage subject to Allscripts laying a foundation for its relevance at trial. This notice as well as the assignment and assumption agreement, formed the basis of a partial motion to dismiss Mahathi's breach of contract counterclaim regarding the license Mahathi provided to Allscripts in the 2018 statement of work.[411] We explained the relevance of this document in our November 22, 2021 Memorandum granting Allscripts's partial Motion to dismiss.[412] We will not explain it again here. But we ultimately dismissed the breach of contract counterclaim. Allscripts posits this document is still relevant to other claims, including its request for declaratory judgment. We agree at this stage. But Allscripts must first lay a foundation at trial to demonstrate why this document being falsified or misrepresented is relevant to its claim it owns the Standard User Interface. Allscripts makes a sufficient showing at this stage to satisfy our gatekeeping function based on Andor's argument this testimony does not "fit."

### C.  Allscripts's expert Dr. Yael Harris.

Yael M. Harris, Ph.D., MHS submitted an expert report about the telehealth industry.[413] Dr. Harris is a researcher of health information technology.[414] Dr. Harris offers four opinions: (1) telehealth is a tool of patient engagement; (2) Allscripts and Andor products deliver patient engagement services; (3) Andor's features are similar to those provided by Allscripts; and (4)

interruption to the availability of the Mobile Patient Experience tool caused harm to patients, providers, and Allscripts.[415]

Andor moves to exclude two of Dr. Harris's opinions: her speculative opinions regarding harms caused by the attack on Allscripts's product, and her attempts to interpret contracts. We agree with Andor and preclude these two opinions from Dr. Harris.

### 1. Dr. Harris cannot speculate as to harms the attack "may" have caused.

Andor challenges portions of Dr. Harris's fourth conclusion. Andor argues Dr. Harris speculated as to the harms patients and providers suffered from Andor's alleged attack, constituting inappropriate expert testimony. Andor also argues Dr. Harris is unqualified to opine on medical harms incurred by the patients using Mobile Patient Experience because she has no medical background. Allscripts cites facts Dr. Harris included in her report, arguing Dr. Harris did not speculate but based her opinions on facts.

We agree with Andor and find Dr. Harris cannot opine regarding medical harms which "may" have been caused by the outage because those opinions are speculative and she is unqualified to provide them. It is well-established "an opinion based on speculation or an educated guess is inadmissible."[416] An opinion is speculative if it "is not based on any direct or circumstantial evidence" in the record.[417]

Dr. Harris offers several speculative opinions about the effects the outage had on patient health. The very wording of Dr. Harris's conclusions reveal her speculation. For example, she speculates "the health of some patients, especially those with chronic conditions, ***may*** have been exacerbated," patients "***may*** have missed appointments," and "patients ***may*** have skipped their appointments."[418] Dr. Harris swore these "conclusions" constituted presumptions. For example, she admitted she did "not know how much [the patients] were impacted"; her "presumption is, if they did not have access to the technology they were planning to use . . . then they were

71

impacted."[419] While an expert may assume facts to form opinions, the expert's opinions themselves cannot constitute assumptions. Allscripts offers no meaningful rebuttal to Andor's argument; Allscripts simply cites portions of Dr. Harris's report where Dr. Harris includes facts but fails to explain how Dr. Harris's conclusions do not constitute speculation. We preclude Dr. Harris from offering speculative opinions as to harms the attack may have caused.

### 2.  Dr. Harris cannot interpret contracts.

Andor also moves to exclude portions of Dr. Harris's rebuttal report regarding the import of the settlement agreement. Andor argues Dr. Harris improperly interprets contracts. Dr. Harris submitted a report rebutting the conclusions of Andor's expert, Mark Anderson. Dr. Harris discusses a confidential settlement agreement between Raj Toleti, Andor, and Mahathi Software, including many of the terms in the contract.[420]

It is well-established "the law of contract interpretation . . . firmly prohibits expert testimony as to legal duties, standards or ramifications arising from a contract."[421] An expert may not opine regarding "the scope and meaning" of a contract.[422]

Dr. Harris impermissibly opines on "the scope and meaning" of the settlement agreement in section II.A of her rebuttal report.[423] She opines a section of the agreement "reflects the parties' agreed understanding of Andor's products as of the date [of] the Settlement Agreement"; "[b]y signing the Settlement Agreement, Andor represented and agreed that [its] products specifically targeted providers to help coordinate care amongst each other"; "Andor did not indicate that [its] product could (or would) be used to engage patients"; the agreement "required the parties to enter into a Marketing Services Agreement"; "[u]nder the Marketing Services Agreement, Andor could market its ThinkAndor and AndorNow solutions to Allscripts clients"; "the Marketing Services Agreement expressly forbids Andor from" selling certain solutions; section 3.1(v) "prohibits

Andor from" referencing certain things; and the contracts "evidence the parties' understanding and agreement" regarding the definition of Andor's products.[424]

These opinions contain legal conclusions regarding the meaning of contractual terms. Dr. Harris opines on the parties' obligations under the contracts, the parties' intent entering the contracts, and the "meaning" of the contractual terms. These tasks are for the jury. Dr. Harris may not offer a contract interpretation to the jury.

