## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **ALLSCRIPTS HEALTHCARE, LLC,** *et al.* | **:** | **CIVIL ACTION** |
| | **:** | |
| | **:** | |
| **v.** | **:** | **NO.  21-704-MAK** |
| | **:** | |
| **ANDOR HEALTH, LLC,** *et al.* | **:** | |

## MEMORANDUM
### with Findings of Fact & Conclusions of Law

**KEARNEY, J.**                                                            **August 23, 2022**

Allscripts Healthcare, LLC moves to enforce what it perceives to be the material terms of an oral settlement agreement with Amar Bulsara, one of several parties Allscripts sued arising from its failed business relationship with Andor Health, LLC; Mahathi Software Pvt., Ltd.; and its principals. These material terms include, among other things, for Mr. Bulsara to resign from his current employer and not compete with Allscripts for six months. Mr. Bulsara opposes, arguing we should disregard his counsel's representations to us of "think[ing] we are in agreement on material terms" when, in fact, Allscripts now proposes defined terms beyond agreeing to not compete with Allscripts or in the patient engagement and telehealth industry for six months.

We held an evidentiary hearing to resolve disputed issues of fact raised by Allscripts's attempt to not only enforce the six-month non-compete obligation but also its attempt to define the scope of the non-compete beyond discussed terms added into a draft settlement agreement which Mr. Bulsara's lawyer did not read before he thought the parties "are in agreement on material terms." We today enter findings of fact and conclusions of law finding genuine issues of

material fact as to the terms of the agreement sought to be enforced in Allscripts's overbroad motion seeking to enforce terms beyond those orally agreed by the lawyers and the parties:

## I.      Findings of Fact

1.      Health Grid LLC employed Amar Bulsara as its Vice President of implementation before May 18, 2018.[1]

2.      Allscripts Healthcare, LLC acquired Health Grid LLC on May 18, 2018 and hired Mr. Bulsara to continue implementing the Health Grid products.[2]

3.      Mr. Bulsara signed the Allscripts Inventions and Restrictive Covenant Agreement upon joining Allscripts. The Restrictive Covenant Agreement contained non-solicitation, non-interference, non-competition, and non-disclosure provisions.[3]

4.      Mr. Bulsara left Allscripts in August 2020.[4]

5.      Global KTech hired Mr. Bulsara on September 11, 2020 as a consultant contracted exclusively to Andor Health LLC to, among other things, implement existing products.

6.      Allscripts, Andor Health LLC, and Mahathi Software Pvt., Ltd. began disputing a variety of business issues in spring 2021 including whether Mr. Bulsara violated multiple provisions of the Restrictive Covenant Agreement.

7.      Allscripts filed this action on May 17, 2021 suing Andor and, among others, Mr. Bulsara for misappropriation of trade secrets, tortious interference with existing and prospective economic advantage, breach of the Restrictive Covenant Agreement, and injunctive relief.[5]

8.      Mr. Bulsara retained Bradley P. Lehman, Esquire to defend the claims against him including arguing the Restrictive Covenant Agreement signed when Allscripts and Health Grid combined do not apply to him.

9.      The parties engaged in months of extensive discovery. We set an initial trial date in September 2021 to begin a seven-day jury trial on April 5, 2022.[6]

10.     The parties requested and we later rescheduled the trial to begin June 27, 2022.[7]

11.     The parties continued discovery, including through the repeated and able assistance of Special Master Chief Judge Sue L. Robinson.

12.     This dispute, at least from the public filings, involves claims between two entities and their principals. Most, if not all, discovery disputes involved the parties' differing views on their obligations. Few discovery disputes involved Mr. Bulsara's conduct.

13.     The parties, including Mr. Bulsara, timely cross-moved for summary judgment.[8]

14.     We denied Mr. Bulsara's motion for summary judgment on Allscripts's claims against him on June 9, 2022.[9]

15.     Mr. Bulsara moved for reargument of our Order denying his summary judgment motion on June 13, 2022.[10]  He also timely filed pretrial Memorandum.[11]

### Mr. Bulsara first offers settlement terms on June 13, 2022.

16.     Mr. Bulsara's counsel orally offered to settle the claims against Mr. Bulsara on June 13, 2022. Mr. Bulsara's lawyer proposed Mr. Bulsara quit his job and agree not to work at all for three months.[12]

17.     Mr. Bulsara thought he saved enough money to stay out of work for three months and if Andor succeeded at trial in defending against Allscripts's claims it improperly competed, he would be able to work directly for Andor in less than the offered three months.[13]

*Allscripts's June 14, 2022 counteroffer of six months of not competing with Allscripts.*