## VI.    Conclusion

Both sides in this case collectively employ eighteen experts to assist the factfinder. They collectively move to exclude fourteen of the eighteen for varied reasons under *Daubert*. We reviewed and studied the *Daubert* motions in the context of the parties' claims, counterclaims, and defenses. We largely deny the parties' motions and permit the experts to testify subject to rigorous cross-examination. But we must exercise our gatekeeping function and exclude some experts' opinions they are unqualified to offer, or which lack fit, are unreliable, or constitute improper legal or state-of-mind opinions. We excluded some but not all of the experts' opinions regarding the Indian criminal system. We exclude Mr. Jenkins's opinions. We exclude all of Mr. Brandon's opinions except his opinion payment of police travel by crime victims is atypical. We permit Attorney Memon to opine on Indian criminal procedure and Mahathi's participation in the criminal process, but we preclude his opinions on the conduct of the Indian police. We permit Attorney Naushad to opine on the standards of the Indian criminal justice system and whether Mahathi deviated from those standards but preclude all other opinions. We similarly permit Attorney Ragavand's opinions on the standards of the Indian criminal justice system and whether Mahathi deviated from those standards but preclude all other opinions. We permit most of the damages experts' opinions. We allow Mr. Ratner to testify to all opinions except those only requiring simple math in sections 7.1, 7.2, and 7.3 of his report. We permit all of Mr. Bersin's opinions except those

which opine on the legal cause of Andor's alleged harms. We permit most but not all of the technology expert opinions. We exclude Mr. Rankhorn's opinion as to "what tenants are, the relationship between tenants and subscriptions, [and] ownership of tenants", and Messrs. Rankhorn and Youness' state of mind opinions, legal conclusions, and interpretations of contracts. We permit all other opinions of Messrs. Rankhorn and Youness. We permit Mr. Zeidman's opinion Andor copied Allscripts's source code. We permit Mr. Ulrich's reverse engineering opinions, his non-quantitative opinion on whether Allscripts saved time and money by reverse engineering the Config Tool, and opinions not involving Allscripts's state of mind, but preclude his opinions on the value of Andor's Config Tool and his opinions involving Allscripts's state of mind. We finally permit some but not all of the miscellaneous expert testimony. We permit Aneesh Chopra's testimony in full.  We only permit Mr. Cauthen to testify regarding the clarifying assignment and assumption letter. We finally preclude Dr. Harris from offering speculative opinions and opinions interpreting contracts.

---

[1] Fed. R. Evid. 702.

[2] *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008).

[3] *Honeywell, Inc. v. Am. Standards Testing Bureau, Inc.*, 851 F.2d 652, 656 (3d Cir. 1988).

[4] *Calhoun v. Yahama Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003).

[5] *B. Braun Melsungen AG v. Terumo Medical Corp.*, 749 F. Supp. 2d 210, 222 (D. Del. 2010) (citing *Daubert*, 509 U.S. at 592 n. 10; *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999)).

[6] *Pineda*, 520 F.3d at 244.

[7] *Id.*

[8] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994).

---

[9] *Id.*

[10] *Id.* at 742.

[11] *Walker v. Gordon*, 46 F. App'x 691, 694 (3d Cir. 2002) (quoting *In re Paoli*, 35 F.3d at 742).

[12] *Id.* (quoting *In re Paoli*, 35 F.3d at 741–42).

[13] *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329 (3d Cir. 2002) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)).

[14] *United States v. Schiff*, 602 F.3d 152, 173 (3d Cir. 2010) (cleaned up).

[15] *Id.* (internal quotations omitted).

[16] *Id.* (internal quotations omitted).

[17] *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985).

[18] *See id.*

[19] Fed. R. Evid. 403.

[20] Fed. R. Evid. 702.

[21] *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 217 (3d Cir. 2006) (citing *United States v. Leo*, 941 F.2d 181, 195–96 (3d Cir. 1991)).

[22] *Patrick v. Moorman*, 536 F. App'x 255, 258 (3d Cir. 2013) (quoting *Berckeley*, 455 F.3d at 217).

[23] *Nix v. Sawyer*, 466 A.2d 407, 412 (Del. Super. Ct. 1983).

[24] *Adams v. Aidoo*, 2012 WL 1408878, at *13 (Del. Super. Ct. Mar. 29, 2012) (quoting *Pfeiffer v. State Farm Mut. Auto. Ins. Co.*, 2011 WL 7062498, at *5 (Del. Super. Ct. Dec. 20, 2011)), *aff'd*, 58 A.3d 410 (Del. 2013), *as revised* (Jan. 3, 2013).

[25] *Id.*

[26] D.I. 472.

[27] D.I. 471-21 at 2, § II.3.

[28] D.I. 471–21.

[29] D.I. 471–22.

---

[30] D.I. 471–24.

[31] D.I. 471–24 at 1, 19, §§ I.1, VI. Mr. Jenkins's report purports to do two things: (1) opine on the travel expenses incurred by Indian police but paid for by Mahathi, and (2) rebut Andor's expert Kenneth Mathieu, forensic accounting expert. Mr. Mathieu's report is not at issue. We confine our review of Mr. Jenkins's opinion to his travel analysis conclusions.

[32] D.I. 471–24 at 17–18, § 23.a.–f.

[33] *See* Jenkins report at § 23.b., D.I. 471–24 at 17.

[34] *See* Jenkins report at § 23.f, D.I. 471–24 at 22–23.

[35] D.I. 472.

[36] D.I. 471-25 at 3.

[37] *Id.* at 6.

[38] *Id.* at 13, ¶ 11.

[39] *Id.* at 80–81, ¶ 37.53.

[40] *Id.* at 87, ¶¶ 37.63, 37.64.

[41] *Id.* at 89–96, ¶¶ 37.69–37.74.

[42] *Id.* at 82–84, ¶¶ 37.55–37.56.

[43] *Id.* at 7–8, ¶¶ 2–3; at 76–80, ¶¶ 37.45–37.52; at 96, ¶ 37.75.

[44] D.I. 472.

[45] D.I. 471–27 at 4–6, § II, ¶¶ 7–13.

[46] *Id.* at 1, § I. ¶ 1.

[47] *Id.* at 32, § VI, ¶¶ 100–106.

[48] Andor believes the following testimony shows Mr. Brandon "retracted" his opinion during his deposition:

> Q. Before we had our technical difficulties a few minutes ago, Mr. Brandon, I read to you the statement at the end of your rebuttal report that "Mahathi's conduct amounts to influencing, funding, and actively participating in the police investigation, corrupting the

investigation and making it unethical and unreliable." And my question is just is that an opinion you continue to intend to present to the jury in this case?