18.     The next day, on June 14, 2022, while we considered Mr. Bulsara's pending motion for reargument and while reviewing pretrial Memoranda for the June 27, 2022 trial, Allscripts presented an oral counteroffer to Mr. Bulsara:[14]

a.     Mr. Bulsara could work but just not compete with Allscripts and specifically not work for Andor or Mahathi during a six-month period and agree not to work in "patient engagement and telehealth industry."

b.     If Mr. Bulsara found a position outside of patient engagement or telehealth and not with the other defendants, he could start work on day one of the agreement and if he had concerns Allscripts might consider a position competitive, Allscripts was willing to evaluate any information he provided them and inform him whether it found the position competitive.

c.     If Allscripts was unsuccessful on its competition claims against Andor, and we found Andor did not improperly compete with Allscripts, Mr. Bulsara could begin working for Andor before the end of the six-month period.

d.     Allscripts's counteroffer did not involve the exchange of money but required the payment of attorney's fees for a party successfully persuading us as to the need to enforce the settlement agreement should a breach occur.

19.     At this point the parties had not substantively discussed the scope of the "patient engagement and telehealth industry" aside from the presumption that Mr. Bulsara would not work for Andor or Mahathi.[15]

*Apparent agreement as to general terms on June 15, 2022.*

20.     Mr. Bulsara's counsel emailed Allscripts the next day representing Mr. Bulsara "is willing to engage with Allscripts further on the '6 months' proposal" and asked, "If we

otherwise agree on the material terms we outlined on our call," could Mr. Bulsara provide his present employer Global KTech with two weeks' notice instead of immediately stopping work.[16]

21.     Allscripts responded, "Just to make sure I am clear – you are saying Mr. Bulsara would accept the offer but would like to be able to give Global KTech 2 weeks-notice instead of quitting immediately. Is that correct?"[17]

22.     Mr. Bulsara's counsel confirmed, "Assuming we reach agreement on all of the specifics, yes. He is willing to agree and try to figure out a way to make 6 months work on his end (understanding it may not really be 6 months if Andor prevails at least in pertinent part at trial)."[18]

23.     Allscripts called Mr. Bulsara's counsel and asked him, "[W]hat does that mean?" Allscripts told Mr. Bulsara's counsel Allscripts would permit a two-week notice to Global KTech, then asked if they had a deal and whether Allscripts should draft a written settlement agreement.[19]

24.     Mr. Bulsara's counsel said Allscripts should draft the settlement agreement.[20]

25.     The parties agreed to the six-month non-compete period undoubtedly prohibiting Mr. Bulsara from working directly or indirectly for Global KTech, his current employer or for Andor and Mahathi, or in the patient engagement and telehealth industry; including a two-week notice period to Global KTech; and including Allscripts's willingness to evaluate a potential competitive employer.[21]

26.     But the parties had no substantive discussions about what each understood to be "the patient engagement and telehealth industry" as proposed by Allscripts.[22]

27.    Following the call, Mr. Bulsara's counsel emailed Allscripts, "I think we are on the same page overall about settlement, and I will keep an eye out for a draft settlement agreement in the near term."[23]

28.    Allscripts swears it and Mr. Bulsara agreed to the material terms of the settlement agreement on June 15 notwithstanding no one understood the scope of the non-compete beyond not working directly or indirectly for Andor or Mahathi.[24]

### Allscripts adds scope of noncompete language on June 16, 2022.

29.    We denied Mr. Bulsara's motion for reargument on June 16, 2022.[25]

30.    Allscripts emailed a draft settlement agreement to Mr. Bulsara's counsel at 9:39 PM on June 16.[26]

31.    Allscripts added a new provision to the draft settlement agreement which no party asserts had been discussed earlier defining what Allscripts meant by "patient engagement and telehealth industry." Allscripts's counsel added a reference to KLAS[27] materials in the Restrictions on Scope of Work provision: "Bulsara agrees that for a period of six (6) months, he will not do work of any kind, directly or indirectly, for any company operating or doing business in the patient engagement and/or telehealth space, as those terms are generally applied by KLAS-including but not limited to companies evaluated or ranked by KLAS (the "Restricted Period"). This restriction is expressly understood to include Andor Health, LLC or Mahathi Software Pvt., Ltd., including through Global KTech. . . ."[28]

32.    A few minutes later at 9:52 PM, Mr. Bulsara's counsel confirmed receipt and thanked Allscripts for drafting the agreement.[29]

***The parties' June 17, 2022 discussions including representations to us.***

33.     The following morning, on June 17, 2022 at 10:39 AM, Mr. Bulsara's counsel represented he would "likely get back" to Allscripts later in the day or over the June 18–19 weekend with a few comments, "but I think it will likely be just clarifying-type comments to ensure we all have the same understanding of the details and prevent any confusion later on."[30]

34.     Mr. Bulsara's counsel swears he made these representations on June 17 without substantively reviewing the agreement and Mr. Bulsara had not seen a draft of an agreement.[31]