A. The difference is that there's nothing in here that said I would present this to the jury. I will – I will continue to consider this something to be considered and to be investigated. If, in fact, I don't find anything that supports this, clearly, this will not be a factor at all, but I'm not talking about presenting anything to a jury tomorrow or anything else. I'm just saying this is my investigative process, my thoughts at this point, and I will pursue that in determining the facts in my own mind to see if there is an issue.

Q. Are you saying you still need to conduct further investigation to determine whether you can support the statement that I just read to you?

A. Yes.

Q. You haven't reached that as an opinion at this point in time that you could present to a jury?

A. Well, I'm not sure at what point an opinion carries any weight that, in fact, that is my investigative opinion now that what I said is possible, and we will consider this. We will look at it to either determine whether that this may be what has occurred or say – we come to the end and we say we do not have any indication that any of this did occur.

Q. If you were on the witness stand and sworn in right now, you would not testify under oath to the statement that I just read you?

. . .

A. I know. Today I do not have anything to completely support or give that opinion. That is my --- that was my opinion at a point in time, and it continues because it has not been resolved to my satisfaction either way.

   *See* D.I. 472 at 19, citing deposition testimony at D.I. 471-28 at 257–58.

[49] D.I. 472 at 19.

[50] D.I. 467–2 (expert report of Attorney Ragavan); D.I. 467-4 (rebuttal report of Attorney Ragavan to Mr. Brandon's opinion).

[51] D.I. 467–2 at 6, § A.

[52] *Id.*

[53] D.I. 467–2 at 29–30, § G.

[54] We find Attorney Ragavan qualified. A proffered expert witness "at a minimum, … must possess skill or knowledge greater than the average layman," a requirement liberally construed by our Court of Appeals. *Schuchardt v. President of the United States*, 802 F. App'x 69, 75 (3d Cir. 2020) (quoting *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998)). And our Court of Appeals "eschew[s] imposing overly rigorous requirements of expertise and [is] satisfied with more generalized qualifications." *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d at 741. Here, Attorney Ragavan received her law degree in India and obtained two additional degrees in the law. She is a professor of law and directs Texas A&M law school's India Program. She worked in the legal departments of two corporations in India. She is an expert in intellectual property law. She possesses knowledge greater than the average layman and is qualified to opine on the framework of the Indian criminal justice system.

[55] D.I. 467–1 at 5.

[56] D.I. 497 at 6–7.

[57] We exclude Attorney Ragavan's opinion India's "robust, independent criminal justice system" makes it impervious from manipulation or abuse. Attorney Ragavan's opinion suggests Andor cannot be liable for abuse of process. This is an improper legal opinion under Rule 704(a).

[58] D.I. 467–2 at 14, § C.(iii). Attorney Ragavan may describe the Code of Criminal Procedure. She may opine as to whether the Mahathi's conduct is not typical of the standards of a victim reporting crime in India.

[59] *Id.*

[60] D.I. 467-2 at 15, § D.

[61] *Id.* at 19–20, § D.(ii).

[62] D.I. 467–2 at 12, § C.(ii).

[63] *Id.* at 18.

[64] D.I. 467–4 at 11, § B (rebuttal report).

[65] *Id.* at 11, § B (rebuttal report) (emphasis in original).

[66] *Id.* at 24, § F. This is a fact question unless Attorney Ragavan can show how Mahathi's conduct is typical of a victim under the Indian cybercrime law.

[67] D.I. 498 at 1. There appears to be disagreement between the parties regarding Attorney Naushad's retention. Allscripts believes Andor offers Attorney Naushad affirmatively and not as a rebuttal expert. *See* D.I. 468-1 at 1. Andor contends it retained Attorney Naushad in rebuttal to Allscripts' expert Zulfiquar Memon. D.I. 498 at 1.

---

[68] D.I. 468-2 at 1, § 1.1.

[69] *Id.* at 29–30, § 9.1.

[70] D.I. 468–1 at 5. We find Attorney Naushad qualified as an expert. She is an Advocate in the Bar Council of Delhi since 2015 and is currently working on a Master of Laws degree from Columbia University specializing in criminal law and procedure. She practiced law in India, focusing her legal career in advisory and litigation in white collar crimes. Before starting her program at Columbia University, she served as a Principal Associate in dispute resolution of a premier law firm in India where she specialized in white collar crime defense and investigations. She is the author of research papers, a book on white collar crime in India, and co-authored articles including on Indian criminal law. *See* D.I. 468-2 at 1–2, § 2.

[71] D.I. 468–1 at 2.

[72] *Id.* Allscripts additionally argues expert opinion, even on foreign law, must still be reliable and not constitute a legal conclusion, citing Federal Rule of Civil Procedure 44.1. Rule 44.1 provides: "A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of evidence. The court's determination must be treated as a ruling on a question of law." We fail to see how Rule 44.1 applies here. We are not applying foreign law to Allscripts's abuse of process claim. The parties agree Delaware law applies to the abuse of process claim.

[73] *See* D.I. 498 at 5–8.

[74] D.I. 471-2 ¶ 7.

[75] *Id.* at Appendix 2.

[76] *Id.* ¶ 94.

[77] *Id.* ¶ 101.

[78] *Id.* ¶ 109.

[79] *Id.* ¶ 133.

[80] *Id.* ¶ 144.

[81] D.I. 471-2 ¶ 58; *id.* at 46; *see also* D.I. 471-1, Ratner Dep. at 117:18–118:5 (confirming Mr. Ratner relied on the Merger Projections to create his lost profits opinions). The Merger Projections ran from 2018 to 2025. Mr. Ratner applied a three-year delay to the Merger Projections because functionality issues delayed implanting the Health Grid technology. *See* Ratner Dep. at 116:14–18.