35.     A few minutes later, Allscripts asked Mr. Bulsara's counsel, "Are you still alright with us letting the Court know during our call today that an agreement has been reached and we are just working on finalizing the documentation?" Mr. Bulsara's counsel responded, "Yes, thanks."[32]

36.     We held the conference with counsel later in the afternoon of Friday, June 17 to discuss the parties' request for additional time to present their evidence at trial given Andor defendants' request for additional trial days including reviewing a brief offer of proof for each witness. We told the parties granting Andor's request would result in the trial being moved to January 2023 since we had no further time in our trial schedule to meet the days requested by Andor before then.[33]

37.     Allscripts raised the settlement with Mr. Bulsara to us early during our conference. We asked Mr. Bulsara's counsel Attorney Lehman to confirm the parties reached an agreement on material terms of a settlement and Mr. Bulsara's counsel responded, "[Y]es, your Honor. I think we are in agreement on material terms. I've got a draft, and there might just be some kind of clarification sorts of discussion. But otherwise, I think it should – there's no hurdle to finalizing it."[34]

38.     Mr. Bulsara's counsel now concedes his representation to us "was optimistic but turned out to be wrong."[35] The first draft of the settlement agreement he received from Allscripts after 9:30 PM on June 16 and <u>later</u> reviewed (after our June 17 call) referred to industry reports (the KLAS information) which he claimed he had never seen before and the parties had never discussed to define "patient engagement" and "telehealth."[36] The draft agreement also contained no geographic limitations.

39.     Mr. Bulsara had not seen the draft settlement agreement and the parties still had not substantively discussed the scope of the proposed non-compete provision before his lawyer represented "think[ing]" he had an "agreement on material terms."[37]

40.     Mr. Bulsara's counsel also swore during our evidentiary hearing he had not read the draft settlement agreement when he represented to us he thought the parties "are in agreement on material terms" subject to "some kind of clarification" discussion with "no hurdle to finalizing" the settlement.

41.     Mr. Bulsara's counsel also swore during our evidentiary hearing he represented this fact to Allscripts and us without Mr. Bulsara's consent while recognizing Mr. Bulsara authorized his counsel to negotiate a settlement and speak on his behalf.

***Parties continue to negotiate whether KLAS defines the scope of "patient engagement" and "telehealth space."***

42.     Mr. Bulsara's counsel credibly swore being surprised to find the non-compete provision in Allscripts's initial draft relied upon KLAS materials for the definitions of "patient engagement" and "telehealth" because the parties never discussed this definition.[38]

43.     After our conference on Friday afternoon on June 17, Mr. Bulsara's counsel emailed a redlined copy of the draft settlement agreement (which included the KLAS

information) back to Allscripts at 3:29 PM describing his changes as minor and "[h]opefully none of it is particularly controversial."[39] Although Mr. Bulsara's counsel did not delete or edit the substance of the non-compete provision with the KLAS information, Mr. Bulsara's counsel swears he intended his redlined draft to only clean up minor nits, and did not include his substantive revisions to the non-compete provisions because he had not yet discussed it with Mr. Bulsara.[40]

44.    Mr. Bulsara's counsel further told Allscripts he is passing along the draft settlement agreement to Mr. Bulsara and he would need to wait for Mr. Bulsara to have an opportunity to review it.[41]

45.    In the same email, Mr. Bulsara's counsel also asked Allscripts to forward the KLAS information cited in the June 16 draft settlement agreement to define "patient engagement" and "telehealth" to help clarify the definition for Mr. Bulsara.[42]

46.    Allscripts responded two days later on Sunday, June 19, 2022, accepting all of Mr. Bulsara's proposed revisions and redlines.[43] Allscripts itemized the claims relating to competitive action as its only further substantive change to the settlement agreement. Allscripts also provided the referenced KLAS materials and documents produced during discovery and identified by the Andor defendants to be used during trial and asked if Mr. Bulsara could now sign the settlement agreement if he "doesn't have further revisions."[44]

47.    Allscripts now seeks to enforce this June 19 version of the agreement.[45]

48.    Mr. Bulsara's counsel substantively discussed the initial draft agreement with Mr. Bulsara on Monday, June 20, 2022.[46] Mr. Bulsara expressed his "significant concerns about the proposed scope of the non-compete restrictions that were not addressed by the KLAS materials" Allscripts previously sent him.[47]

***Our June 21, 2022 Order disrupts settlement negotiations.***

49.     We needed to move the trial date for two reasons: Andor's repeated demands for more trial days after we reviewed offers of proof for each witness (not including Mr. Bulsara who we then understood had agreed to all material terms of a settlement); and Andor defendants' last-minute motion to withdraw jury demands raised significant constitutional issues just days before trial.[48] Neither Allscripts nor Mr. Bulsara would have an opportunity to meaningfully respond to this tactic before trial. Nor did we have the opportunity to review the issues before the June 27, 2022 trial.