---

[82] Ratner Dep. at 125:3–9 (noting the Merger Projections "rel[ied] on the premerger projections" in the Health Grid PowerPoint); 126:18–23 (same); 128:6–12.

[83] *Id.* at 121:1–122:2.

[84] *Id.* at 130:4–131:13.

[85] *See* D.I. 471-4 at 12 (the Merger Projections); Ratner Dep. at 142:9–144:3.

[86] Ratner Dep. at 153:18–24.

[87] D.I. 471-4 at 45.

[88] Ratner Dep. at 133:12–24.

[89] *Id.* at 133:20–134:5.

[90] *Id.* at 137:22–138:6.

[91] *Id.* at 140:7–17.

[92] *Id.* at 134:22–135:2.

[93] *Id.* at 135:10–11.

[94] *Id.* at 135:15–136:11.

[95] *Id.* at 139:17–140:5.

[96] *Id.* at 152:16–153:1.

[97] D.I. 471-2 at 42–43.

[98] *Id.* at 45–46.

[99] *Id.* at 46–47.

[100] *Apotex, Inc. v. Cephalon, Inc.,* 321 F.R.D. 220, 232 (E.D. Pa. 2017) (internal quotations omitted) (citing *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291–92 (3d Cir. 2012)).

[101] *In re SemCrude L.P.*, 648 F. App'x 205, 214 (3d Cir. 2016) (quoting *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (3d Cir. 2000)).

[102] *Apotex*, 321 F.R.D. at 233.

[103] *Id.* (alteration in original) (quoting *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013)).

[104] *In re SemCrude*, 648 F. App'x at 213.

[105] 696 F.3d 254 (3d Cir. 2012).

[106] *Id.* at 292.

[107] *Id.*

[108] *Id.*

[109] *Id.*

[110] *Id.* at 293.

[111] *Id.*

[112] *MOSAID Techs. Inc. v. LSI Corp.*, 2014 WL 807877, at *3 (D. Del. Feb. 28, 2014); *see also, e.g.*, *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 537 F. Supp. 3d 273, 339 (N.D.N.Y. 2021) (excluding expert opinion by following *ZF Meritor* where expert possessed "ignorance as to the most basic facts underlying the data he relies on"); *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 137 (M.D. Pa. 2015) (excluding lost profits analysis based on expert's "blind adherence to data absent any sort of independent investigation"); *Legendary Art, LLC v. Godard*, 2012 WL 3550040, at *4 (E.D. Pa. Aug. 17, 2012) (excluding lost profits opinion which relied on business projections "without independent verification" as unreliable); *Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 590–92 (D. Del. 2004) (excluding opinion which "simply adopted" a marketing plan's analysis "without reviewing its underpinnings," resulting in "a damages expert making untested[] and unverified marketing projections the foundation of a damages calculation").

[113] 648 F. App'x 205.

[114] *Id.* at 213.

[115] *Id.* at 213–14.

[116] *Id.* at 214.

[117] *See, e.g.*, *Apotex*, 321 F.R.D. at 233 (a "rational connection" between data and opinion existed, warranting admission of opinion); *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at *16 n.10 (E.D. Pa. July 29, 2015) (admitting expert opinion where expert relied on internal data estimates because jury should determine weight to apply to report); *In re: Chocolate Confectionary Antitrust Litig.*, 2013 WL 11305184, at *4 (M.D. Pa. May 10, 2013) (admitting opinion of expert who employed "flawed data" because "concerns about the sufficiency of the data upon which [the expert] relief properly go to the weight of the evidence, not its admissibility").

[118] *In re SemCrude*, 648 F. App'x at 213 (quoting *ZF Meritor*, 696 F.3d at 213).

[119] *Id.* (quoting *ZF Meritor*, 696 F.3d at 213).

[120] *Id.* (quoting *ZF Meritor*, 696 F.3d at 213).

[121] *ZF Meritor*, 696 F.3d at 293 (finding appellants "cannot clear [the] high hurdle" of an abuse of discretion standard); *id.* at 291 ("[T]he District Court did not abuse its discretion by finding that [the expert's] damages estimate, which was based heavily on the SBP projections, bore insufficient indicia of reliability to be submitted to a jury.").

[122] A district judge abuses his discretion only where the Court of Appeals obtains "a definite and firm conviction" the district judge "committed a clear error of judgment." *Id.* at 293.

[123] *Id.* at 292.

[124] *AngioDynamics*, 537 F. Supp. 3d at 339.

[125] *Salas by Salas v. Wang*, 846 F.2d 897, 905 (3d Cir. 1988).

[126] *See In re SemCrude*, 648 F. App'x at 214.

[127] *See Apotex*, 321 F.R.D. at 233.

[128] D.I. 471-2 at 47–49.

[129] *Id.* at 49.

[130] Ratner Dep. at 222:16–223:2.

[131] *Id.*

[132] *See, e.g.*, *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, 2020 WL 5822058, at *2 (S.D.N.Y. Sept. 30, 2020) (concern about failing to apportion damages among trade secrets "boils down to a dispute over the extent of misappropriation" and "is an issue for cross-examination"); *see also Philips N. Am. LLC v. Summit Imaging Inc.*, 2021 WL 2118400, at *7 (W.D. Wash. May 25, 2021) (similar holding).

[133] *See Syntel*, 2020 WL 5822058, at *2.

[134] D.I. 471-2 at 34–38.

[135] *Id.* at 34.

[136] *Id.* at 35.

[137] *Id.*

[138] *Id.* at 36.

[139] *Id.* at 37.

[140] *Id.* at 38.

[141] *CareDx, Inc. v. Natera, Inc.*, 2021 WL 1840646, at *3 (D. Del. May 7, 2021).

[142] Ratner Dep. at 281:19–282:2.