50.     We rescheduled trial for January 2023 in our June 21, 2022 Order.[49] We also required Allscripts to either timely dismiss all claims against Mr. Bulsara or show cause why Mr. Bulsara should not be dismissed from the case based on the parties' representations during the June 17 conference.[50]

51.     Our June 21 Order changed the landscape for Mr. Bulsara. He admitted our Order requiring us to reschedule trial due to the Andor defendants' pending motions "sort of threw a wrench in things" and he began to question his consent to the six-month non-compete period of the settlement agreement.[51] At no earlier point did anyone mention the timing of the trial as a condition of settlement.

52.     Mr. Bulsara changed his mind on the agreed-upon six-month period of the non-compete. His change of mind does not change his consent to a six month non-compete.

53.     Mr. Bulsara's counsel also told Allscripts after our June 21 Order he had to reconnect with Mr. Bulsara to continue discussing the agreement "more substantively." He represented, "Mr. Bulsara would like a clearer idea of what is going to be considered competitive, as the KLAS document I passed along to him is fairly vague/broad in terms of 'patient engagement.'"[52] Mr. Bulsara's counsel proposed "just agreeing that [Mr. Bulsara] isn't

going to work for someone who is offering or plans to offer products that compete with Allscripts's products during the Restricted Period rather than relying on a sort of imprecise industry term that is more open to interpretation."[53] Mr. Bulsara's counsel offered to send a revised settlement agreement after speaking with Mr. Bulsara.[54]

### The parties' continued negotiations confirm no agreement on Allscripts's proposed scope of the non-compete.

54.     Trial judges and lawyers know an imminent date certain trial may motivate settlement discussions. We learned this lesson again. The parties could not reach agreement after our June 21, 2022 Order although they tried with each party bearing some responsibility: Mr. Bulsara tried to change his mind as to the six-month term and Allscripts arguably tried to expand the scope of the non-compete.[55]

55.     On June 23, 2022, after discussing the proposed settlement with Mr. Bulsara, Mr. Bulsara's counsel confirmed Mr. Bulsara's change of position to Allscripts based on the trial adjournment, representing "[t]he finality of knowing the outcome of trial within a few weeks was a primary reason that Mr. Bulsara felt he could agree to 6 months (there was potential for things to be resolved earlier)."[56] Mr. Bulsara's counsel candidly admitted he "would like to revisit the possibility of a shorter restricted period like the three months we proposed before."[57]

56.     But they continued to try settlement negotiations. Allscripts maintained the parties had an agreement as of June 15, 2022.[58] Mr. Bulsara's counsel maintained the parties never reached an agreement as to <u>all</u> the material terms.[59]

57.     As to the scope of the still-not-agreed-upon-and-undefined scope of the non-compete, Mr. Bulsara's counsel asked whether Allscripts would "agree on a list of companies it views as offering competing products (rather than the broad notions of 'patient engagement' and

'telehealth') so that Mr. Bulsara can have a better idea from the start of who he can and can't work for during the Restricted Period."[60]

58.   By July 28, 2022, Mr. Bulsara maintained he continued to "look[] around at jobs" but did not feel "comfortable moving ahead with the proposed settlement under present circumstances."[61] Mr. Bulsara specifically did not feel "comfortable quitting his job . . . and gambling on being able to find something suitable to him that is also OK with Allscripts within a reasonable time."[62]

59.   Allscripts seeks to enforce an agreement it believes the parties orally agreed to on June 15, 2022, and asks us to enforce the written agreement as circulated between counsel on June 19, 2022, which includes restricting the scope of Mr. Bulsara's work to "any company operating or doing business in the patient engagement and/or telehealth space as those terms are generally applied by KLAS- including but not limited to companies evaluated or ranked by KLAS."[63]

## II.   Conclusions of Law

1.   We review a motion to enforce a settlement agreement under the same standard as a motion for summary judgment because "[t]he stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same—both deprive a party of his right to be heard in the litigation."[64]

2.   We treat all the non-movant's assertions as true, and "when these assertions conflict with those of the movant, the former must receive the benefit of the doubt" because "[s]ummary judgment is appropriate only if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.'"[65]

3. We held an evidentiary hearing on Allscripts's motion to enforce the settlement agreement because "[w]hen relief from a judgment hinges upon a factual issue and credibility determinations are involved, a hearing should be held to determine entitlement to relief."[66]

4. The parties agreed on the length of the non-compete, the two weeks' notice to Mr. Bulsara's current employer, and Allscripts's willingness to evaluate a potential competitive employer before conferring with us on June 17, 2022.