[143] *Id.*

[144] *CareDx*, 2021 WL 1840646, at *3; *AgroFresh Inc. v. Essentiv LLC*, 2019 WL 9514565, at *2 (D. Del. Oct. 7, 2019) (jurors are "more than capable of adding" data offered through fact witnesses); *Cavi v. Evolving Sys. NC, Inc.*, 2018 WL 2317594, at *2 (D. Del. May 21, 2018) (where expert opinion "amounts to nothing more than a simple math equation," the opinion involves "no scientific, technical, or other specialized knowledge involved that would help the jury").

[145] D.I. 469-2 at 25.

[146] *Id.* at 29.

[147] *Id.*

[148] *Id.* at 28–29.

[149] *Id.* at 30–31.

[150] *Id.* at 41–42.

[151] *Id.* at 41–42.

[152] *Id.* at 44.

[153] *Id.* at 42–44.

[154] *ZF Meritor*, 696 F.3d at 292.

[155] *See, e.g.*, *In re SemCrude*, 648 F. App'x at 214; *Apotex*, 321 F.R.D. at 233.

[156] *In re SemCrude*, 648 F. App'x at 214.

[157] Mr. Bersin's opinion on lost profits passes our gatekeeping function far more easily than Mr. Ratner's. Unlike Mr. Ratner, Mr. Bersin analyzed the documents underlying the input data he used

for his lost profits calculations. While Mr. Ratner accepted the Merger Projections largely because Valuation Research adopted them, Mr. Bersin reviewed the primary source of the projections by analyzing Andor's internal documents. While we find both opinions admissible, Allscripts should realize if Mr. Ratner's opinion is inadmissible for the reasons Allscripts argues in its motion, Mr. Bersin's would also be inadmissible for the same reasons.

[158] *See Rhoads Indus., Inc. v. Shoreline Found., Inc.*, 2021 WL 2778562, at *35 (E.D. Pa. July 2, 2021) ("[E]xpert opinions on damages commonly assume liability, which must be established independently.").

[159] D.I. 471-9 at 6–7.

[160] *Id.*

[161] D.I. 471-14 at 4–5.

[162] D.I. 472 at 18–21.

[163] *Id.* at 18–19.

[164] *Id.*

[165] *Id.* at 19.

[166] D.I. 501 at 14–15.

[167] *Id.* at 14–15.

[168] *Id.* at 15.

[169] *Pineda*, 520 F.3d at 244.

[170] *In re Paoli*, 35 F.3d at 741.

[171] *Id.*

[172] *Calhoun*, 350 F.3d at 322 ("While the background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions."); *Three Rivers Hydroponics, LLC v. Florists' Mut. Ins. Co.*, 2020 WL 419946, at *3 (W.D. Pa. Jan. 27, 2020) ("However, '[a]n expert may be generally qualified but may lack qualifications to testify outside [their] area of expertise.' While 'background, education, and training may provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions.'") (quoting *Calhoun*, 350 F.3d at 322); *Michaux v. Temas*, 2019 WL 6606110, at *5 (W.D. Pa. Dec. 5, 2019) ("An expert's qualifications are determined with respect to each matter addressed in the proposed testimony.") (citing *Calhoun*, 350 F.3d at 322); *Am. Cruise Lines, Inc. v. HMS Am.*

*Queen Steamboat Co. LLC*, 2017 WL 3528606, at *2 (D. Del. Aug. 16, 2017) ("Generalized qualifications are sufficient . . . but 'more specific knowledge is required to support more specific opinions[.]'") (citing *In re Paoli*, 35 F.3d at 741, then citing *Calhoun*, 350 F.3d at 322).

[173] D.I. 472 at 18.

[174] D.I. 471-9 ¶ 1.

[175] *Id.* ¶¶ 1, 3.

[176] *Id.* ¶ 4.

[177] *Id.*

[178] *Id.* ¶¶ 8–11.

[179] *Id.* ¶ 13.

[180] *Id.* ¶ 14.

[181] *Id.*

[182] *Id.* ¶ 15.

[183] D.I. 471-10, Rankhorn Dep. at 10:4–10; *see also* D.I. 471-9 at 2.

[184] D.I. 501 at 15.

[185] D.I. 472 at 18.

[186] Rankhorn Dep. at 10:18–11:5.

[187] *Id.* at 11:9–11; *see also id.* at 46:18–25.

[188] *Id.* at 27:16–30:14, 47:10–48:15.

[189] *Id.* at 57:3–58:15.

[190] D.I. 472 at 18.

[191] *Id.*

[192] *Id.* at 19.

[193] *Pineda*, 520 F.3d at 244 (further citations omitted) ("This liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts. '[I]t is an abuse of discretion to

exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.'").

[194] D.I. 472 at 19.

[195] *Id.*

[196] *Id.* at 20.

[197] D.I. 501 at 12.

[198] *Id.*

[199] *Id.* at 13.

[200] *Id.*

[201] D.I. 472 at 19.

[202] *Betterbox Commc'ns Ltd.*, 300 F.3d at 329 (quoting *Carmichael*, 526 U.S. at 150) (internal quotations omitted); *Palmer v. Black & Decker (U.S.) Inc.*, 2022 WL 1721207, at *2–3 (M.D. Pa. May 27, 2022); *Ezeibe v. Chivers*, 2022 WL 882732, at *4 (M.D. Pa. Mar. 24, 2022) ("In cases like this one 'where an expert is proffered to testify regarding non-scientific matters, '[t]he relevant reliability concerns [will] focus upon personal knowledge [and] experience' of the witness and the methodology used will be applying that experience to the facts of the case.'") (further citation omitted); *Christoforetti v. Bally's Park Place, Inc.*, 2021 WL 3879074, at *4, 6 (D.N.J. Aug. 31, 2021) ("[W]hen examining expert testimony that is based on practical experience, rather than academic theories, 'the *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable' because the reliability of testimony from a practical experience expert 'depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'") (further citation omitted).