5. But Allscripts now seeks to enforce a more definite material term as to the scope of the prohibited activity.

6. Genuine issues of material fact concerning whether Mr. Bulsara agreed to the KLAS definition of "patient engagement and telehealth industry" preclude our ability to enter summary judgment enforcing settlement terms based on those which Allscripts claims to be enforceable.

7. We evaluated the credibility of the witnesses and find Mr. Bulsara's counsel Attorney Lehman is credible, considering the adduced evidence, when explaining neither Mr. Bulsara nor he understood or agreed to the KLAS information contained in the draft settlement agreement and which Attorney Lehman did not earlier discuss with Mr. Bulsara.

8. Attorney Lehman's cavalier approach to his representations to us of "think[ing]" the parties had reached an agreement on all material terms without reading the settlement agreement is regrettable at a minimum. He offers no valid reason for this representation especially when he did not read the draft agreement when he made the representation to us.

9. But we today face genuine issues of material fact as to whether Mr. Bulsara through his authorized agent agreed to the KLAS information which Allscripts now seeks to enforce as a material term of its bargained settlement.

10.    We cannot redline or rewrite the material terms of the agreement proposed by Allscripts. We recognize the parties reached agreement on many material terms but not all. We lack authority to create a settlement agreement on some but not all material terms. We cannot guess which terms are more important to Allscripts than others. Allscripts argues they are all material to it. We cannot find agreement on this material term defined by Allscripts.

## III.  Analysis

Allscripts seeks to enforce what it perceives to be an oral settlement agreement with all material terms agreed to on June 15, 2022, but a genuine issue of material fact exists as to whether the parties reached a definite and final settlement agreement on terms Allscripts now claims are material as of June 15, 2022.

State law governs our construction and enforcement of settlement agreements.[67] The parties agreed during our evidentiary hearing Delaware law governs whether the parties formed an oral settlement agreement.[68] Delaware courts encourage parties to negotiate resolutions to contested cases and enforce settlement agreements as contracts.[69]

To determine whether Allscripts and Mr. Bulsara reached a settlement agreement including the KLAS terms, we look at whether "a reasonable person would conclude, based on the objective manifestations of assent and the surrounding circumstances, that the parties intended to be bound by their agreement on all essential terms."[70] We examine the "objective, overt manifestations of the parties, rather than their subjective intent."[71] A contract contains all essential terms and is enforceable when "it establishes the heart of the agreement" but it does not need to contain all the terms as some matters can be left for future negotiation.[72] An enforceable contract exists if a reasonable person would conclude the parties reached a definite and final

agreement on all essential terms.[73] But if both parties unknowingly attach materially different meanings to a contract term, they have not achieved mutual assent.[74]

When construing a contract, we cannot rewrite it or supply omitted provisions.[75] To do so infringes on the parties' freedom of contract.[76] Allscripts cannot ask us to enforce a contractual right it did not obtain for itself because this would "create new contract rights, liabilities and duties" which the parties never agreed to in the course of their negotiations.[77]

Allscripts contends the parties reached a binding oral agreement to settle this case on June 15, 2022 as memorialized in its June 16 draft emailed after 9:30 PM, which Mr. Bulsara's counsel revised on June 17, and Allscripts further revised on June 19. By June 15, Allscripts's proposal consisted of Mr. Bulsara staying out of the "patient engagement and telehealth" for six months, which prohibited him from working directly or indirectly for his current employer or for Andor and Mahathi with a two-week notice period to Mr. Bulsara's current employer, and Allscripts's willingness to evaluate a potential competitive employer.[78] As Mr. Bulsara's counsel represented to Allscripts on June 15 when asked whether Mr. Bulsara would accept these terms, "[a]ssuming [the parties] reach agreement on all of the specifics" then "yes" Mr. Bulsara "is willing to agree and try to figure out a way to make 6 months work on his end."[79]

On June 17, 2022, Allscripts asked Mr. Bulsara's counsel, "Are you still alright with us letting the Court know during our call today that an agreement has been reached and we are just working on finalizing the documentation?"[80] Mr. Bulsara's counsel responded "[y]es, thanks."[81] At this point, certain "specifics" still needed to be discussed and "finaliz[ed]" because the parties had no substantive discussions about the definition of "the patient engagement and telehealth industry" and never agreed or even discussed being bound by the KLAS classification.[82]

15

Later on June 17, Mr. Bulsara's counsel represented to us he thought "we are in agreement on material terms" subject to "some kind of clarification" discussion with "no hurdle to finalizing" the settlement.[83] Mr. Bulsara's counsel now admits his representation "was optimistic but turned out to be wrong" because the June 16, 2022 draft circulated by Allscripts, which Mr. Bulsara's counsel had not substantively reviewed before speaking to us, referred to industry reports (the KLAS information) which he had never seen before and the parties had never discussed to define "patient engagement" and "telehealth."[84] Consistent with Mr. Bulsara's sworn statement, none of the parties' correspondence before June 16, 2022 reference the KLAS information.