[203] *Ezeibe*, 2022 WL 882732, at *4.

[204] *See, e.g.*, D.I. 471-11, Youness Dep. at 177:3–185:17.

[205] *See, e.g.*, D.I. 471-14 at 2–4.

[206] *Id.* at 2–4, 33–34.

[207] *Christoforetti*, 2021 WL 3879074, at *6–7.

[208] D.I. 472 at 20.

[209] *See, e.g.*, Youness Dep. at 110:18–114:8, 164:19–167:2, 187:20–193:14.

---

[210] *Palmer*, 2022 WL 1721207, at *3.

[211] *Id*. ("Rather, to the extent that Defendants believe that the opinions of [the expert] are unsubstantiated by the available facts upon which he based his conclusions, or that he relied on incorrect facts in forming his opinions and conclusions, the appropriate remedy is the presentation of contrary evidence and 'vigorous' cross-examination of the witnesses."); *see also Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination.").

[212] D.I. 472 at 20.

[213] *Id.*

[214] *Shire Viropharma Inc. v. CSL Behring LLC*, 2021 WL 1227097, at *25 (D. Del. Mar. 31, 2021); *see also In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 2020 WL 6887885, at *5 (E.D. Pa. Nov. 24, 2020); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 286 F.R.D. 266, 271 (W.D. Pa. 2012).

[215] D.I. 472 at 21.

[216] D.I. 501 at 15–16.

[217] *Colkitt*, 455 F.3d at 217; *Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co., LP*, 203 F. Supp. 3d 499, 546 (E.D. Pa. 2016); *Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*, 2021 WL 982732, at *16 (D. Del. Mar. 16, 2021).

[218] *Sprint Commc'ns Co. LP*, 2021 WL 982732, at *16; *Comcast Cable Commc'ns, LLC*, 203 F. Supp. 3d at 546 (both citing *Roche Diagnostics Ops., Inc. v. Abbott Diabetes Care*, 756 F. Supp. 2d 598, 606 (D. Del. 2010), *aff'd sub nom. Roche Diagnostics Operations, Inc. v. Lifescan Inc.*, 452 F. App'x 989 (Fed. Cir. 2012).

[219] *Comcast Cable Commc'ns, LLC*, 203 F. Supp. 3d at 546.

[220] Rankhorn Dep. at 53:7–54:7 ("I believe in the merger agreement, the area I focused on, I believe, was – refer to my report – but I believe it was 3.6 talking about, in essence, what do you get – what does Allscripts get when they purchase HealthGrid, and that is a plain statement that I feel I can interpret."); Youness Dep. at 267:24–269:12, 307:15–308:1 ("According to the merger agreement, they belong to Allscripts along with the tools used for building and managing those applications, and one of those tools is the Active Directory."); *see also* Youness Dep. at 308:2–16 (indicating Merger Agreement not sole basis for opinion).

[221] D.I. 472 at 21.

[222] D.I. 471-9 ¶ 3 ("Andor, Mahathi, Toleti, and Tyriver, working together, accessed Allscripts' computer resources with knowledge that they were owned by Allscripts and with the willful intent

to deny Allscripts access to Allscripts' computer resources."), 32; D.I. 471-14 at 23 (Youness opining, "In my opinion this was an intentional malicious act to hack into and sabotage an organization's access to its own cloud resources.").

[223] D.I. 501 at 17.

[224] *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 497 (D. Del. 2019) (ellipses in original) (further citation omitted); *see also Sec. & Exch. Comm'n v. Ambassador Advisors, LLC*, 2021 WL 6052589, at *6 (E.D. Pa. Dec. 21, 2021) (publication in F. Supp. 3d forthcoming); *Shire Viropharma Inc.*, 2021 WL 1227097, at *5 (intent not proper expert testimony because it is "classic jury question"); *In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 181 F. Supp. 3d 278, 294–95 (E.D. Pa. 2016);

[225] D.I. 472 at 21.

[226] *Patrick*, 536 F. App'x at 258.

[227] *Id.*; *see also Leo*, 941 F.2d at 197; *Colkitt*, 455 F.3d at 217–18 (permitting testimony about customs but not whether complied with legal duties and/or exempt from registration requirements because improper legal conclusions); *Hartle v. FirstEnergy Generation Corp.*, 2014 WL 5089725, at *3–4 (W.D. Pa. Oct. 9, 2014).

[228] D.I. 472 at 14–18.

[229] D.I. 471-5 ¶ 102.

[230] D.I. 472 at 15–18.

[231] D.I. 501 at 9–11.

[232] D.I. 472 at 15–17.

[233] D.I. 471-5 ¶ 6.

[234] *Id.*

[235] *Id.* ¶¶ 9, 10, 21; *see also id.*, Exhibit A (Zeidman resume including list of all publications).

[236] *Id.* ¶ 10; *see also id.*, Exhibit A.

[237] *Id.* ¶¶ 20–21.

[238] *Id.* ¶ 21; *see also id.*, Exhibit A.

[239] *Id.* ¶ 21.

[240] *Id.* ¶¶ 10, 22.

[241] *Id.* ¶¶ 22, 25–26.

[242] *Id.* ¶¶ 28–31; *see also id.* ¶¶ 13–19 (explaining the function of statements, comments/strings, identifiers, and instruction sequences in the source code).

[243] *Id.* ¶ 22.

[244] *Id.* ¶ 24.

[245] *Id.* ¶ 22; *see also id.* ¶ 27.

[246] *Id.* ¶¶ 32–34, 36.

[247] *Id.* ¶ 32.

[248] *Id.* ¶ 34.

[249] *Id.* ¶ 36.

[250] *Id.*

[251] *Id.* ¶ 23.