Upon reviewing the KLAS term for the first time in the June 16 draft agreement, Mr. Bulsara's counsel only then sought the KLAS information relied on by Allscripts to define "patient engagement" and "telehealth" so he could make the definition clear to Mr. Bulsara.[85] Although Mr. Bulsara counsel's initial revisions to the draft agreement did not raise concerns with the substance of this provision, Mr. Bulsara's counsel swears his redline, as he represented in his email to Allscripts, did not include his substantive revisions to the non-compete provisions because he had not yet discussed it with Mr. Bulsara.[86] His email signals his general agreement moving forward on the structure of the settlement the parties had previously discussed, but his request for KLAS materials credibly suggests he did not fully understand certain aspects of the proposal and could not commit to them.[87]

At this point, Mr. Bulsara never agreed to be bound by this draft agreement with the KLAS terms now sought to be enforced. We face facts distinct from those presented in *Maya Swimwear Corp. v. Maya Swimwear*, *LLC*, where Judge Robinson found an enforceable oral settlement agreement when defendants made an offer to settle which plaintiffs then accepted

16

evidenced by a course of emails with one stating: "My clients have given the 'green light' to the settlement discussed earlier this afternoon. Kindly allow this letter to confirm this matter has resolved."[88] Defendants later acknowledged the parties reached a settlement when they threatened to take action if plaintiffs reneged on the agreement.[89]

We are not in the same position. Mr. Bulsara did not give the "green light" and Mr. Bulsara's counsel made this clear to Allscripts in his June 15 email stating Mr. Bulsara is willing to figure out a way to make the six months work on his end "[a]ssuming we reach agreement on all of the specifics[.]"[90] Bulsara's counsel again made this clear on June 17 in response to receiving the initial draft agreement when he wrote, "I have passed your initial draft along to Mr. Bulsara but need to wait for him to have an opportunity to review it before I will be able to discuss it with him to see if he has any thoughts of his own on it."[91]

We spent considerable time during our evidentiary hearing on the negotiations after June 21, 2022 because Allscripts argued those discussions provided context. We agree. The context confirms not only Mr. Bulsara seeks to get out of his agreement for a six-month non-compete but also the parties never reached an understanding as to the scope of the non-compete. They agreed as to the length but not the scope. From June until late July, the parties continued to negotiate the scope of the non-compete, further demonstrating they had not agreed to the material terms of the agreement. Unlike in *Rohm & Haas Elec. Materials LLC v. Honeywell Int'l, Inc.*, where Chief Judge Sleet held the parties reached a definite and enforceable settlement agreement on all essential terms considering they reduced their oral agreement to writing in a "final version" and told the court "[we] have reached a settlement[,]"[92]Allscripts and Mr. Bulsara exchanged "drafts" as the parties both confirmed in their emails. They never finalized these drafts and as

Mr. Bulsara represented to Allscripts, Mr. Bulsara needed some more clarification before finalization.[93]

Although the parties agreed to the six-month non-compete period prohibiting Mr. Bulsara from working directly or indirectly for his current employer or for Andor and Mahathi, the two-week notice period, and Allscripts's ability to evaluate a potential competitive employer, this is not the settlement agreement Allscripts seeks to enforce. Allscripts now proposes different terms beyond agreeing to not compete with Allscripts or work with Andor and Mahathi for six months. A genuine issue of material fact exists as to whether the parties agreed to restricting the scope of Mr. Bulsara's work to "any company operating or doing business in the patient engagement and/or telehealth space as those terms are generally applied by KLAS- including but not limited to companies evaluated or ranked by KLAS[.]"

Our evaluation of the credibility of the parties' testimony, objective manifestations (including the representations at the evidentiary hearing), and the surrounding circumstances confirms the parties never entered into a final, complete, and enforceable agreement to settle this case on June 15, 2022 under the terms Allscripts now seeks to enforce.

Allscripts asks we enforce a draft written settlement agreement dated June 18, 2022 which is presumably an error since no exchanges between the parties occurred then or expressly set forth the terms of the agreement within our Order.[94] But its proposed order asks us to enforce the "written settlement agreement as circulated between counsel on June 19, 2022."[95] We find the material terms in Allscripts's proposed order and as further defined by the June 19, 2022 draft exceed what the parties orally agreed to as of June 15, 2022. In the alternative, Allscripts asks us to choose which terms of the settlement agreement should apply and create a binding settlement agreement.[96] We cannot simply make up or rewrite the terms of the settlement

agreement and force it upon Mr. Bulsara. Doing so would infringe on the parties' freedom to contract.