[252] *Id.*; D.I. 471-6, Zeidman Dep. at 39:14–18.

[253] Zeidman Dep. at 38:19–39:10.

[254] D.I. 471-5 ¶ 57.

[255] *Id.* ¶¶ 57–69.

[256] *Id.* ¶ 57.

[257] *Id.* ¶ 70.

[258] *Id.* ¶¶ 70–102; *see also* D.I. 501-2, Zeidman Supplemental Report ¶¶ 22–54.

[259] D.I. 472 at 15–16.

[260] *Id.* at 16.

[261] *See, e.g.*, D.I. 472-5 ¶¶ 57–69; Zeidman Dep. (explaining process of filtering throughout deposition).

[262] Zeidman Dep. at 163:21–169:9.

[263] Zeidman Dep. at 58:12–59:20, 115:23–117:23, 126:21–127:21, 136:19–137:13, 226:3–227:4, 242:4–243:21.

[264] *Id.*

[265] *Id.* at 58:19–59:20.

[266] *Id.* at 117:13–23.

[267] *Id.* at 78:9–83:3.

[268] *Id.*

[269] *Id.*

[270] *Id.*

[271] *Id.* at 79:2–7.

[272] *Id.* at 82:21–24.

[273] *Id.*

[274] *Id.* at 83:1–3.

[275] *Id.* at 115:23–117:23, 136:19–137:13.

[276] *Id.* at 115:23–117:23, 126:21–127:21, 136:19–137:13, 138:12–17, 170:3–171:9.

[277] D.I. 473-5.

[278] D.I. 473-1.

[279] D.I. 500.

[280] D.I. 473-1 at 11.

[281] *Id.*

[282] D.I. 473-5, Ex. C at 9. Mr. Ulrich's report has been filed on CM/ECF multiple times, making it impossible to discern the CM/ECF pagination provided. Thus, when referencing Mr. Ulrich's affirmative expert report, we use the page numbers provided by Mr. Ulrich on the bottom of the page.

[283] D.I. 473-7, Ulrich Dep. at 29:5–17, 36:15–38:24.

[284] *Id.* at 28:8–18, 34:11–35:6.

[285] *Id.* at 37:1–38:24.

[286] D.I. 473-1 at 11–12.

[287] Ulrich Dep. at 117:24–119:13.

[288] *Id.*; *see also* D.I. 473-1 at 11 (Allscripts selectively citing a portion of his answer).

[289] Ulrich Dep. at 119:14–120:12.

[290] *See, e.g.*, D.I. 473-5 ¶¶ 12–22; *see also id.*, Ex. A (curriculum *vitae*).

[291] D.I. 473-1 at 12.

[292] *Id.*

[293] *Id.*

[294] D.I. 277, Counterclaim Count VI ¶¶ 304–309.

[295] D.I. 473-2 at 7 § 2.2. The Reseller Agreement has been filed on CM/ECF multiple times, making it impossible to discern the CM/ECF pagination provided. Thus, when referencing the Reseller Agreement, we use the page numbers of the Agreement in the bottom center of the page.

[296] D.I. 473-1 at 12.

[297] D.I. 473-2 at 7 § 2.2(e).

[298] *Id.* § 2.2(a)

[299] *Id.* § 2.2(c).

[300] *Id.* § 2.2(g).

[301] D.I. 473-1 at 13.

[302] *Id.*

[303] *Id.* at 14.

[304] *Id.* at 15.

91

[305] *Id.* at 17–21.

[306] *Id.* at 18.

[307] D.I. 500 at 15.

[308] *Id.* at 15–18.

[309] D.I. 473-5, Ex. C.

[310] D.I. 473-1 at 19.

[311] Ulrich Dep. at 140:12–24.

[312] D.I. 473-1 at 20–21.

[313] *Id.* at 19, 21–22.

[314] *Id.* at 22.

[315] D.I. 471-8 ¶ 99.

[316] D.I. 473-1 at 21.

[317] *Id.*

[318] D.I. 500 at 18–19.

[319] In a preceding paragraph, Mr. Ulrich explained based on his interviews with Andor, "2 industry advisors, 5 design/product architects, 7 software engineers/developers, 2 graphics/UI developers, and a 3-person QA team were continuously involved over a roughly 18 [*sic*] month period to build the Andor Config Tool." D.I. 473-5 ¶ 34.

[320] *Id.* ¶ 35.

[321] Ulrich Dep. at 210:16–22.

[322] *Id.* at 210:23–211:14. The parties do not identify what Mr. Ulrich is referring to as "CMS".  We generally understand CMS to be the Centers for Medicare and Medicaid Services but we cannot bolster counsel's burden.

[323] *Id.* at 211:15–212:3.

[324] *Id.* at 212:4–8.

[325] *Id.* at 212:9–213:10.

[326] *Id.* at 213:11–12.

[327] *Id.* at 213:13–14.

[328] *Id.* at 213:15–214:6.

[329] *Id.* at 214:7–15.

[330] *Id.* at 214:17–24.

[331] *Id.* at 215:1–2.

[332] D.I. 500 at 19.

[333] D.I. 473-5 ¶ 35.

[334] D.I. 473-5 ¶ 35 n.6–8.

[335] Ulrich Dep. at 217:13–16.

[336] *Id.* at 217:17–19.

[337] *Id.* at 217:19–218:5.

[338] D.I. 473-5 ¶ 35 ("The value of MPE campaigns in general is well understood and it is a national strategy supported and followed by CMS, the National Health Council, and EHR vendors groups.")

[339] *Frequently asked questions*, Electronic Health Record, available at https://www.healthit.gov/faq/what-electronic-health-record-ehr (last visited July 27, 2022).

[340] D.I. 473-5 ¶ 35.

[341] D.I. 473-1 at 19.

[342] *Id.*

[343] *Id.*

[344] D.I. 500 at 16.