## IV.  Conclusion

Mr. Bulsara's counsel would typically be held to his June 17, 2022 representations of an agreement as to material terms on behalf of his client both to us and to the Plaintiffs. His willingness to represent a settlement to us without reviewing the draft June 16, 2022 settlement agreement is not easily excused and could be enforced as to the six-month term within a general framework of patient engagement and telehealth industries. And Mr. Bulsara would be bound to the six-month term of not working in patient engagement and telehealth industries subject to later challenging the enforceability of this language.

But Allscripts now moves for relief beyond the agreed oral terms and seeks to enforce disputed language on the scope of the non-compete by specifically defining patient engagement and telehealth industries based on information allegedly exchanged in discovery. Allscripts overreaches in moving to add material terms defining the scope of the non-compete based on terms which we find, after evaluating the credibility of the negotiating lawyers and Mr. Bulsara, had not been agreed upon as later confirmed by the parties' continuing negotiations. We could and should enforce the terms of the oral agreement as to length and notice but Allscripts seeks a larger bargain. We lack a basis to redline what Allscripts asserts are the terms upon which it will release Mr. Bulsara from the case. We deny Allscripts's motion to enforce as presented.

---

[1] D.I. 41 ¶¶ 55, 155.

[2] *Id.* ¶ 162.

[3] *Id*. ¶ 168.

[4] *Id*. ¶ 173.

[5] D.I. 1.

[6] D.I. 86 at 1.

[7] D.I. 363 ¶ 6.

[8] D.I. 438; D.I. 439; D.I. 442; D.I. 443.

[9] D.I. 548.

[10] D.I. 552.

[11] D.I. 557.

[12] D.I. 643 ¶ 2; D.I. 657 ¶ 4.

[13] D.I. 643 ¶ 3; D.I. 657 ¶¶ 4–5.

[14] D.I. 643 ¶ 4; D.I. 657 ¶ 6.

[15] D.I. 657 ¶ 6.

[16] D.I. 643 at Exhibit 1.

[17] *Id*. at Exhibit 3.

[18] *Id*.

[19] D.I. 643 ¶ 8.

[20] *Id*.

[21] D.I. 643 ¶¶ 7–8; D.I. 657 ¶ 8.

[22] D.I. 657 ¶ 8.

[23] D.I. 643 at Exhibit 4.

[24] *Id*. ¶ 1.

[25] D.I. 587.

[26] D.I. 643 at Exhibit 6a, Exhibit 6b.

[27] KLAS appears to be a Utah-based research organization which "has been providing accurate, honest, and impartial insights for the healthcare IT (HIT) industry since 1996." *See* The KLAS Model, KLAS RESEARCH, https://klasresearch.com/klas-model (last visited Aug. 22, 2022).

[28] D.I. 643 at Exhibit 6b.

[29] *Id*. at Exhibit 7.

[30] *Id*. at Exhibit 8.

[31] D.I. 657 ¶ 11.

[32] D.I. 643 at Exhibit 9.

[33] D.I. 608 at 6:11–16.

[34] *Id*. at 5:18–6:1.

[35] D.I. 657 ¶ 12.

[36] *Id*.; D.I. 643 at Exhibit 6b.

[37] D.I. 657 ¶ 13.

[38] *Id*. ¶ 14.

[39] D.I. 643 at Exhibit 10a, Exhibit 10b.

[40] D.I. 657 ¶ 14.

[41] D.I. 643 at Exhibit 10a.

[42] *Id*.

[43] *Id*. at Exhibit 11a, Exhibit 11b.

[44] *Id*. at Exhibit 11b, Exhibit 11c.

[45] D.I. 641-1 ¶ 5.

[46] D.I. 657 ¶ 17.

[47] *Id*.

[48] D.I. 607.

[49] *Id*. ¶ 4b.

[50] *Id.* ¶ 2.

[51] D.I. 643 at Exhibit 13.

[52] *Id.*

[53] *Id.*

[54] *Id.*

[55] *Id.* at Exhibits 16–22, Exhibits 26–38.

[56] *Id.* at Exhibit 16.

[57] *Id.*

[58] *Id.* at Exhibit 17, Exhibit 20, Exhibit 30, Exhibit 36.

[59] *Id.* at Exhibit 18, Exhibit 29.

[60] *Id.* at Exhibit 16.

[61] *Id.* at Exhibit 42.

[62] *Id.* at Exhibit 43.

[63] D.I. 641-1 ¶ 5; D.I. 642 at 13.

[64] *Tiernan v. Devoe*, 923 F.2d 1024, 1031 (3d Cir. 1991); *see also Maya Swimwear Corp. v. Maya Swimwear, LLC*, 855 F. Supp. 2d 229, 233 (D. Del. 2012) ("Because motions for the enforcement of settlement agreements resemble motions for summary judgment, the court must employ a similar standard of review.").

[65] *Maya Swimwear Corp.*, 855 F. Supp. at 233–34 (internal citations omitted); *see also* Fed. R. Civ. P. 56(c).