[345] D.I. 473-5 ¶¶ 68–70.

[346] *Id.* ¶ 68.

[347] Ulrich Dep. at 152:19–153:2.

[348] D.I. 473-5 ¶ 70.

[349] D.I. 473-5 ¶ 63.

[350] *Id.* ¶ 64.

[351] *Id.*

[352] D.I. 521-1.

[353] D.I. 521.

[354] D.I. 363.

[355] D.I. 466, 466-1.

[356] *Id.*

[357] D.I. 479.

[358] D.I. 482, 484.

[359] D.I. 484.

[360] D.I. 521.

[361] *Id.*

[362] D.I. 363.

[363] *Id.*

[364] D.I. 479, 484.

[365] D.I. 479; 484 (permitting the same).

[366] D.I. 521.

[367] D.I. 542.

[368] *Id.*

[369] *Id.*

[370] D.I. 521.

[371] Fed. R. Civ. P. 37(c)(1).

[372] *See, e.g.*, *ZF Meritor*, 696 F.3d at 298.

[373] *Id.* (internal quotations omitted).

[374] D.I. 466-1 at 13; D.I. 521 at 13 (incorporating previous arguments raised in first motion).

[375] D.I. 521-2 (Chopra's deposition transcript); *see also* Fed. R. Civ. P. 26(b)(4)(A) ("(A) *Deposition of an Expert Who May Testify*. A party may depose any person who has been identified as an expert whose opinions may be presented at trial**.** If Rule 26(a)(2)(B) requires a report from the expert, the deposition may be conducted only after the report is provided.") (italics in original)..

[376] D.I. 521-2 (deposition transcript, CV, publications, past testimony, no compensation).

[377] D.I. 466-1, 521.

[378] D.I. 542 at 9 (Andor arguing we need not decide this issue because Mr. Chopra is properly testifying under Federal Rule of Evidence 702.).

[379] D.I. 471-18.

[380] D.I. 472 at 23.

[381] D.I. 501 at 20.

[382] D.I. 472 at 23.

[383] *Id.*

[384] D.I. 501 at 20.

[385] *Schiff*, 602 F.3d at 173 (3d Cir. 2010).

[386] *Id.* (internal quotations omitted).

[387] *Id.* (internal quotations omitted).

[388] D.I. 41 ¶¶ 187–202, 512–519.

[389] D.I. 277 ¶¶ 73–77, 111–15, 364–73.

[390] D.I. 444 (Allscripts's 339 paragraphs of facts in support of summary judgment); D.I. 503 (Allscripts's response to Defendants' facts and additional facts in support of summary judgment only mentioning Nicklaus Children's Hospital with respect to tortious interference.)

---

[391] D.I. 501 at 20.

[392] D.I. 471-18 at 5 ¶ 4(a). *Compare* D.I. 471-18 at 5 ¶ 4(a), 29 ¶ 53 (no actor identified in conclusion) with D.I. 471-18 at 5 ¶ 4(b) (actor identified in conclusion); D.I. 471-20 at 4 ¶ 6 (amending opinion in paragraph 4(b)).

[393] D.I. 471-19, Cauthen Dep. at 132:23–133:6, 136:17–137:11.

[394] D.I. 277 ¶ 369.

[395] D.I. 277 ¶ 360.

[396] D.I. 472 at 23.

[397] D.I. 471-18 at 5 ¶ 4(b).

[398] *Id.* at 5 ¶ 3.

[399] *Id.* at 30–44 ¶¶ 1–69.

[400] D.I. 471-20 at 10–11 ¶¶ 35–39.

[401] D.I. 471-20 at 5–11.

[402] *Compare* D.I. 471-20 at 10–11 ¶¶ 35–39, *with* 471-18 at 30–44 ¶¶ 1–69.

[403] D.I. 471-20 at 5–11.

[404] *Wilburn v. Maritrans GP Inc.,* 139 F.3d 350, 359 (3d Cir. 1998) (quoting *Salem v. United States Lines Co.*, 370 U.S. 31, 35 (1962)); *In re Davol, Inc.*, 546 F. Supp. 3d 666, 679 (S.D. Ohio 2021); *Krys v. Aaron*, 112 F. Supp. 3d 181, 206 (D.N.J. 2015) ("In other words, 'an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based on record evidence.'" (quoting *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 469 (S.D.N.Y.2005)).

[405] D.I. 501 at 21.

[406] D.I. 472 at 23.

[407] D.I. 526.

[408] D.I. 501 at 21.

[409] D.I. 471-18 at 6 ¶¶ 4(c), 71–72 ¶¶ 75–81.

[410] *Id.* at 72 ¶ 81.

---

[411] D.I. 144–45.

[412] D.I. 144.

[413] D.I. 471-15.

[414] *Id.* at 97–103.

[415] *Id.* at 65.

[416] *United States ex rel. Jackson v. DePaul Health Sys.*, 454 F. Supp. 3d 481, 491 (E.D. Pa. 2020); *see also Fedorczyk v. Caribbean Cruise Lines, Ltd.*, 82 F.3d 69, 75 (3d Cir. 1996) ("[I]f an expert opinion is based on speculation or conjecture, it may be stricken.").

[417] *Fedorczyk*, 82 F.3d at 75.

[418] D.I. 471-15 at 64 (emphases added).

[419] D.I. 471-16 at 79 (Harris Dep. at 306:4–8).

[420] D.I. 471-17 at 10–11.

[421] *Dow Chem. Canada Inc. v. HRD Corp.*, 656 F. Supp. 2d 427, 435 (D. Del. 2009), *aff'd*, 587 F. App'x 741 (3d Cir. 2014).

[422] *Roche Diagnostics Operations, Inc.*, 756 F. Supp. 2d at 606.

[423] D.I. 471-17 at 10–11.

[424] *Id.*