[66] *Tiernan*, 923 F.2d at 1031 (internal quotation omitted).

[67] *Maya Swimwear Corp.*, 855 F. Supp. at 234.

[68] Delaware's choice-of-law approach entails a two-pronged inquiry: (1) compare the laws of the competing jurisdictions to determine whether the laws actually conflict on a relevant point, and (2) if an actual conflict exists, employ the "most significant relationship" test, as set forth in the Restatement (Second) of Conflict of Laws to determine which law should apply. *Pa. Emp., Benefit Tr. Fund v. Zeneca, Inc.*, 710 F. Supp. 2d 458, 466–67 (D. Del. 2010). Since there is no actual conflict between the competing jurisdictions—Delaware, Illinois, and Florida—in the enforcement of an oral settlement agreement, and as the parties agreed, we will apply Delaware law. *See Lawrence v. Forster*, 2017 WL 2491513, at *2 (Del. Ch. May 5, 2017), *adopted,* (Del.

Ch. 2017) ("[S]ettlement agreements are enforceable as a contract . . . [and we] must inquire: 'whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and thus that that agreement concluded the negotiations.'" (quoting *Schwartz v. Chase*, 2010 WL 2601608, at *4 (Del. Ch. June 29, 2010))); *New Dirt, Inc. v. Harrison*, 182 So. 3d 773, 774 (Fla. Dist. Ct. App. 2015) ("For there to be an enforceable oral contract, there must be an offer, an acceptance, consideration, and sufficient specification of essential terms so that the obligations involved can be ascertained. . . . As with written contracts, '[t]he fact that nonessential terms remain open is not fatal to an oral contract.'" (internal citations omitted)); *Pritchett v. Asbestos Claims Mgmt. Corp.*, 773 N.E.2d 1277, 1282 (Ill. App. 2002) ("Oral settlements are enforceable if there is an offer, an acceptance, and a meeting of the minds regarding the term . . . An offer, or the acceptance thereof, must be so definite with respect to its material terms that the promises and performances to be rendered by each party are reasonably certain.").

[69] *Lawrence*, 2017 WL 2491513, at *1.

[70] *Rohm & Haas Elec. Materials, LLC v. Honeywell Int'l, Inc.*, 2009 WL 1033651, at *5 (D. Del. Apr. 16, 2009) (internal quotations omitted).

[71] *Schwartz*, 2010 WL 2601608, at *4.

[72] *Maya Swimwear Corp.*, 855 F. Supp. 2d at 234 (internal citations omitted).

[73] *Rohm & Haas Elec. Materials, LLC*, 2009 WL 1033651, at *5 (internal quotations omitted).

[74] *Cont'l Warranty, Inc. v. Warner*, 108 F. Supp. 3d 250, 254 (D. Del. 2015).

[75] *Gertrude L.Q. v. Stephen P.Q.*, 466 A.2d 1213, 1217 (Del. 1983).

[76] *Murfey v. WHC Ventures*, LLC, 236 A.3d 337, 355 (Del. 2020) (citing *Conner v. Phoenix Steel Corp.*, 249 A.2d 866, 868 (Del. 1969)).

[77] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *7 (Del. Ch. June 21, 2012) (internal citation omitted) ("[A] party may not come to court to enforce a contractual right that it did not obtain for itself at the negotiating table.").

[78] D.I. 643 ¶¶ 4, 7; D.I. 657 ¶¶ 6, 8.

[79] D.I. 643 at Exhibit 3.

[80] *Id*. at Exhibit 9.

[81] *Id*.

[82] D.I. 657 ¶¶ 8, 12.

[83] D.I. 608 at 5:18–6:1.

[84] D.I. 657 ¶ 12.

[85] *Id*. ¶ 14; D.I. 643 at Exhibit 10a.

[86] 657 ¶ 14; D.I. 643 at Exhibit 10a

[87] *See Ramone v. Lang*, 2006 WL 905347, at *11 (Del. Ch. Apr. 3, 2006) ("For [plaintiff's] email to have constituted acceptance, it must have included three general components: (i) an expression of commitment; (ii) the commitment must not be conditional on any further act by either party; and (iii) the commitment must be one on the terms proposed by the offer without the slightest variation.").

[88] *Maya Swimwear Corp.*, 855 F. Supp. 2d at 235.

[89] *Id*.

[90] D.I. 643 at Exhibit 3.

[91] *Id*. at Exhibit 10a.

[92] *Rohm & Haas Elec. Materials, LLC*, 2009 WL 1033651, at *5.

[93] D.I. 643 at Exhibit 6a, Exhibit 10a.

[94] D.I. 642 at 13.

[95] D.I. 641-1 at ¶ 5.

[96] D.I. 642 at 13.