UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALLSCRIPTS HEALTHCARE, LLC, et al. | . | Case No. 1:21-cv-00704-MAK |
| | . | |
| Plaintiffs, | . | |
| | . | James A. Byrne U.S. Courthouse |
| v. | . | 601 Market Street |
| | . | Philadelphia, PA 19106 |
| ANDOR HEALTH, LLC, et al. | . | |
| | . | |
| Defendants. | . | |
| | . | August 11, 2022 |
| . . . . . . . . . . . . . . . . | .. | 2:01 p.m. |

TRANSCRIPT OF MOTION TO ENFORCE SETTLEMENT
AGREEMENT HEARING
BEFORE THE HONORABLE MARK A. KEARNEY
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For Allscripts Healthcare, LLC: | BARNES & THORNBURG, LLP<br>By:  MARK L. DURBIN, ESQ.<br>One North Wacker Drive<br>Suite 4400<br>Chicago, IL 60606 |
| For Amar Bulsara: | GELLERT SCALI BUSENKELL & BROWN, LLC<br>By:  BRADLEY P. LEHMAN, ESQ.<br>RONALD S. GELLERT, ESQ.<br>1201 North Orange Street<br>Suite 300<br>Wilmington, DE 19801 |
| Audio Operator: | Ulrike Hevener |

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

2

## INDEX

**MOTIONS:**

|  | **PAGE** |
|---|---|

Agenda
Item 1:  Motion to Enforce Settlement Agreement filed     3
         By Allscripts Healthcare, LLC


**WITNESSES CALLED**
**BY THE PLAINTIFFS:**                                   **PAGE**

AMAR BULSARA
Direct examination by Mr. Durbin                          7
Cross-examination by Mr. Lehman                          17
Redirect examination by Mr. Durbin                       23


BRADLEY LEHMAN
Direct examination by Mr. Durbin                         30
Cross-examination by Mr. Gellert                         39
Redirect examination by Mr. Durbin                       45
Examination by the Court                                 47

CHRISTINA BAUGH
Direct examination by Mr. Durbin                         51
Cross-examination by Mr. Gellert                         66
Redirect examination by Mr. Durbin                       70
Recross-examination by Mr. Gellert                       74


## EXHIBITS


**PLAINTIFFS' EXHIBITS:**                                **EVID**

Nos. 1-45  Attached to declaration of Christine Baugh     5

No. 46     Transcript                                     5

1         (Proceedings commenced at 2:00 p.m.)

2              THE CLERK:  All rise.

3              Court is now in session.  The Honorable Mark A.

4    Kearney presiding.

5              THE COURT:  Good afternoon.

6              COUNSEL:  Good afternoon.

7              THE COURT:  Please be seated.

8              We're here this afternoon in the scheduled hearing

9    on a contested motion to enforce a settlement agreement between

10   the Allscripts Plaintiffs and Amar Bulsara.

11             Can I have entry of appearance first for the

12   Plaintiffs?

13             MR. DURBIN:  For the Plaintiffs, you have Mark

14   Durbin, Christina Baugh, and William Burton.

15             THE COURT:  Welcome.  Thank you for being here.

16             And on behalf of Mr. Bulsara?

17             MR. LEHMAN:  Good afternoon, Your Honor.  Bradley

18   Lehman.

19             THE COURT:  Good afternoon.

20             MR. LEHMAN:  I'm joined by Ronald Gellert from my

21   office --

22             THE COURT:  All right.  Welcome, Mr. Gellert.

23             MR. LEHMAN:  -- but I don't expect him to

24   participate.

25             THE COURT:  Mr. Gellert, have you entered an

1    appearance?  I don't have you on the docket.

2            MR. GELLERT:  It's being filed as we speak.  I was

3    informed when we walked in that it was necessary, so --

4            THE COURT:  Okay.  Good.  Thank you.

5            MR. GELLERT:  -- it's being done.  So, immediately.

6            THE COURT:  Okay.  So, Allscripts, your motion.

7    Please call your first witness.

8            MR. DURBIN:  Judge, if I may address a preliminary

9    matter?

10           THE COURT:  Sure.

11           MR. DURBIN:  I've been consulting with

12   Mr. Bulsara -- not Mr. Bulsara -- Mr. Lehman, about

13   Mr. Bulsara.  We don't know how you'd like to proceed, other

14   than to call witnesses, but we would agree that the

15   declarations and the exhibits associated with can be admitted

16   as evidence, in connection with the hearing.  We thought that

17   might streamline things.

18           THE COURT:  Sure.  The exhibits I have attached to

19   Ms. Baugh's declaration?

20           MR. DURBIN:  Yes, Judge.  We actually have a binder

21   of all of those exhibits.

22           THE COURT:  I don't need them in a binder.  Is there

23   anything in addition to that?

24           MR. DURBIN:  There are no -- well, the only addition

25   is the transcript --

1              THE COURT:  Okay.

2              MR. DURBIN:  -- which has been marked as Exhibit 46.

3    I think it's already in the record, but for reference.

4              THE COURT:  Okay.  All right.  Well, thank you.

5    That does streamline.  We'll just work off -- are they -- can

6    we work off the same number, then?

7              MR. DURBIN:  Yes.

8              THE COURT:  Is it Document 643?

9              MR. DURBIN:  They are all the exact same number,

10   Judge.

11             THE COURT:  All right.  Then I don't need another

12   copy.

13             MR. DURBIN:  Okay.  Very good.

14             THE COURT:  Anything else?

15             MR. DURBIN:  Nope.

16             THE COURT:  Okay.  So, they're all admitted.

17        (Exhibits 1 - 46 received into evidence)

18             THE COURT:  Let's just talk about the questions.

19             Let me raise an issue with you first, before I --

20   preliminarily.  What state law am I applying?

21             MR. DURBIN:  Oh, we believe it's Delaware law,

22   Judge.

23             MR. LEHMAN:  I agree, Your Honor.

24             THE COURT:  Okay.  With counsel's consent, we're

25   going to apply Delaware law.  Okay.  You understand for

6

1    procedure, I'm under Third Circuit law.

2    We agree with that?

3            MR. DURBIN:  Yes, Judge.

4            MR. LEHMAN:  Yes, Your Honor.

5            THE COURT:  Okay.  So, counsel has understood we're

6    not applying either, Illinois or Florida law; is that correct?

7            MR. DURBIN:  Correct, Judge.

8            MR. LEHMAN:  Yes, Your Honor.

9            THE COURT:  All right.  Okay.

10   All right.  Fine.  Allscripts, you may call your first witness.

11           MR. DURBIN:  We call to the stand, Amar Bulsara.

12           THE COURT:  Mr. Bulsara?  Sir, up here on the

13   witness stand, sir.

14           THE CLERK:  Please remain standing and raise your

15   right hand.

16           AMAR BULSARA, PLAINTIFFS' WITNESS, SWORN

17           THE WITNESS:  I do.

18           THE CLERK:  Okay.  You may be seated.

19   Please state your name and spell it for the record.

20           THE WITNESS:  Amar Bulsara, A-m-a-r  B-u-r-s-a-r-a.

21           THE COURT:  Welcome, Mr. Bulsara.

22   Counsel, you may proceed.

23           All the documents are admitted, attached to Exhibit

24   643.  There's no need to proffer, admit, or so on and so forth.

25   I ask you to just go to the merits today.  We do not need a

Bulsara - Direct/Durbin                                    7

1  background of Mr. Bulsara.

2          I know you, Mr. Bulsara, of your background from

3  numerous papers.

4          But you may, as you wish, do sir, do what you need

5  to do.

6          MR. DURBIN:  Very good, Judge.

7          May I simply present a binder of the exhibits?

8          THE COURT:  If you wish, yes.

9          MR. DURBIN:  So, I presented the witness with a

10 binder of exhibits that line up with the exhibits to

11 Ms. Baugh's declaration.  In addition, they have Exhibit 46,

12 which is the transcript.

13         THE COURT:  Fine, sir.  Thank you.

14         And you may inquire as to whatever you wish,

15 whatever you're comfortable with.  As long as Madam Deputy can

16 you hear, we're fine.

17         MR. DURBIN:  Great.

18                    DIRECT EXAMINATION

19 BY MR. DURBIN:

20 Q    Good afternoon, Mr. Bulsara.

21 A    Good afternoon.

22 Q    Mr. Bulsara, who is your attorney in this case?

23 A    Bradley Lehman.

24 Q    You engaged Mr. Lehman to represent you in the court

25 proceedings?

Bulsara - Direct/Durbin                                    8

1   A     Yes.

2   Q     And you engaged Mr. Lehman to represent you in connection

3   with the settlement negotiations related to these proceedings?

4   A     Yes.

5   Q     You authorized Mr. Lehman to discuss the terms of the

6   settlement between Allscripts and you; is that correct?

7   A     Yes.

8   Q     And during your -- during the settlement negotiations --

9   well, you were aware that settlement negotiations occurred,

10  correct?

11  A     Yes, I was aware they were ongoing.

12  Q     And you're aware that drafts of settlement agreements

13  were exchanged between the parties; is that correct?

14  A     Yes.

15  Q     And during the settlement discussions and negotiations

16  and the exchange of drafts, were you in regular communication

17  with Mr. Lehman regarding the terms being proposed by the

18  parties in connection with the settlement?

19  A     I've seen those, yes.

20  Q     And as part of that -- and I'm not asking you what you

21  discussed with Mr. Lehman -- but you understood that

22  Mr. Lehman was keeping you fully apprised of the status of the

23  discussions with Allscripts, right?

24  A     To the best of my knowledge, yes.

25  Q     And you expected him to do so, correct?

1   A      I would expect that, yes.

2   Q      You expected when Allscripts made a proposal of any

3   specific type of term, that he would convey that to you, right?

4   A      I would expect that, yes.

5   Q      And to the best of your knowledge, he did so?

6   A      Yes.

7   Q      And when Mr. Lehman communicated back to Allscripts, you

8   authorized him to make those communications regarding

9   settlements, correct?

10  A      Yes.

11  Q      And you discussed Mr. Lehman -- you provided input with

12  respect to what terms would be acceptable for the settlement,

13  correct?

14  A      Yes.

15  Q      And you expected that Mr. Lehman would provide that same

16  response, or information, I should say, to Allscripts, correct?

17  A      Uh-huh, yes.

18  Q      And to your knowledge, that is what he did, right?

19  A      Yes, to my knowledge.

20  Q      And in this case, you have read the briefs that were

21  submitted in the motion to enforce the settlement agreement

22  that we're here for today, right?

23  A      Yes.

24  Q      And in those briefs and in the supporting declarations,

25  was there anything in there that you were not aware of during

Bulsara - Direct/Durbin                          10

1  the course of the settlement negotiations?

2  A     In the motion, I believe that there was something about

3  where I had agreed to a settlement, when I never had.

4  Q     And at what point in time was that?

5  A     I think it was right before the -- one of the hearings.

6  I don't remember the exact date.

7  Q     So, your testimony is you never agreed to a settlement?

8  A     That's correct.

9  Q     And you conveyed to Mr. Lehman that you did not agree to

10 a settlement?

11 A     That's correct.

12 Q     And if Mr. Lehman made the statement that there was an

13 agreement, he did that without your authorization; is that your

14 testimony?

15 A     That would be correct, yes.

16 Q     And are you aware of Mr. Lehman making any statements

17 that were made without your authorization?

18 A     I'm not.

19 Q     I would like to take you to the binder that's in front of

20 you.  I direct you to Exhibit 9.  Let me know when you've found

21 it, sir.

22 A     I think I have.  I'm not sure.

23 Q     It is an email --

24        THE COURT:  Exhibit 9 in the book, sir.  Go to  Tab

25 9.

Bulsara - Direct/Durbin                                    11

1          THE WITNESS:  Yep.

2          THE COURT:  And counsel will direct you to what you

3  know he's talking about, sir.

4          THE WITNESS:  I appreciate it.  Thank you.

5  BY MR. DURBIN:

6  Q    And just so we're sure we're looking at the same thing,

7  you're looking at an email on the first page of Exhibit 9, Tab

8  9 in the binder, from Mr. Lehman to Ms. Baugh on June 17, 2022,

9  at 10:44 a.m., correct?

10 A    That's correct, yes.

11 Q    So, I'd like to take you down to the second email, the

12 one below that, from Ms. Baugh to Mr. Lehman on June 17, 2022,

13 at 10:43 a.m.

14      Do you see that?

15 A    You said 10:43?

16 Q    Yes.

17 A    Yes.

18 Q    Okay.  In this email, when Ms. Baugh says:

19      "Understood.  Are you still all right with letting

20 the Court know during our call today that an agreement has been

21 reached and we are just working on finalizing the

22 documentation?"

23      Do you see that?

24 A    Yes, I do.

25 Q    Now, you see on the top page, Mr. Lehman responds to Ms.

Bulsara - Direct/Durbin                                    12

 1  Baugh, on the top of the page of Exhibit 9.

 2       Do you see that?

 3  A    Uh-huh.

 4  Q    Is that a "yes"?

 5  A    Yes.

 6  Q    And his response is, "Yes, thanks."

 7       Correct?

 8  A    Yes.

 9  Q    Was Mr. Lehman authorized to make that statement to

10  Ms. Baugh?

11  A    No.

12  Q    I want to take you to Exhibit 19(a).

13       Actually, before we talk about the document,

14  Mr. Bulsara, have you -- did you ever agree to the idea of a

15  six-month noncompete with Allscripts as one of the components

16  of this settlement of this matter?

17  A    We had proposed it, never agreed to it.

18  Q    So, you, meaning Mr. Bulsara, you, had proposed a six-

19  month noncompete as part of the settlement?

20  A    Yes.

21  Q    And was your understanding that Allscripts accepted that

22  six-month noncompete?

23  A    They accepted it to a certain extent, because we still

24  had other things that we were trying to negotiate out.

25  Q    And as part of the settlement agreement that you

1  proposed, Mr. Bulsara, did that also include the option of you

2  giving notice to G -- Global KTech, two weeks' notice before

3  the six-month period began?

4  A     Yes, that's also a proposal.

5  Q     And as part of the settlement agreement that you

6  proposed, the claims against you would be dismissed, right?

7  A     That would be the understanding, yes.

8  Q     All right.  Now, I want to take you back to

9  paragraph 9 -- or Document 19(a) in the binder.  And you'll see

10 on the first page of Exhibit 19(a) at the top is an email from

11 Mr. Lehman on June 24, 2022, at 2:32 p.m. to Christina Baugh.

12        Are you with me?

13 A     Yes.

14 Q     Very good.

15        In this email, Mr. Lehman, your counsel says:

16            "Christina, good afternoon.  If we are not able   to

17 --"

18            THE COURT:  I can read it, counsel.

19            MR. DURBIN:  Okay.

20            THE COURT:  You don't have to read it here.  I can

21 read it.

22            MR. DURBIN:  Very good.

23 BY MR. DURBIN:

24 Q     So, you see, Mr. Bulsara, in the email, Mr. Bulsara --

25 I'm sorry -- Mr. Lehman says on your behalf:

1          "We suggest the revisions in the attached agreement

2   against the latest version circulated."

3          Do you see that?

4   A     Yes.

5   Q     And was Mr. Lehman authorized to make that suggestion?

6   A     Yes, I believe we had discussions around that.

7   Q     And did you authorize Mr. Lehman to make that suggestion?

8   A     Yes.

9   Q     And he said it would --

10  A     I'm not sure what the revision was because I don't have

11  the attachment, but --

12  Q     The attachment, actually, is Exhibit 19(b), but we'll go

13  to that in just a second.

14         No, no, fine.  If you want to, it's only fair for you to

15  take a look.  Exhibit 19(b).  Can you tell me when you find

16  Exhibit 19(b), the settlement and release agreement.   There's

17  red lines on it.

18         (Pause)

19  A     Yes, I do remember this.

20  Q     Okay.  And did you authorize Mr. Lehman to send  Exhibit

21  19(a), the email, and Exhibit 19(b), the redlined settlement

22  agreement, to Ms. Baugh on your behalf?

23  A     Yes, but it was never an acceptance to an agreement.

24  Q     So, you -- but this is language -- I just want to make

25  sure I'm clear.  In 19(b), Section 1 -- are you with me? --

1  it's titled, "Restrictions on scope of work."

2  A     Yep.

3  Q     You authorized Mr. Lehman to propose to Allscripts, a

4  settlement that used this language, correct?

5  A     Yes.

6  Q     Let me take you to the Exhibit 20(a) in the binder.

7  You'll see on the first page of Exhibit 20(a), Ms. Baugh --

8  it's an email from Ms. Baugh to Mr. Lehman on June 24, 2022, at

9  3:26 p.m.

10      Are you with me?

11  A     Yes.

12  Q     Very good.  If you take a moment to look at -- excuse me

13  -- the full email that is 20(a), but you see this is a

14  continuation of Mr. Lehman's email that was marked as 19(a).

15      Do you see how it's at same language with Ms. Baugh's

16  response on top?

17  A     Yeah, I do see the continuation of the email.

18  Q     And you see here in Ms. Baugh's email, Ms. Baugh conveys

19  that Allscripts' position is that they will accept your recent

20  revisions with one clarifying insert, correct?

21  A     I see -- I do see that statement, yes.

22  Q     All right.  I'll take you to Exhibit 20(b), the

23  attachment to the email that Ms. Baugh sent.  And I'd like you

24  to take a look, again, at Section 1, "Restrictions on scope of

25  work."

1       Do you see that paragraph?

2  A     Yes.

3  Q     And you see Ms. Baugh's only change to the language that

4  you had proposed was to add the answer, "Including, without

5  limitation, Allscripts' FollowMyHealth Solution."

6       Do you see that?

7  A     Yes.

8  Q     And that is a product that Allscripts offers, right?

9  A     I don't know the answer to that.

10 Q     When you worked for Allscripts, was it a product that

11 Allscripts offered?

12 A     Yes.

13 Q     I'd like you to take a look at Exhibit 46 in your binder.

14 It is a transcript of a hearing on June 17, 2022.

15      Do you see that?

16 A     Yes.

17 Q     I'd like to take you to page 5 of the transcript,

18 starting at line 22.  And the lines are numbered on the left-

19 hand side.  Do you see them going down the page?  Do you see

20 those?

21 A     Yes.

22 Q     And you see at line 22, Mr. Lehman states:

23           "Yes, Your Honor, I think we are in agreement on

24 material terms."

25      Do you see that?

Bulsara - Cross/Lehman                    17

1  A       Yes, I do.

2  Q       Did you authorize Mr. Lehman to make that statement to

3  the Court?

4  A       I was not aware of what happened during that trial --

5  during that trial or -- or that session.

6  Q       But at that time, on June 17, Mr. Lehman was your lawyer,

7  authorized to negotiate for you in connection with the

8  settlement agreement, or potential settlement agreement with

9  Allscripts, correct?

10 A       That's correct, yes.

11 Q       He was acting on your behalf during this hearing on June

12 17th, correct?

13 A       That's correct, yes.

14         MR. DURBIN:  Those are my only questions, Judge.

15         THE COURT:  Thank you, Counsel.

16         Mr. Lehman, do you wish to examine Mr. Bulsara?

17         MR. LEHMAN:  I have a few questions, Your Honor.

18         THE COURT:  Now, this will be his entire testimony.

19 He doesn't come back up.

20         MR. LEHMAN:  Yes.  Yes.

21                    CROSS-EXAMINATION

22 BY MR. LEHMAN:

23 Q       Mr. Bulsara, you were asked about, early on, some

24 exchange of offers to settle the case.

25         Do you recall making an original offer in early June to

Bulsara - Cross/Lehman                    18

1  resolve the case with Allscripts?

2  A      Yes.

3  Q      What was the offer that you made?

4  A      I would work -- I would be out of work for three months

5  completely.

6  Q      So, you would not work at all for three months to address

7  their noncompete concerns?

8  A      Correct.

9  Q      And did Allscripts accept that offer?

10  A      I do not believe they did.

11  Q      Did they make a counteroffer?

12  A      Yes, I believe they came back with six months.

13  Q      And what would you be restricted from doing during the

14  six months, that you were aware of?

15  A      I believe I was restricted six months with no work in

16  telehealth or patient engagement.

17  Q      And did we have some dialogue back and forth with

18  Allscripts about how we were going to define telehealth and

19  patient engagement for purposes of that restricted period?

20  A      Yes, I do.

21  Q      Was it your understanding that we never --

22              THE COURT:  Sir, did you have those discussions?

23  The question was "Did we have those?"  Did you have those

24  discussions, you, personally?

25              THE WITNESS:  Not with Allscripts.  I had it with my

1 counsel.

2          THE COURT:  The question was "Did we have some

3 discussions with Allscripts?"

4          Did you have discussions with Allscripts or was it

5 all through Mr. Lehman?

6          THE WITNESS:  It was all through Mr. Lehman.  I had

7 no conversations with Allscripts directly.

8          THE COURT:  Okay.  Thank you, sir.

9          THE WITNESS:  I apologize for that.

10          THE COURT:  No, I -- the question was "we" and

11 that's plural.

12          THE WITNESS:  I apologize if I wasn't clear, Your

13 Honor.

14          THE COURT:  That's all right.

15 BY MR. LEHMAN:

16 Q     Were you aware that I went back and forth with them to

17 some extent about how we would define those terms for purposes

18 of your restricted period?

19 A     Yes, I did.

20 Q     And did you understand that we ever came to an agreement

21 with them about how we would define those?

22 A     No.

23 Q     So, to clarify a question you were asked by Mr. Durbin,

24 you were not the one who proposed six months, is that right,

25 that was a counteroffer that came from Allscripts?

Bulsara - Cross/Lehman                          20

1   A      Yes, that's correct.

2   Q      Did you ever accept that counteroffer?

3   A      No.

4   Q      You were also asked about some revised language -- and I

5   don't recall which exhibit it was -- but it was the redlined

6   settlement agreement where Ms. Baugh inserted the language

7   about FollowMyHealth.

8          Do you recall that?

9   A      Yes.

10  Q      How long ago were you terminated from Allscripts?

11  A      To current date, it's been a little over a year and a

12  half now.

13  Q      Do you know currently what their FollowMyHealth product

14  looks like, or does, or what products would be competitive with

15  it?

16  A      I do not.

17  Q      Would it be important for you to know that in order to

18  agree that you wouldn't compete with the FollowMyHealth

19  product?

20  A      Yeah, I would think I would need to know what I'm being

21  restricted to be worked under or work, you know, for what

22  industry or what business.

23  Q      As of June 17th, when the hearing with the Court took

24  place, have you seen any draft agreement from Allscripts?

25  A      I have not, no.

Bulsara - Cross/Lehman                    21

1  Q     After we went through the dialogue with them about

2  patient engagement and telehealth, you're aware, then, that the

3  conversation changed to competing products, as you were just

4  talking about, with FollowMyHealth?

5  A     Yes.

6  Q     And do you recall whether we were ever able to reach an

7  agreement with them on which products out there in the industry

8  they believe competed with theirs?

9  A     No.

10 Q     Would it be important for you to know what they viewed as

11 competing products in order to find a job that did not compete?

12 A     Yes.

13 Q     Do you recall that we later moved on to considering an

14 arrangement where we might agree on a list of companies you

15 wouldn't work for?

16 A     Yes.

17 Q     Did you put together a list of your suggestions?

18 A     I believe I put together a list of 7 to 10 companies.

19 Q     And do you understand that I provided that to Allscripts?

20 A     Yes.

21 Q     To your knowledge, was Allscripts willing to agree with

22 us on a list of companies that were their competitors and you

23 could not work for?

24 A     No.

25 Q     Have you been working for a new job to try to address

1  their noncompete concerns and resolve the case?

2  A     Yes, I've been actively searching.

3  Q     And have you found anything yet that would be a suitable

4  replacement for your current job?

5  A     No, no not to the current date.

6  Q     Did you have concerns about their six-month counteroffer

7  and the restrictions that they proposed in terms of finding a

8  new job?

9  A     I did, because, financially, there's no way for me to

10 support myself or my family with the personal, you know, life

11 occurrences, life events that we have going on right now.

12 Q     To your knowledge, did I explain to Allscripts that three

13 months was the maximum period of time you felt comfortable

14 being out of work?

15 A     Yes.

16 Q     And is that because of the personal, and family, and

17 financial circumstances you were just talking about?

18 A     Yes, that's correct.

19 Q     And so, were you concerned that if the restrictions in

20 the agreement were not sufficiently clear, that you might be

21 out of work longer than three months?

22 A     Yes, very much.

23 Q     As we sit here today, are you still willing to resolve

24 this case with Allscripts by, for example, not working for

25 three months at all?

1  A      Yes.

2  Q      As we sit here today, would you also be willing to engage

3  with them on a list of competing companies you couldn't work

4  for to come to an agreement that might involve a six-month

5  restricted period?

6  A      Potentially, yes.

7            MR. LEHMAN:  That's all I have, Your Honor.

8            THE COURT:  Counsel?

9            MR. DURBIN:  Yeah.

10                     REDIRECT EXAMINATION

11 BY MR. DURBIN:

12 Q      I'd like to take you Mr. Bulsara, back to paragraph -- to

13 Exhibit 19(a) and 19(b) for one moment.  I thought I heard on

14 your examination, you say that you had never -- you,    Mr.

15 Bulsara, had never proposed a six-month noncompete with

16 Allscripts as part of the settlement.

17       Was that your testimony?

18 A      That's correct.

19 Q      So, looking at Exhibit 19(a), that's an email from your

20 lawyer on your behalf that you testified that he was authorized

21 to send, right?

22 A      I'm sorry, can we just -- which page are we on?

23 Q      I'm sorry, the first page at the top of Exhibit 19(a), an

24 email from Mr. Lehman to Ms. Baugh on June 24, 2022.

25 A      At 9:52 a.m.?

Bulsara - Redirect/Durbin                    24

1  Q     At 2:32 p.m.

2  A     I'm sorry, yes.  I've got it.

3  Q     Are you with me?

4  A     Yes.

5  Q     And that's an email sent by your lawyer on your behalf to

6  Allscripts, which attached a version of the settlement

7  agreement that you were proposing through Mr. Lehman, correct?

8  A     You said that was on 19(b).  So, 19(b), the restriction

9  of scope is not redlined for that item of six months.

10 Q     But my question, though, is more specific.  This email

11 was sent by your lawyer on your behalf with your authorization,

12 attaching a proposal to Allscripts to resolve the case,

13 correct?

14 A     Correct.  But with the redlined items only.

15 Q     In exhibit -- I'm sorry, sir.  Please explain what you

16 were saying.

17 A     So, my understanding is that 19(b), the settlement

18 agreement is redlined and the redlined items were only sent by

19 my counsel.

20 Q     Correct.

21 A     Okay.

22 Q     Correct.  So, let's look at 19(b), Section 1.  And in

23 that, you, through your counsel, proposed a six-month

24 noncompete, working directly or indirectly for any company

25 which offers health care software products, which compete

Bulsara - Redirect/Durbin                    25

1  against the products offered by Allscripts.

2       That's the redline, right?

3  A    The redline does not include the six-month.  The redline

4  is later on.

5  Q    I understand what you're saying.  I didn't mean to

6  confuse you.

7       The Section 1 of the agreement that you proposed, through

8  your counsel, provided for a six-month noncompete with respect

9  to any of Allscripts -- any competition with Allscripts'

10 products, correct?

11 A    That's what it shows, correct.

12 Q    And in that email, you didn't -- in your proposal to

13 Allscripts, you didn't say that the language was unclear as to

14 which products would be competitive, did you, sir?

15 A    Not at that time.

16 Q    And any your proposal to Allscripts in Section 1 on

17 Exhibit 19(b), you didn't ask for additional clarification as

18 to, specifically, what products Allscripts had or what products

19 Allscripts viewed as competitive, correct, sir?

20 A    I believe that came later on.

21 Q    And Allscripts, as we looked at Exhibit 20(b), sent back

22 its own redline in Section 1, which accepted the changes made

23 by you through your counsel, with respect to the six-month

24 noncompete, but added a specific product, right?

25 A    Correct.

1  Q    Now, at no point in time did you make any suggested

2  revisions to the language that Allscripts was proposing to try

3  to provide you additional clarity, even beyond

4  Exhibit 20(a), did you, sir?

5  A    I think we did, because in the previous exhibit, you had

6  references to class and we asked for clarification on what the

7  class definitions were.  Allscripts provided some white paper

8  documentation and then later on, it changed to other things.

9       So, I don't think I've ever agreed to the agreement in

10 its whole.

11 Q    Let me try to focus that question.  After Allscripts

12 accepted the language with the modification for FMH be

13 included, it was sent, and as reflected in Exhibit 19(b) and

14 20(b), after that point in time, at no point, did you make

15 suggested revisions to the language that would provide

16 additional clarity as to what products would compete, correct?

17 A    I don't recall at the current moment.

18 Q    And Allscripts, in fact, did try to provide additional

19 clarity, descriptions and functionality and so forth, that

20 might satisfy your concerns, right?

21 A    Allscripts provided a reference to their publicly facing

22 website.

23 Q    That was the recent for FMH, right?

24 A    No, I don't remember what the website was, but --

25            THE COURT:  I don't know what FMH is.

1          MR. DURBIN:  I'm sorry, that's FollowMyHealth, which

2   is what's referenced in Exhibit 20(b).

3          THE COURT:  Okay.  I know it.

4   BY MR. DURBIN:

5   Q    And did you do any investigation to determine what

6   functionality existed within FMH, okay, in connection with the

7   settlement agreement?

8   A    Yes, I went to the website.  I looked at multiple pages

9   of the website.  Was still unclear as to what the definitions

10  were, of what I was going to be restricted from, from a

11  competitive perspective.

12  Q    And that was your position, even though your lawyer, on

13  June 24th, sent a draft of the agreement proposing a six-month

14  noncompete for which you would not work for any company this

15  offers health care software products, which compete against the

16  products offered by Allscripts, with no further definition in

17  that language, correct?

18  A    Which reference?  Where are you referencing?

19  Q    19(b), Section 1.

20       (Pause)

21  A    Yes, that's correct.

22          MR. DURBIN:  I have nothing further, Your Honor.

23          THE COURT:  Counsel, do you wish to redirect [sic]?

24          MR. LEHMAN:  I don't think I have anything else,

25  Your Honor.  Thank you.

1          THE COURT:  Sir, I have a question.  You can follow-

2     up with my question, if you wish.

3          Do you dispute, sir, that when you -- when your

4     counsel wrote a proposal saying you agreed to a period of six

5     months, you would not do work of any kind, directly or

6     indirectly, for any company, which offers health care software

7     products, which compete against the products offered by

8     Allscripts, you don't dispute your client -- your counsel wrote

9     that; am I correct?

10         THE WITNESS:  That's correct.

11         THE COURT:  Okay.  Do you dispute the idea that

12    FollowMyHealth is a product offered by Allscripts?

13         THE WITNESS:  I'm sorry, could you repeat the

14    question?

15         THE COURT:  Yes.  Do you dispute that

16    FollowMyHealth, at the time of this agreement -- the time of

17    this proposal, is a product offered by Allscripts?

18         THE WITNESS:  No.

19         THE COURT:  Okay.  Any follow-up on my question?

20         MR. DURBIN:  No, Judge.

21         THE COURT:  Counsel?

22         MR. LEHMAN:  No, Your Honor.

23         THE COURT:  Thank you, sir, for your testimony.

24         You're welcome to stay for the balance or leave as

25    you wish.

 1                THE WITNESS:  Thank you.

 2          (Witness excused)

 3                THE COURT:  Thank you.

 4                Plaintiff, do you wish to adduce for the record?

 5                MR. DURBIN:  Yes, Judge.  We would like to adduce

 6    testimony from Mr. Lehman.

 7                THE COURT:  All right.  Mr. Lehman, please?

 8                MR. DURBIN:  Yes, Judge.  We would like to adduce

 9    testimony from Mr. Lehman.

10                THE COURT:  All right.  Mr. Lehman, please?

11                MR. LEHMAN:  Your Honor, if I can, I would just like

12    to note for the record that I thought we were in agreement

13    yesterday --

14                THE COURT:  Sir, you can't walk and talk.  This is

15    not town hall.

16                MR. LEHMAN:  Oh, I apologize.

17                THE COURT:  Get in front of the microphone.  Thanks.

18                MR. LEHMAN:  I apologize.  I'm sorry.

19                THE COURT:  That's all right.  It's all right.

20                MR. LEHMAN:  I'm just a little surprised --

21                THE COURT:  I mean, don't you worry, here --

22                MR. LEHMAN:  -- because we -- I thought we had come

23    to an agreement yesterday that we would intend to rely on the

24    declarations if Your Honor would allow it, and now both Mr.

25    Bulsara and myself are being called as witnesses, and that was

Lehman - Direct/Durbin                           30

1  not my understanding what was going to happen.  But if Your

2  Honor prefers it, I'm --

3          THE COURT:  Yeah, it's a live evidentiary hearing,

4  sir.  This isn't Chancery Court.

5          And with all respect to my former court, this is not

6  Chancery Court -- my former (indiscernible).

7          Remain standing, sir.

8          THE CLERK:  Remain standing and raise your right

9  hand.

10         BRADLEY LEHMAN, PLAINTIFFS' WITNESS, SWORN

11         THE WITNESS:  Yes, I do.

12         THE CLERK:  Thank you.  You may be seated.

13 Please state and spell your name for the record.

14         THE WITNESS:  Bradley Lehman, B-r-a-d-l-e-y, and the

15 last name is L-e-h-m-a-n.

16         THE COURT:  Thank you, Counsel, and welcome.

17         Counsel is under oath.  Counsel is known to this

18 Court and there's no need to challenge anything other than

19 let's focus on the issues in the case, sir.

20         MR. DURBIN:  Yes, Judge.

21         THE COURT:  Please.

22                     DIRECT EXAMINATION

23 BY MR. DURBIN:

24 Q    Mr. Lehman, are you attorney for Mr. Bulsara in this

25 action?

Lehman - Direct/Durbin                                    31

1  A      I am.

2  Q      At any point in time have you taken any objection in

3  connection with the settlement negotiations with Allscripts

4  that was not authorized by Mr. Bulsara?

5  A      I think the way I would describe that is I went back and

6  forth on a number of instances with Ms. Baugh, noting by either

7  email or by phone that I had some ideas, but that I would need

8  to have further discussion with Mr. Bulsara, you know, trying

9  to move things along.  There were some periods of time where

10 there might be a couple of days between phone calls with him,

11 so I wouldn't say it was without his authorization, but with

12 the understanding that his input would be needed.

13 Q      Can you think of anything, provide a specific example of

14 anything that you said to Allscripts that was not authorized by

15 Mr. Bulsara?

16 A      I mean, there were a number of conversations that I had

17 either, by email or by phone with Ms. Baugh, where I didn't,

18 you know -- if we happened to get on the phone, I didn't hang

19 up on her and call him before I spoke to her.  You know, I

20 relayed what I had to say and then spoke to him afterwards to

21 let him know the status of what was going on.

22 Q      And Mr. Bulsara had authorized you to engage in those

23 communications with Ms. Baugh, correct?

24 A      Yes.  Yeah, we were actively working on trying to resolve

25 the case prior to trial.

1  Q    And he authorized you to exchange emails and drafts of

2  proposals with Ms. Baugh, correct?

3  A    I didn't ask for his permission, but he knew it was

4  happening, so I think it was presumed that he was okay with it.

5  Q    What was it your understanding that you were authorized

6  to take the actions of negotiating, sending emails, and sending

7  drafts to Allscripts and Ms. Baugh in connection with the

8  settlement, and did that authorization come from

9  Mr. Bulsara?

10 A    Yes.

11 Q    And did you ever send a draft agreement to Ms. Baugh that

12 wasn't authorized -- you weren't authorized to send by Mr.

13 Bulsara?

14 A    For example, the one that we've been talking about --

15       THE COURT:  So, that's a yes or no, again?  Can you

16 answer that and help me out.

17       THE WITNESS:  Oh, yes.  Yes, I would say, for

18 example, the one that we've been talking about, what was it?

19       I think it's 20(b) or 19(b), maybe, the idea of the

20 competing products.  That was an idea that I believe I

21 mentioned separately from sending the email attaching the draft

22 that Mr. Bulsara would need clarity on what Allscripts'

23 position was on what those products were for his own

24 edification and comfort level before we would agree on it.

25       So that was, you know, as I think I described in my

Lehman - Direct/Durbin                                          33

1    declaration, some kind of brainstorming efforts on how we could

2    get to an agreement once I had --

3    BY MR. DURBIN:

4    Q    I'm sorry, brainstorming with whom?

5    A    Back and forth with Ms. Baugh.

6    Q    Okay.  So, you viewed you sending the markup for this

7    Exhibit 19(b) to Ms. Baugh as a brainstorming session?

8    A    Yeah, I think what my email said was, is that this was a

9    suggestion.

10   Q    And was -- did you send -- let's go back to the specific

11   question -- the draft that you sent to

12   Ms. Baugh, 19(b), on June 24, you were authorized, as part of

13   your discussions with Allscripts, to send that draft to Ms.

14   Baugh by Mr. Bulsara, correct?

15   A    Yeah, as far as I'm concerned, I was authorized, yes.

16   Q    So, I want to go back to something that happened earlier

17   today that makes me think about the first email in 19(a).  So,

18   let's take a look at the Exhibit 19(a), the first date on the

19   top, June 24, 2022.

20        In that email to Ms. Baugh, you said:

21        "Good afternoon, we are unable to agree on a list of

22   competing companies, which we think would be easiest and least

23   (indiscernible) agreement, then we suggest the revisions in the

24   attached against the latest version circulated."

25        Do you see that reference to "we suggest"?

Lehman - Direct/Durbin                      34

1   A      I do.

2   Q      That was you and Mr. Bulsara making that suggestion,

3   correct?

4   A      I don't recall what I thought at the time, but I assume I

5   would be talking about the both of us, yes.

6   Q      Did -- at any point in time -- no, strike that.

7         In any conversation or communication with Ms. Baugh, did

8   you ever tell her that you were not authorized to provide a

9   settlement term or proposal to Allscripts -- I'm sorry -- to --

10  yeah, to Allscripts, on behalf of Mr. Bulsara?

11  A      I would say on a number of occasions, I told her I would

12  need to have further discussions with Mr. Bulsara about

13  whatever the idea was, but I don't think I ever said, I'm not

14  authorized to be doing what I was doing.

15  Q      Now, after the -- well, let me back up to Exhibit 9.

16  Exhibit 9 is the email from you to Ms. Baugh in response to her

17  email to you on the morning of June 17th, before we have the

18  June 17th hearing with the Court.

19        Do you recall that?

20  A      Yes.

21  Q      And as of June 17th, Ms. Baugh had sent you a draft

22  settlement agreement, correct?

23  A      Yes, the evening before she sent me a draft.

24  Q      And that draft settlement agreement included a six-month

25  noncompete?

1  A    It did; although, I would clarify that my review of the

2  draft was after this exchange.

3  Q    So, you had not reviewed the email or the draft agreement

4  from Ms. Baugh when you responded to Ms. Baugh's inquiry as to

5  whether or not she could tell the Court that an agreement has

6  been reached?

7  A    I had not, no.

8  Q    But you did tell her, nonetheless, yes, she could tell

9  the Court that an agreement had been reached, correct?

10  A    Yes, I thought that the way that our discussions had been

11  proceeding, I felt like things were moving in a productive

12  direction and I was comfortable thinking that it would be

13  resolved quickly and that we could, you know, assure the Court

14  that that was the case.

15  Q    Now, after -- I want to switch topics and go to after the

16  June 24th settlement proposal that you sent to Ms. Baugh, after

17  that point in time, Mr. Bulsara testified that there were

18  requests for additional clarification and information about the

19  products, correct?

20  A    Yes.

21  Q    And at any point in time, did you or Mr. Bulsara propose

22  back to Allscripts, any clarifying language with respect to

23  Section 1, where you previously proposed there would be any

24  products that compete with products offered by Allscripts?

25  A    I think that rather than sending back more redlines past

Lehman - Direct/Durbin                                   36

 1  a certain point, we shifted gears to just kind of broader

 2  concepts on how we might resolve it, that we could then

 3  incorporate, if we came to some understanding of, you know,

 4  what was mutually agreeable, what he was comfortable with and

 5  also satisfied Allscripts.

 6  Q    And each -- but in each version of the settlement

 7  agreement that was exchanged by either party, there was always

 8  a version of a six-month noncompete, correct?

 9  A    Of actual drafts, yes, there was.

10  Q    And in discussions, prior to the exchange of those

11  drafts, you had a conversation -- a discussion with Ms. Baugh

12  prior to that.  You discussed an agreement that would include a

13  six-month noncompete, right?

14  A    We did discuss that, yeah.

15  Q    And you advised Ms. Baugh, prior to her sending you the

16  draft settlement on June 16th, that Mr. Bulsara would agree to

17  a six-month noncompete, correct?

18  A    Yes, I -- she asked me, I believe -- and I don't know

19  what exhibit it is -- but she asked me would he be willing to

20  agree to the six months if he were permitted to give two-weeks'

21  notice to Global KTech.  And I believe my response was,

22  assuming we agree on all the specifics, yes, and understanding

23  that it may not really be six months, depending on what happens

24  at the trial, because we had an early-termination concept

25  incorporated into the agreement.

Lehman - Direct/Durbin                                    37

1  Q      I want to take you back to Exhibit 9.

2  A      I think I'm still there.

3  Q      Okay.  Great.

4         So, if you go to your email at the bottom of the first

5  page on Exhibit 9 --

6  A      Yes.

7  Q      -- Friday -- from you to Ms. Baugh on Friday,

8  June 17th, 2022, at 10:39 a.m.

9         Do you see that?

10 A      I do.

11 Q      And that was prior to the court hearing?

12 A      Right.

13 Q      And in this email, you indicate that you would likely get

14 back to Ms. Baugh later, or perhaps over the weekend, with a

15 few comments, but I think it will likely be just clarifying-

16 type comments to ensure we all have the same understanding of

17 the details.

18        That's what you wrote?

19 A      Right.

20 Q      And it's your testimony you hadn't even read the

21 agreement when you sent this email at 10:39 a.m. on

22 June 17th, 2022, before that hearing with the Court?

23 A      That's correct.  Based on our discussions up until that

24 point, I was pretty optimistic that once I had an opportunity

25 to review it, that ideally, there would just be some

Lehman - Direct/Durbin                                        38

1   clarification necessary and some minor nits, but that turned

2   out not to be, you know, a safe assumption.

3   Q    Well, let's talk about that for a minute.  At the end of

4   the day, what you were trying to do was to take -- the parties

5   continued to negotiate what products compete with Allscripts,

6   right?

7   A    I don't think that was on that day, but that did happen

8   later on, yes.

9   Q    And that was all in negotiation after you sent the  June

10  24th proposal, that he would just not compete with any products

11  for six months, right?

12  A    Right.  I think contemporaneously with that email, there

13  were other discussions with Ms. Baugh about him needing a

14  comfort level about what Allscripts' current products were and

15  what things out there they would view as competing with those

16  products to inform his job search and ensure that he be able to

17  find something.

18  Q    And as part of those discussions, you were advised -- Ms.

19  Baugh advised you that Allscripts would be happy to provide

20  ideas or thoughts if he had an employer -- well, strike that.

21            MR. DURBIN:  I have no further questions, Judge.

22            THE COURT:  Thank you, Counsel.

23            Mr. Gellert, do you wish to examine?

24            MR. GELLERT:  Yes, thank you.

25            THE COURT:  Please.

Lehman - Cross/Gellert                                  39

1              MR. GELLERT:  Just a few questions.

2                        CROSS-EXAMINATION

3  BY MR. GELLERT:

4  Q     Referring back to that Exhibit 19(b) -- or 19(a).

5  So --

6  A     Did you say (a) or (b)?

7  Q     (A).

8  A     I'm sorry.

9  Q     Looking first at the email from Ms. Baugh on June 17th,

10 10:43 a.m. (indiscernible).

11 A     The 10:43, you said?

12 Q     Correct.

13 A     Okay.

14 Q     Take a second and read that.

15 A     Yes.

16 Q     Okay.  Now, on examination, the question was asked

17 whether you had given consent to an agreement, right, but to

18 continue on with the remainder of that email, it says,

19 "finalizing the documentation."

20      In your mind, was the documentation finalized when you

21 gave your consent to being able to state that on the record?

22 A     No, it was never finalized.

23 Q     At that time when you made that email, when you gave that

24 consent, had your client ever -- has Mr. Bulsara ever seen the

25 agreement?

Lehman - Cross/Gellert                    40

1  A    No.

2  Q    At that point, had Mr. Bulsara given consent to the terms

3  of the agreement?

4  A    No.

5  Q    If you keep following that, the next email in that string

6  is on June 17th at 3:29.

7       Do you see that?

8  A    Yes, uh-huh.

9  Q    Take a second and read that.

10      In the -- what is the third sentence, "I have passed

11 ..."?

12 A    Yes.

13 Q    And I don't want to read it to you, but, essentially,

14 what was your thought process when you're saying, "We need to

15 wait for him to have an opportunity."  What was your thought

16 process at that point?

17 A    So, after the hearing, I took a look at the draft I'd

18 been sent the evening before and I knew that I was need to

19 speak to Mr. Bulsara about it and review it substantively with

20 him.  But what I did was take a look and I noted that there

21 were some things like some defined terms that were kind of

22 hanging in a weird way or defined twice or things like that and

23 some typos.  So, I fixed those and sent them back, and as I

24 mentioned in my email, you know, these were, you know, some

25 minor edits, but I needed to send it along to him and have an

Lehman - Cross/Gellert                          41

1  opportunity to speak to him before I could get back to him

2  about the agreement.

3  Q    In your mind, the redline that you sent, was that the

4  fully authorized version of what you intended to propose on a

5  counter?

6  A    No, I was just fixing typos and let them know that I

7  would need to talk to the client to get back to them about it.

8  Q    The next email in the string, Sunday, June 19th, from Ms.

9  Baugh --

10 A    Yeah, I'm there.

11 Q    -- the third sentence there, starting at, "If these

12 changes look good ..."

13 A    I got it.

14 Q    "If these changes look good and Mr. Baugh [sic] doesn't

15 have further revisions," what does that mean to you?  What did

16 -- occurred to you through the use of that terminology?

17 A    That we could make a determination about whether we

18 wanted to accept those changes or not.  We could propose other

19 changes.  We could reject those changes.  And depending on how

20 that played out, maybe we would be able to execute something.

21 Q    Does it reflect to you the position that Ms. Baugh felt

22 that the agreement was not complete in final form?

23 A    No, I don't think I ever got that impression until July

24 5th.

25 Q    And then the next email, June 21st, at 5:09.  That's from

Lehman - Cross/Gellert                              42

1  you to Ms. Baugh?

2  A      Yes.  Also, I misspoke a moment ago.  It wasn't July 5th.

3  It was the date that the Court entered an order moving the

4  trial, which doesn't come (indiscernible).

5  Q      All right.  So, the email --

6            THE COURT:  Hold on.  Hold on.

7            This June 21, how does that -- you just completely

8  lost me there.  How would you -- how would that be the date?

9  June 21 is before your June 24th draft.

10           MR. GELLERT:  If I could step back, I think the

11 pending question that I --

12           THE COURT:  Well, let me answer my question,

13 Counsel.

14           MR. GELLERT:  Sorry.  I'm just trying to help

15 clarify.

16           THE WITNESS:  Maybe I wasn't speaking clearly.

17 I never got the impression that Allscripts felt any agreement

18 had been reached until Your Honor entered the order moving the

19 trial, asking them then, also, to show cause why

20 Mr. Bulsara should not be dismissed --

21           THE COURT:  Okay.

22           THE WITNESS:  -- and quoting me as saying during the

23 hearing that --

24           THE COURT:  Okay.

25           THE WITNESS:  -- I thought we had an agreement.

1          THE COURT:  So, but you said -- did you think -- did

2   you -- are you suggesting you did not think that Allscripts

3   thought it had an agreement until after June 21, then, when we

4   entered the order moving the trial; is that your testimony?

5          THE WITNESS:  That -- later that day after Your

6   Honor entered the order was the first time I ever heard

7   anything like that.

8          THE COURT:  Okay.  I'm sorry, Counsel.  Go ahead.

9          MR. GELLERT:  Thank you, Your Honor.

10  BY MR. GELLERT:

11  Q    So, June 21st, the email that you sent at 5:09 --

12  A    I see it.

13  Q    Okay.  In here, you say you're going to be connecting

14  with Mr. Bulsara.

15       Again, at that point, what was your state of mind?  Do

16  you believe that you and Mr. Bulsara had agreed to the terms of

17  the agreement?

18  A    No, I didn't think we had any agreement.  And I saw the

19  Court's order moving the trial and it struck me that that would

20  have an impact on the notion of the potential for early

21  termination.

22       In this same email, I let Ms. Baugh know that

23  Mr. Bulsara and I had not found the document she passed along

24  that Sunday to be helpful in understanding the scope of the

25  restrictions and that we needed to work more on that.

Lehman - Cross/Gellert                    44

1  Q     And then the next email -- and this is the last one I'll

2  do; I know everybody can read -- June 23rd at 10:32 a.m., a

3  follow-up from Ms. Baugh asks where you he or you stand.

4        What did that mean to you?  What did that convey to you

5  in terms of the state of the settlement?

6  A     That we didn't have one as far as I was concerned, but I

7  think that the Court had asked for an update.  And so I think

8  that that was the show-cause pleading that they needed to file,

9  and so they were asking for my position.

10       And my position was, why don't we let the Court know that

11  we're still working on things and we'd like some more time to

12  try to get to an agreement.

13  Q     So, in sum, between this June 17th and June 23rd period,

14  what was your feeling of what the status was in terms of the

15  meeting of the minds between the parties?

16  A     I didn't think there ever was one.  As I said, Allscripts

17  extended a counteroffer and then asked me by email, whether Mr.

18  Bulsara would be willing to accept it.

19       And I had said, Assuming that we can agree on the

20  specifics, he's okay with the six months.

21       After that point, there were discussions either by email

22  or phone, where we tried to pin down what was patient

23  engagement and telehealth.  Then we kind of moved on to, well,

24  maybe he won't compete with these particular products, but help

25  us understand what they are.  He hasn't worked there in a

Lehman - Redirect/Durbin                                    45

1  while.  He doesn't have insight into it.

2      We didn't get, really, anywhere with that, and so then, I

3  think sequentially, then, was the idea that we proposed of, how

4  about we agree on a list of companies he won't work for?  We

5  provided a list and Allscripts advised that they would not be

6  willing to agree on a list because there could be companies out

7  there they didn't know about.

8      And beyond that, things sort of broke down into a point

9  where I advised that perhaps the most efficient way to resolve

10 this would be to not worry about going through the process

11 we're going through today and, instead, see if

12 Mr. Bulsara could find a job that was acceptable to them, at

13 which point we could dismiss the case prior to trial.  But

14 since that hasn't happened yet, we're still kind of in limbo.

15          MR. GELLERT:  That's all I have.

16          THE COURT:  Thank you.

17          Counsel, do you wish to cross-examine?

18          MR. DURBIN:  Yes, Your Honor.

19          THE COURT:  Recross [sic], I'm sorry.

20                  REDIRECT EXAMINATION

21 BY MR. DURBIN:

22 Q    Take Exhibit 13, the email on June 21, 2022, from you to

23 Ms. Baugh at 5:09 p.m.

24 A    Yes.

25 Q    And June 21, that's the -- you can tell from your email,

1  that the Court had moved the trial as of that date?

2  A     Yes.

3  Q     And that, as you described it, threw a wrench in things,

4  right?

5  A     Yes.

6  Q     And that wrench had nothing to do with defining

7  competitive products or defining patient engagement or

8  telehealth, correct?

9  A     No, that had more to do with the concept of early

10  termination of the agreement.

11  Q     In your second paragraph, you ask, you say that

12  Mr. Bulsara --

13  A     Uh-huh.

14  Q     -- would like a clearer idea of what is going to be

15  considered competitive.  You raise that on June 21, right?

16  A     Right.

17  Q     And then it was three days later on June 24 that you sent

18  the proposal to Allscripts that he simply would not compete

19  with any product that they offer, correct?

20  A     Yes.  In my view, that was in the broader context of the

21  discussions we've been having, where I thought I had made it

22  reasonably clear that he would need insight into that, but that

23  would be something we could work from.

24          MR. DURBIN:  I have nothing further, Judge.

25          THE COURT:  Counsel?

1              MR. GELLERT:  No, Your Honor.

2              THE COURT:  Sir, I have a question if I may?

3              THE WITNESS:  Sure.

4                            EXAMINATION

5    BY THE COURT:

6    Q     Your last point is the one I'm wrestling with.

7          Where would I find something that tells me that supports

8    your theory that when you sent the draft on June 24, which is

9    marked as Exhibit 19(b), where did you say along the lines of,

10   By the way, my client will agree to this, but I'm not -- I

11   mean, what would lead -- remember, this is an objective

12   standard -- what would lead me to think that could reasonably

13   be interpreted as objectively there'd be some caveat to that

14   that says, which offers health care software products, which

15   compete against the products offered by Allscripts.  Where in

16   anywhere do you suggest that, by the way, that still has to be

17   negotiated?

18   A     I don't think that was in one of these emails.  It may be

19   in my declaration.  There were --

20   Q     Well, what did you say and when?  Declarations are

21   hearsay.  What did you say and when?

22   A     Off the top of my head, I couldn't tell you exactly when

23   I had any of the individual phone conversations with   Ms.

24   Baugh, but I thought it was clear between the two of us that

25   this was a suggestion that we could work from, assuming that we

Lehman - The Court                                    48

1   were able to get some insight into what the competing products

2   were.  And so, I asked for that information and we were

3   directed to the Allscripts website, as Mr. Bulsara said, and we

4   were also advised that the information about their products was

5   in the discovery exchanged in the case, a couple million pages,

6   and so we had follow-up discussions about how are we going to

7   define these things without scavenger hunting through the

8   discovery.

9   Q    Sir, if Allscripts had -- you also deleted paragraph 2,

10  which is the early termination, restricted period.

11       That was your idea, as well, right?

12  A    Right.  At that point, I felt that it was kind of

13  useless, because --

14  Q    Okay.

15  A    -- they couldn't terminate anymore.

16  Q    Why?

17  A    Your Honor had moved the trial out beyond the six months

18  from this time, so there wasn't a possibility for a verdict to

19  be rendered in Andor's favor and terminate the agreement early

20  anymore.  That had been an assumption that this was predicated

21  on, and then once that was no longer an option, the

22  conversation changed.

23  Q    Okay.  So, when you wrote, "Which offers health care

24  software products, which compete against the products offered

25  by Allscripts," you had been in litigation now for over a year.

Lehman - The Court                                      49

1   You were aware that FollowMyHealth was a product offered by

2   Allscripts?

3   A       Yes.

4   Q       Okay.  And at which stage -- had Allscripts literally

5   accepted these changes that you suggested, wouldn't we have an

6   agreement?

7   A       In the broader context of our discussions, I don't think

8   so.

9   Q       Why?

10  A       I thought it was understood that we had an ongoing

11  discussion that that these would be interpreted as suggestions

12  that we could work from, but --

13  Q       Okay.  So, that's my question, under where could I find

14  that?  I mean, why would someone reading this objectively think

15  that there's some other discussions coming out?  Your language

16  -- I'm just asking; I don't want to cross you -- but it says:

17          We suggest the revisions in the attached, getting rid of

18  the CLAS classification -- the C-l-a-s classification, and so,

19  this is what we suggest instead.  And I don't see any other

20  communication otherwise that would tell me that you're

21  describing anything other than products offered by Allscripts.

22          I mean, do you have any kind of internal -- I mean, how

23  would I find that, sir?

24          I'm guessing, you're saying, Judge, I just remember

25  having a conversation with Ms. Baugh; is that what it is?

Baugh - Direct/Durbin                    50

1   A     Yes, I'm positive that we had ongoing discussions --

2   Q     All right.  That's not the question.

3         Before you sent this?

4   A     Uh-huh.

5   Q     Before you sent this?

6   A     I don't recall specifically the dates or times of all the

7   conversations.  I think, actually, Ms. Baugh's declaration was

8   pretty detailed about phone calls.  Mine talked more about the

9   email exhibits that were in here.

10        But I did not understand that this was a situation where

11  if Allscripts said, Okay, that was going to be the end of it,

12  in the context of the discussions that we were having.

13              THE COURT:  Counsel, do you have some follow-up?

14              MR. DURBIN:  I have no follow-up, Judge.

15              THE COURT:  Counsel?

16              MR. GELLERT:  None.

17              THE COURT:  Sir, thank you very much.  I appreciate

18  the -- and I've testified before -- I appreciate the discomfort

19  as a lawyer being on the stand today.  You may be seated.

20              THE WITNESS:  I don't get to look in this direction,

21  so.

22              THE COURT:  That's exactly right.

23         (Witness excused)

24              THE COURT:  Allscripts, do you wish to adduce

25  further evidence?

1          MR. DURBIN:  Yes, Judge.  We call to the stand, Ms.

2   Christina Baugh.

3          THE COURT:  Ms. Baugh?

4          THE COURT:  Ms. Baugh?

5          CHRISTINA BAUGH, PLAINTIFFS' WITNESS, SWORN

6          COURTROOM DEPUTY:  Please state and spell your name

7   for the record.

8          THE WITNESS:  Christina Baugh.  First name is

9   spelled C-H-R-I-S-T-I-N-A.  Last name Baugh, B-A-U-G-H.

10          THE COURT:  Good afternoon, counsel.  Thank you

11  being here today.

12          Counsel, you may examine as you wish.

13                      DIRECT EXAMINATION

14  BY MR. DURBIN:

15  Q     Ms. Baugh --

16          THE COURT:  Again, incorporating -- I have read the

17  declaration and I read the papers.

18          MR. DURBIN:  Okay.

19          THE COURT:  Focus on the issues we need to -- the

20  disputed issues.

21  BY MR. DURBIN:

22  Q    Ms. Baugh, a question I want to cover first, briefly,

23  were you authorized by Allscripts to engage in the settlement

24  in the settlement negotiations with Mr. Bulsara?

25  A    I was.

Baugh - Direct/Durbin                    52

1  Q    And were the drafts that you exchanged and the comments

2  you proposed authorized by Allscripts?

3  A    Yes.

4  Q    I want to jump to telephone conversations since we've

5  talked about email.  Tell me about the first conversation you

6  can recall with Mr. Lehman regarding December?

7  A    Mr. Lehman had sent me a short email just asking if we

8  could separately get on the phone after there was a main confer

9  that had also included the Andor defendant's counsel, just he

10 had wanted to talk with me about something.  So we did.  And we

11 talked about something else first, I believe, relating to the

12 trial exhibits.

13     Then he asked whether I would be willing to engage in

14 settlement discussions.  He noted he had previously had all

15 those discussions with you, Mr. Durbin, and whether or not I

16 would talk with him.  I said that either one of us would be

17 willing to do that; you know, whether he wanted to continue

18 them with you or that I was reasonably well-apprised of the

19 discussions that I could continue them.

20 Q    Do you remember the date of that conversation?

21 A    That was Monday the 13th.

22 Q    Of?

23 A    June, sorry.

24 Q    In that conversation did you discuss substantive terms of

25 potential settlement?

Baugh - Direct/Durbin                                      53

1   A      Mr. Lehman did make an offer on behalf of Mr. Bulsara

2   that after discussing some reasons why Mr. Bulsara might be

3   interested in reaching a settlement the settlement offer

4   conveyed was three months where Mr. Bulsara would not work at

5   all.  So he would be out of work for three months and then he

6   could go back to doing whatever he wanted to do.

7   Q      How did you respond?

8   A      I had some clarifying questions regarding some of the

9   things that Mr. Lehman had conveyed for rationale behind it

10  mostly relating to personal considerations that might impact

11  finances just to get a better understanding because I figured

12  the client would have questions for me regarding that.  Then,

13  otherwise, I said I would I have to talk with Allscripts and I

14  would get back to him as soon as I could.

15  Q      Did you have a subsequent conversation?

16  A      I did.

17  Q      When was that conversation?

18  A      There was, first, a subsequent email where Mr. Lehman

19  actually clarified and answered one of the questions that I had

20  asked on the phone.  Then we spoke again, by phone, the next

21  day which was Tuesday, June 14th.

22  Q      What did you discuss during that conversation with Mr.

23  Lehman?

24  A      I discussed how Allscripts had never had the intention

25  that Mr. Bulsara would have to be completely out of work.  That

Baugh - Direct/Durbin                    54

1    was never the intention, but understanding that Allscripts

2    position was that there was a one year non-compete and Mr.

3    Bulsara's position that there was none that the counteroffer

4    was six months non-competition which would mean that he would

5    stay out of the patient engagement telehealth industry.

6        There were other terms we had set forth within that

7    discussion where I specifically identified, because I know the

8    Andor defendants contest whether they are in patient engagement

9    or telehealth that it would specifically include him not

10   working directly or indirectly for Andor or Mahathi, those

11   defendants; that we would want a fee shifting provision in

12   there that, you know, if Andor or Mahathi was declared to not

13   be competitive we were fine saying fine.  That would make that

14   acceptable under the non-six month non-compete period.

15       I believe -- if there was something else in my

16   declaration, there might have been another initial term, but

17   those were -- oh, you know, no money would change hands;

18   essentially, everyone carry their attorney's fees to date,

19   we're done.

20   Q    How did Mr. Lehman respond?

21   A    That he needed to talk to Mr. Bulsara and would get back

22   to me.

23   Q    Did you have a subsequent conversation with Mr. Lehman

24   about the potential for a settlement?

25   A    Yes.  On the 15th I received an email back from Mr.

1  Lehman where, if I recall correctly, and I know it's in this

2  book, he was proposing that Mr. Bulsara would want to be able

3  to provide notice to his current employer, Global KTech, so

4  that, you know, he didn't burn bridges with his employer.  I

5  don't remember if I asked a clarifying question or if he just

6  sent a subsequent one clarifying that that would be a two week

7  notice period, which I think is relatively standard, and that

8  would not be in the six months.

9        Then I sent back an email, after checking with the

10 client, that, yes, we would be agreeable to that, whether its

11 clarification, or addition, or change, to the six month time

12 period.  Mr. Lehman did respond.  I found his response -- I

13 don't know, maybe I was just tired, but I called to ask him

14 what does this mean because, frankly, we had a lot going on --

15 Q    Let me just pause here.

16 A    Oh, no.  Apologies.

17 Q    I'm sorry, Ms. Baugh.  I asked a, sort of, general

18 question.  I will try to break it up a little bit.

19 A    Yeah.

20 Q    During the conversation you just described, before we go

21 to the next one, did Mr. Lehman say anything about the response

22 that you provided and Allscripts has?

23 A    No.

24 Q    Was there any indication or discussion about

25 Mr. Bulsara, and Mr. Bulsara's reviewing those terms with

Baugh - Direct/Durbin                                    56

1  Mr. Lehman, anything like that?

2  A     No.  That was his clarification back that they wanted to

3  be able to provide a two week notice period and that would,

4  essentially, delay when he would no longer be competing.

5  Q     Any indication that a six month period would not be

6  acceptable?

7  A     No.

8  Q     Now let's go to the follow-up.  You had some further

9  conversation with Mr. Lehman.

10  A     Yes.  I called him because we had --

11  Q     Can I ask you when this was?

12  A     This would have been late in the afternoon or early

13  evening of Wednesday, June 25th.

14  Q     June 25th?

15  A     I'm sorry, June 15th.  Apologies.

16        Yes.  I called him because I wanted clarification that we

17  had an agreement and that I should draft the written settlement

18  agreement to memorialize that because, frankly, we had a lot

19  going on and if there wasn't an agreement I was not spending

20  the time drafting that document.

21  Q     How did Mr. Lehman respond?

22  A     He responded, yes, I should go ahead and draft that

23  document.

24  Q     Did he indicate to you any objections to any of the terms

25  that you had laid out in your prior conversations?

Baugh - Direct/Durbin                           57

1  A     No.

2  Q     Did he indicate that Mr. Bulsara had not authorized him

3  to enter into that agreement?

4  A     No.

5  Q     Let me just ask broadly: was there ever a time when Mr.

6  Lehman conveyed to you that he was not authorized by Mr.

7  Bulsara to engage in the communications he was having with you?

8  A     Not to engage in the discussions, no.

9  Q     What about with respect to the terms of the settlement,

10 was there ever an indication from Mr. Lehman that he was

11 proposing terms of the settlement that were not authorized by

12 Mr. Bulsara?

13 A     The closest thing to that, that I would say, is after

14 June 21st, after -- I can find the exact email.  There was a

15 lengthy email from Mr. Lehman where he, essentially, set forth

16 his position why there was no settlement, but other -- you

17 know, that was, I think, June 24th or June 25th, somewhere

18 along those line.  Prior to that, no, absolutely not.

19 Q     So you spoke to Mr. Lehman late in the afternoon --

20 A     Yes.

21 Q     -- of the 15th and asked is there an agreement.  You said

22 yes.  Then what did you do?

23 A     I'm sorry, what did I do?

24 Q     What did you do?

25 A     Whether it was that evening or the next morning I drafted

Baugh - Direct/Durbin                                    58

1  a written settlement agreement that memorialized what we had

2  discussed and had some, you know, what I consider pretty

3  standard other settlement agreement terms; you know, signing

4  counterparts, all that good fun stuff.

5       I believe he had sent me a follow-up email that

6  afternoon, Thursday the 16th, asking when he would expect to

7  see that written document.  I sent it back to him an hour or

8  two later.

9  Q    So on June 17th -- I'm going to be a little more focused,

10 Judge, sorry.

11      On June 17th, the date of the hearing before the  court

12 --

13 A    Yes.

14 Q    -- you reached out to Mr. Lehman.  Why did you reach out

15 to Mr. Lehman?

16 A    He actually first had responded both to acknowledge my

17 email on the 16th that he had the draft and then the morning of

18 the 17th he sent an email saying that he would have some

19 clarifying redlines back to my document.  I wanted clarity that

20 there wasn't any disagreement because we had, in my view,

21 reached our agreement on the 15th and we had previously

22 discussed that knowing that the court would be interested in

23 knowing of that settlement, because it impacted the topic of

24 discussion in terms of timing for the trial, that we were going

25 to be telling the court that there was an agreement between the

Baugh - Direct/Durbin                    59

1  parties.

2       So I needed to know was he still okay with us telling the

3  court, you know, not knowing what his clarifying comments would

4  be, that we have an agreement, we're just finalizing

5  documentation because that was exactly where I believed us to

6  be of we are simply -- you know, to the extent attorney's

7  wordsmith documents.

8  Q    How did Mr. Lehman respond?

9  A    He said yes.

10 Q    Did he give you any suggestion that there was no

11 agreement to the material terms of a contract at that point on

12 June 17th?

13 A    No.

14 Q    I want to jump forward now to June 24th.  We've talked

15 about Exhibits 19-A and 19-B, and 20-A and 20-B several times,

16 so I won't go through them again.

17      Again, was there any suggestion in 19-A when Mr. Lehman

18 sent you a proposed settlement agreement covering the

19 restrictions on scope of work for six months for any competing

20 product?  Any suggestions that that was subject to further

21 discussion?

22 A    No.

23 Q    And the response that you gave back to Mr. Lehman was

24 what?

25 A    Are we talking about Exhibit 20?

Baugh - Direct/Durbin                          60

1  Q       20-A and B, yes.

2           THE COURT:  Counsel, can I -- I don't want to

3  interrupt your flow, but did -- when that came to you -- when

4  19 came to you what was the status of the negotiations?  You

5  can look at 19 if it gives you some context.

6           THE WITNESS:  Yeah.

7           THE COURT:  19 is, again, Mr. Lehman to you, right?

8           THE WITNESS:  Yes.

9           THE COURT:  This is -- okay.  So the last thing I

10 see is June 24th.  Here is a list that Mr. Bulsara provided,

11 okay.  That is at 9:52 a.m. and then, you know, four or five

12 hours later -- it's curious and it's your records, I don't

13 know.  Is your phone call -- I mean it turns on a dime to the

14 outsider.

15          It says here we're talking about lists, right, at

16 9:52 a.m.  Then, just a few hours later, if we are unable to

17 agree on a list of competing companies that presumes to you had

18 a -- that would seem to suggest that you had a discussion.  Do

19 you remember a discussion between 9:52 and 2:32 that led to

20 this new draft?

21          THE WITNESS:  I do not believe we had any

22 discussions in between there.

23          THE COURT:  Okay.  So you get the one at 2:32,

24 right?

25          THE WITNESS:  Yes.

Baugh - Direct/Durbin                    61

 1              THE COURT:  It has this new language?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Was this new to you this concept of --

 4              THE WITNESS:  Yes.

 5              THE COURT:  -- the focus on Allscripts products.

 6              THE WITNESS:  Yes.

 7              THE COURT:  Okay.  No discussion before that about

 8  that kind of language?

 9              THE WITNESS:  No, Your Honor.

10              THE COURT:  Yet below Mr. Lehman is actually

11  identifying -- he writes,

12              "Please, let me know what Allscripts has to say

13  about it."

14              Is it your understanding -- is it your testimony,

15  Ms. Baugh, that you didn't get back to him about that?  I just

16  want to be clear,

17              "Please, let me know what Allscripts has to say

18  about it."

19              You check, whatever you are doing, then you get this

20  without any kind of response?

21              THE WITNESS:  Correct.

22              THE COURT:  Okay.

23              THE WITNESS:  In between there I was conversing with

24  a client regarding their new suggestion of doing a list of

25  competitors.  So I had not had a chance to respond to him yet

Baugh - Direct/Durbin                    62

1  regarding his 9:52 a.m. email when I got the 2:32 p.m. email.

2          THE COURT:  Okay.  At the bottom of Mr. Lehman's

3  email, that comes at 9:52 a.m., right, he says,

4          "I don't see a lot of utility as we ought to be able

5  to simply finalize and execute the agreement."

6          What agreement?  I can -- what did you understand

7  the agreement was?

8          THE WITNESS:  I understood our agreement to be that

9  Mr. Bulsara would not work in the Patient Engagement or

10 Telehealth industry for six months and that would specifically

11 include Andor and Mahathi unless they had already been found to

12 not compete --

13         THE COURT:  Okay.

14         THE WITNESS:  -- with Allscripts.

15         THE COURT:  If that is your understanding did it

16 surprise you that he then gives you eight companies in the same

17 email? I mean what I'm getting at is I'm having a disconnect

18 between this idea, the telehealth idea and then all of a sudden

19 we're identifying companies.

20         Could you help me?  Why did that happen in your

21 view?  If you think the agreement is telehealth and patient

22 engagement --

23         THE WITNESS:  Yes.

24         THE COURT:  -- how does it get to, in your view, you

25 guys discussing particular companies?

1            THE WITNESS:  Okay.  So during the discussions on

2    the -- so it would be Tuesday was the 14th, the 15th and then

3    the initial draft of the written agreement it was always

4    discussed as patient engagement and telehealth industry.

5            THE COURT:  Okay.

6            THE WITNESS:  I had not received any word back from

7    Mr. Lehman that that was unacceptable or too unclear.  He did

8    ask for one specific document that I had referenced within the

9    written agreement; again, trying to provide clarity and not end

10   up back in a situation where we contend people don't know what

11   that means.

12           Prior to June -- so after the hearing was moved on

13   the 21st, Your Honor, was really the first time then it seemed

14   as if now Mr. Bulsara was not going to move forward with the

15   agreement that had been reached.

16           THE COURT:  Right.

17           THE WITNESS:  After that point, you know, I was

18   trying to get word back from Mr. Lehman of what are we doing

19   because Your Honor had requested that we either would have to

20   show cause or file the dismissal, but if Mr. Bulsara was

21   backing out of the agreement there wouldn't be a dismissal.  We

22   would have to do the show cause.  So I was trying to get

23   clarification from Mr. Lehman of what his client was going to

24   do.

25           Mr. Lehman then had, at some point, and it looks

Baugh - Direct/Durbin                                64

1   like it was on Thursday because I do remember there was a delay

2   in hearing back or I guess in this case two days feels like a

3   delay.   So by Thursday he was now putting forth that Mr.

4   Bulsara would rather --

5             THE COURT:  Oh, I see it.   Okay.

6             THE WITNESS:   -- put forth a list of the companies.

7   So he had set that forth and he was also, at this point, trying

8   to change the six months to three months, set forth the

9   position that, no, absolutely we believed we had ourselves an

10  agreement.   We did not want to re-negotiate, but, frankly, we

11  were trying to avoid what we are doing right now.   So if there

12  was a way to, you know, satisfy Mr. Bulsara's concerns we were

13  going to attempt to do that.

14            So that was why Mr. Lehman sent me the list that Mr.

15  Bulsara had said he had prepared of competitive companies.   And

16  while I was working to get a response back to that is when I

17  received the 2:32 p.m. email that had a different suggestion.

18            THE COURT:  Okay.   I didn't have the context

19  earlier. I see the -- I see in the emails now that there is --

20  it's Mr. Lehman who is suggesting agreeing on a list of

21  companies.   You say I will present the list as a good faith

22  effort and accommodation.   Then the response is here's the

23  list.

24            THE WITNESS:  Correct.

25            THE COURT:  The point is by the time its back to

Baugh - Cross/Gellert                                   65

1  back Mr. Lehman.  At 9:52 he's saying here's the list --

2              THE WITNESS:  Yes.

3              THE COURT:  -- by later that afternoon he's --

4              THE WITNESS:  Giving a different alternative way to

5  identify what non-competition would be. Yes, Your Honor.

6              THE COURT:  Okay.  So in the interim -- that's my

7  point, in the interim -- again, I am just going to be clear on

8  this, in the interim there is certainly no email chain, but you

9  don't recall a telephone conversation where that -- there's a

10 heads up, hey, by the way, we're changing our view of this.

11             THE WITNESS:  Correct.

12             THE COURT:  Okay.  I'm sorry, counsel, I could never

13 figure out what this was and now I get it.

14             MR. DURBIN:  I have no other questions, Judge.

15             THE COURT:  Counsel, Mr. Lehman or Mr. Gellert?

16                      CROSS-EXAMINATION

17 BY MR. GELLERT:

18 Q    Good afternoon.  I don't even know why I thought it was

19 even close to morning.

20      I wanted to start with the motion that you drafted.  In

21 the motion it says that June 15th was when the material terms

22 of the settlement were reached.  Is that correct?

23 A    That is definitely my understanding, yes.

24 Q    The wherefore clause of the motion says the agreement as

25 of June 18th, but it's really the 17th I think because the 18th

1  is a Saturday.  Either way, 17th or 18th.  So we're in that

2  timeframe of the 15th to the 17th as relating to the motion,

3  correct?

4  A    I'm sorry, can you clarify your question?

5  Q    Sure.  I'm just trying to get the timeframe of the motion

6  -- of the settlement that you're trying to enforce.  It's

7  either that of the 15th or the 17th as it relates to the

8  motion.

9  A    So my understanding is we had reached an agreement, an

10 oral agreement, as to all material terms on the 15th.  There

11 was then a written memorialization of that that was exchanged

12 and Mr. Lehman did send me revisions that were clarifying only

13 and minor that we accepted.  So if there is a look for which

14 document, because Allscripts did accept those clarifying

15 revisions, I think that would be fair to say that that would be

16 the appropriate document to look at.

17 Q    Do you have the exhibit binder?

18 A    I do.

19 Q    Can you turn to Exhibit 3, please?

20 A    Okay.

21 Q    Look at that email chain, your email dated June 15th at

22 6:24 p.m. where you're asking for clarification will he accept

23 the offer?

24 A    Yes.

25 Q    The subsequent emails from Mr. Lehman, do you see that

Baugh - Cross/Gellert                                67

1  one above it?

2  A      Yes.

3  Q      He starts out by saying "Assuming we reach agreement on

4  all the specifics we will agree." Is that correct? Is that

5  your understanding?

6  A      That is what he wrote.

7  Q      And so when he says "Assuming we reach agreement on all

8  the specifics" you still have to work out the specifics, right?

9  A      I think -- no.

10         (Pause)

11 Q      I'm sorry, are you finished.

12         THE COURT:   The answer was no.

13 BY MR. GELLERT:

14 Q      I thought you were still thinking.  I apologize.

15 A      No.

16 Q      So, in fact, the email before that, the June 15th at

17 2:12, the second paragraph, second sentence he says, "He's

18 willing to engage with Allscripts further on the six month

19 proposal above." So when he says he's willing to engage with

20 Allscripts that is a clear indication that he hasn't agreed to

21 anything other than just the concept of six months if we can

22 agree to the specifics.  Isn't that right?

23 A      Correct because he was adding a two week notice period in

24 this email.

25 Q      Okay.  So then we get to a couple hours later at 6:31 and

1  somehow -- strike that.

2       So there doesn't seem to be a specific agreement on the

3  15th because it hasn't been ironed out yet?

4  A    I disagree.

5  Q    Even though he says assuming we reach agreement on the

6  specifics you believe that --

7            THE COURT:  Got it counsel, argumentative to the

8  jury.

9            MR. GELLERT:  Okay.

10           THE COURT:  Thank you, sir.

11           MR. GELLERT:  Just trying to clarify.

12           THE COURT:  No, I get it.  Thank you.

13 BY MR. GELLERT:

14 Q    So then you send the draft on the 16th, correct?

15 A    Correct.

16 Q    Now before you sent that written draft on the 16th had

17 you ever discussed relying on any class document of definitions

18 for what patient engagement or telehealth word?

19 A    We had only discussed that it would be patient engagement

20 and telehealth and he did not indicate any lack of clarity on

21 that.  He's also been engaging in discovery with us.

22 Q    Have you been in other instances where you were drafting

23 agreements with non-competes?

24 A    Are you asking me whether I've worked on other matters

25 that have reached a settlement with a non-compete?

Baugh - Cross/Gellert                    69

1  Q      Yes, essentially.

2  A      Yes.

3              MR. DURBIN:  I'm going to object to the line of --

4              MR. GELLERT:  I just asked one question.  I just

5  wanted to

6              THE COURT:  This is like a foundation --

7              MR. GELLERT:  Yes.

8  BY MR. GELLERT:

9  Q      So in those agreements wasn't it critical to understand

10 what the actual key elements were so that both sides should be

11 very clear on what the terms would be of the non-compete,

12 right, so you're not ending up back in court?

13             THE COURT:  I'm sorry, counsel, I don't know if I

14 understand the question.  Is the question -- you're asking --

15 this witness can't provide a legal opinion, and she may be

16 qualified to, but it's not for today.  Are you asking her

17 whether it's important that you define the terms of a non-

18 compete?

19             MR. GELLERT:  Right, so that you don't --

20             THE COURT:  That's not today, but you can talk about

21 what her experience was in connection with Mr. Lehman.

22 BY MR. GELLERT:

23 Q      Well I was going to ask has there ever been a time when

24 you have agreement in principal, but it breaks down because you

25 can't get to the specific terms?

Baugh - Redirect/Durbin                                    70

1   A     No.

2   Q     But you could see how that could happen sometimes, right?

3   A     I can see how people sometimes back-out of agreements,

4   yes.

5   Q     That is not the question I asked you.

6   A     That is my answer to your question.

7              THE COURT:  Counsel, one moment.

8         (Pause)

9              THE COURT:  Thanks, counsel.

10             MR. GELLERT:  Nothing further.

11             THE COURT:  Nothing further?  Counsel?

12             MR. DURBIN:  Yes, Judge.

13                   REDIRECT EXAMINATION

14  BY MR. DURBIN:

15  Q     You were asked on examination, cross-examination, about

16  whether you believe there could be an agreement on the

17  specifics as described in the email had not been agreed to.

18  You answered there could be one.  Could you, please, explain

19  your answer?

20  A     I answered him no, but we have the material terms agreed

21  to.  If Mr. Lehman had a disagreement with the phraseology in

22  the document or any of the, you know, routine settlement

23  conditions I have seen instances where counsel insists upon

24  using their exact language for each party bears your own

25  attorney fees or however it is that they prefer to set things

Baugh - Redirect/Durbin                    71

1  forth, but you still have an agreement on the material terms.

2  The material terms are always going to govern what the written

3  documentation should say.

4  Q    My final question is with Exhibit 20-B.  I this was a

5  response to Mr. Lehman's proposal.  Are there any specifics

6  left to iron out?

7  A    No.

8           MR. DURBIN:  Nothing further, Judge.

9           THE COURT:  Counsel?

10          MR. GELLERT:  Nothing, Your Honor.

11          THE COURT:  Okay.  I'm going to interrupt again, Ms.

12 Baugh.  Why did -- no, I'm sorry.

13          When -- did you -- on 20-B there's the language

14 about including without limitation Allscripts FollowMyHealth

15 Solutions.  You wrote that, I suspect, right?

16          THE WITNESS:  Yes, Your Honor.

17          THE COURT:  Okay.  Wouldn't the language before

18 that, which compete against the products offered by Allscripts,

19 by definition include Allscripts FollowMyHealth Solutions?

20          THE WITNESS:  Yes, it would.

21          THE COURT:  Then why did you put it there?  And

22 don't tell me what your counsel said.  What was your legal

23 thinking for doing that?  I mean what is the -- what is the

24 materiality of saying FollowMyHealth Solutions if it's already

25 in the language that is agreed to by Mr. Bulsara?

Baugh - Redirect/Durbin                                    72

1          THE WITNESS:  That this would be a provision for six

2    months looking forward.  So while product offerings might

3    change the FollowMyHealth was specifically the solution that

4    Mr. Bulsara had worked on while at Allscripts.  So the

5    information that was competitive would -- we just wanted to

6    make sure it was abundantly clear that what we're talking about

7    is not only their product offering, but specifically the one

8    that we are most concerned with.

9          THE COURT:  I wasn't clear, I don't think.  Wouldn't

10   that -- by the use of the word "including" --

11         THE WITNESS:  Yes.

12         THE COURT:  -- that would seem to be the objective

13   reader that something that is within a larger set of products

14   offered by Allscripts.

15         THE WITNESS:  That is correct.

16         THE COURT:  So a lawyer reads a contract when

17   somebody has specifics to say you're saying something

18   different, right, because you won't need to say including

19   without limitation FollowMyHealth Solution.  I don't follow

20   your answer.  If it's already in there why do you need it?  Why

21   do you draw Mr. Bulsara's attention to it if he's already

22   agreed to do that?

23         THE WITNESS:  Abundance of caution and clarity.

24         THE COURT:  Okay.  Is there another product that is

25   at issue in the case other than FollowMyHealth involving Mr.

Baugh - Recross/Gellert                        73

1  Bulsara?

2              THE WITNESS:  I believe --

3              THE COURT:  In other words, is this a gift to Mr.

4  Bulsara saying, by the way, I am just talking about

5  FollowMyHealth because you're being specific.  You have the

6  general, then you jump to the specific which is like

7  draftsmanship, why?

8              THE WITNESS:  I believe Mr. Bulsara at times may

9  have worked on other Allscripts products as well.  The one that

10 he was most involved with and that has been, as we pointed out,

11 at issue in the case is the FollowMyHealth product.

12             THE COURT:  Okay.  Thank you.

13             I'm sorry, counsel.

14             MR. DURBIN:  Nothing else.

15             THE COURT:  Counsel?  Mr. Gellert?  Anything you

16 wish.  Don't stay on the scope of my question. Outside of jury

17 I need to figure some things out.

18             MR. GELLERT:  Just a quick question if it's okay.

19             THE COURT:  Please.

20                     RECROSS-EXAMINATION

21 BY MR. GELLERT:

22 Q    The eight questions -- the eight companies that

23 Mr. Lehman sent to you I want to talk about that.

24 A    Which exhibit is it in?

25 Q    19-A would be the first page actually.

1   A      Okay.

2   Q      Did you ever get confirmation from your client that these

3   would be or would not be competing companies that he couldn't

4   work for?

5              MR. DURBIN:  Your Honor --

6              THE COURT:  Sustained.  Whatever it is its

7   attorney/client.

8              MR. GELLERT:  Oh, sorry.  I was just trying to get

9   clarification so he knows where he can go apply for a job.

10             THE COURT:  Well that is not before us today.

11             MR. GELLERT:  Okay.

12             THE COURT:  I appreciate your question.  That can be

13  done outside of my presence.

14             MR. GELLERT:  Okay.  Thank you, Your Honor.

15             THE COURT:  Thank you for being here.  I appreciate

16  the professionals that have been here today.  Thank you.

17       (Witness excused)

18             Mr. Durbin, do you have any further witnesses you

19  wish to adduce, any further evidence?

20             MR. DURBIN:  No further evidence or witnesses.

21             THE COURT:  The exhibits are admitted.

22       (Plaintiff Exhibits received into evidence)

23             THE COURT:  Mr. Gellert or Mr. Lehman, do you wish

24  to adduce any evidence I haven't already heard or witness I

25  haven't heard?

1          MR. LEHMAN:  Nothing you've not already heard, Your
2    Honor.
3          THE COURT:  Okay.  Let me ask a question, Mr.
4    Gellert adduced something that I hadn't thought about before
5    and that is the motion that you filed -- I can only grant what
6    you give me, right?  The motion you filed asked me to enforce
7    the document as of -- well, it's curious.  The motion says one
8    thing, the memorandum says something different.  You say
9    holding the written settlement agreement containing the
10   revisions as of June 18th be deemed signed and enforceable.

11         We spent a lot of time today, and I just spent a lot
12   of time with Ms. Baugh, talking about something that happened a
13   week later which seems to me to be some language issues.  What
14   exactly are the terms you're trying to enforce?  Is it -- why
15   would I hear all about June 24th if what you are asking is June
16   18th?

17         MR. DURBIN:  So we're actually not tying our
18   proposed order to any of the specific documents. The agreement
19   on June 15th of our proposed order has the material terms as
20   Ms. Baugh described them.

21         THE COURT:  Okay.

22         MR. DURBIN:  A non-compete -- all the terms were
23   already agreed to orally at that point in time.  So we are not
24   saying accept this contract and then enforce --

25         THE COURT:  Okay.

1    MR. DURBIN:  The June 24th document is to prove the

2    agreement to all of those material --

3    THE COURT:  Oh, I see.  Okay.  Is the -- if -- what

4    does -- so we make some hay about Mr. Lehman's admissions in my

5    hearing, but what about the idea that Allscripts by repeatedly

6    representing to us that, or continuing to negotiate, or

7    continuing to try to work it out is admitting to me that they

8    have not reached an agreement when I gave two continuances.  Is

9    that not telling me that, Judge, we also understand we may not

10   have an agreement?

11   MR. DURBIN:  I believe Ms. Baugh has consistently

12   made clear in her writings that we believe we had an agreement,

13   but we will talk to you and try to get this resolved.  Again,

14   this was -- the material terms didn't change in those

15   documents.  That is our argument.  This was about do you want

16   some more language to describe what something is, we will work

17   on that with you.

18   She said in each of her emails, and you saw it, the

19   first time this was raised after the June 24th hearing, 21st

20   hearing, we responded, Ms. Baugh responded and said we have a

21   deal.  We are willing to work with you to try to accommodate

22   this and get this done so we don't have -- as we all say, do

23   this here, but we have a deal.

24   THE COURT:  And the deal -- Mr. Durbin, I ask it

25   this way: is what I'm deciding is whether to accept the terms

1  that you put in your proposed order as being the deal?  Is that

2  the question before me because there seems to be different

3  arguments today then -- and maybe that is what I'm getting at,

4  maybe just give me context.

5          MR. DURBIN:  Sure.

6          THE COURT:  Is that what I'm asked to do is say,

7  Judge, these are -- under my proposed order these are the

8  terms.  Is that what you are asking or some other terms?

9          MR. DURBIN:  Under our proposed order we believe

10  that these are the terms --

11          THE COURT:  Okay.

12          MR. DURBIN:  -- that were agreed to consistently

13  throughout every document.

14          THE COURT:  Okay.

15          MR. DURBIN:  We're not saying -- I mean, I think the

16  June 24th agreement, as you have seen, has no changes.  We

17  could say just take that because it has every one of these

18  terms in it.

19          THE COURT:  Does it?  Does June 24th mean the same

20  thing, you think, as -- and you guys -- your clients know this

21  business better than anybody, but you know it better than I do.

22  Is when we say against the products offered by Allscripts is

23  that the same thing as -- I will just get you the language.

24  You know the language in 9 or 6-A.  Is that the same thing?

25          MR. DURBIN:  It includes everything in 6 and 9,

1  Judge.

2          THE COURT:  Okay.

3          MR. DURBIN:  We are not asking, technically, for

4  everything that they proposed to us on June 24th in the

5  proposed order.  We have narrowed it to patient engagement and

6  telehealth based on the agreement.

7          THE COURT:  As those terms are generally applied by

8  CLAS?

9          MR. DURBIN:  Correct.

10         THE COURT:  Even though, if I understand it from Ms.

11 Baugh's testimony, on the 24th you also agreed to the proposal

12 from Mr. Lehman or Mr. Bulsara that which offers healthcare

13 software products which compete against the products offered by

14 Allscripts.

15         MR. DURBIN:  Yeah.  We have no intention of -- that

16 is so broad it covers all the things we care about.

17         THE COURT:  So is your argument, Mr. Durbin, that

18 what we're asking to enforce is actually narrower then what Mr.

19 Bulsara is willing to do?

20         MR. DURBIN:  Our proposed order is narrower then

21 what he proposed to --

22         THE COURT:  On the 24th?

23         MR. DURBIN:  Yes, Judge.

24         THE COURT:  Okay.  What is the status -- we are now

25 within six months of trial or will be shortly -- no, we are.

1 Yeah, we are in August.  So if I go back to what was agreed to

2 on the 15th and 16th is the early termination provision back

3 in?

4            MR. DURBIN:  It is.

5            THE COURT:  Even though it was out?

6            MR. DURBIN:  Correct.

7            THE COURT:  I see.  The standard I apply in the

8 Third Circuit is no genuine issue of material fact.  Is -- it's

9 a Rule 56 standard.  Is your theory or is your idea that -- Mr.

10 Durbin, is your idea that, Judge, we have no genuine issue of

11 material fact as to these specific terms in our proposed order.

12 The other stuff -- for example, Illinois law, and attorney's

13 fees, all that, that is not in play, right?

14            MR. DURBIN:  Actually, I think attorney's fees was

15 agreed to on the 15th as included.

16            THE COURT:  Okay.

17            MR. DURBIN:  The other stuff, yes.  That is why we

18 narrowed it.

19            THE COURT:  Okay.  Anything further, Mr. Durbin, you

20 wish me to consider or argument?

21            MR. DURBIN:  No, Judge.

22            THE COURT:  Okay.  Mr. Lehman or Mr. Gellert?  Mr.

23 Gellert, again, I appreciate your professionalism being here

24 today to help your partner present testimony.  Anything further

25 I can hear from Mr. Bulsara's counsel?

1          MR. LEHMAN:  Just very briefly, Your Honor, if I

2   may.

3          THE COURT:  Please.

4          MR. LEHMAN:  One thing that I wanted to do, and I

5   regret that -- there is a case that I think might be helpful to

6   Your Honor that didn't make its way into any of the submissions

7   so far, but this is <u>Ramone v. Lang</u>, this is a Court of Chancery

8   case from 2006 decided by then Vice Chancellor Strine.  Its

9   2006, Delaware Chancery Lexus 71.  I am looking specifically at

10  what Lexus will consider page 36 of 37, maybe 38.  I have got

11  an extra copy if the Court would

12  like one or I can provide one later.

13         The Court in this case is discussing how you can

14  determine, by email exchanges, whether an offer has been

15  accepted.  And the then Vice Chancellor explained in this case

16  that:

17         "For an email to have constituted acceptance and

18  form a contract it must have included three general components:

19  an expression of commitment, the commitment must not be

20  conditional on any further act by either party, and the

21  commitment must be one on the terms proposed by the offer

22  without the slightest variation."

23         And what we have heard so far, Your Honor, is that

24  it seems like in the 15th to 18th of June timeframe is when

25  Allscripts believes an agreement was reached, but as we went

through the testimony in the exhibits Your Honor will see that

what happened on the 15th, when Allscripts says that a contract

came into existence, was that Ms. Baugh asked me my email

whether if Allscripts were willing to allow Mr. Bulsara to put

in two weeks' notice, rather than just walking out on his job,

would he be willing to accept the six month counter-offer.  My

response was that assuming we can agree on all of the

specifics, yes.

There was another email that day that I believe Mr.

Gellert elicited some testimony about where I said that he

would be willing to engage with them further on that notion.

There is -- I would submit there is not any way to construe

that as an expression of commitment that requires nothing else

from either party.  It was understood, certainly on my part,

and I understand that it's an objective standard, that there

was more work to be done to iron out the specifics and reach an

agreement.

As I think Ms. Baugh agreed with Mr. Gellert that,

you know, for example, after the exchange on the 15th I

received a draft agreement that relied on a class document that

neither Mr. Bulsara and I had seen before, and that would

define patient engagement and telehealth for purposes of the

agreement.

So then there were subsequent discussions after the

hearing on the 17th, please, provide that to us.  We need to

1    understand what that means.  And when I sent that redline back

2    on the 17th I think I mentioned in my declaration there is a

3    typo.  I think they meant to refer to the 17th because the 18th

4    was a Saturday and I don't think we had any discussions that

5    day.

6         The redline that I returned, noting that there were

7    some minor comments and edits fixing defined terms, I mentioned

8    to them I will need to send this or I have just sent this to

9    Mr. Bulsara. I will need an opportunity to talk to him about it

10   after he has had an opportunity to review it.

11        And so I think it's clear, objectively, that

12   during that entire timeframe the understanding was that we were

13   going to work toward agreement on specifics.  Unfortunately, we

14   never got there because the patient engagement and telehealth

15   idea broke down when the class document wasn't helpful.  There

16   were additional exchanges after the trial date was move, so we

17   needed to deal with the early termination idea.

18        As you heard from me, the concepts evolved to

19   competing products, but let's talk about what the competing

20   products are --

21        THE COURT:  Where does it say that?

22        MR. LEHMAN:  Like I mentioned, Your Honor, I

23   distinctly recall having a telephone conversation about it.

24        THE COURT:  Okay.

25        MR. LEHMAN:  That was my sworn testimony.  So I

1  think the court can consider it, but --

2       THE COURT:  Let me ask you this: do I not have an

3  agreement in Document 19?  I mean, I don't know if -- I don't

4  know if Allscripts is seeking to enforce it, but don't -- it's

5  your language and your client signed off on it.  It's your

6  language saying, you know -- what happened is Ms. Baugh, in a

7  little bit of vigor, added some language that was specific, but

8  don't I --

9       MR. LEHMAN:  Sorry, Your Honor, I'm trying to --

10       THE COURT:   -- have an agreement in 19-B?

11       MR. LEHMAN:  Yeah.  I'm just trying to find the --

12       THE COURT:  Your redline back.

13       MR. LEHMAN:  Right, I'm looking for the email that

14  was attached.

15       THE COURT:  If you have an email that says something

16  that's not in the -- you sent it and I'm wondering -- and I

17  don't know if it's being asked to be enforced, but that seems

18  to me -- you say -- you say we suggest the revisions in the

19  attached against the latest version circulated eliminating the

20  early termination as moot, but getting rid of the class

21  classification in favor of saying he won't for companies that

22  offer competing products.

23       Nothing in there, by the way, about we have a new

24  world because of the change.  Earlier you talked about the

25  wrench.  Get rid of the early termination idea, but, Mr.

84

1  Lehman, don't -- aren't you agreeing to this language which

2  offers healthcare software products which compete against

3  products offered by Allscripts?

4            MR. LEHMAN:  Well, Your Honor, I certainly, again,

5  recognize that it's an objective standard, but what I was doing

6  here was suggesting that that would be something we could work

7  off of rather than patient engagement and telehealth which

8  seemed to us were going to be too nebulous, but I would note,

9  as Your Honor discussed toward the end of Ms. Baugh's

10  testimony, and referring back to the Ramone v. Lang case, the

11  commitment must be on the terms proposed by the offer without

12  the slightest variation.  So that is not what happened.

13            I got this back and now they're saying including

14  without limitation FollowMyHealth.  So then we had discussions

15  about, okay, Mr. Bulsara hasn't worked there for a year and a

16  half or going on two years.  He doesn't know what is going on

17  with --

18            THE COURT:  How do you distinguish Lawrence v.

19  Forrester which is a case which is ten years late -- excuse me,

20  its 11 years later then Vice Chancellor Strine's opinion in

21  Ramone.  It talks about the idea that they have to reach

22  agreement on all the terms the parties, themselves, regarded as

23  essential, not the idea -- this is not the kind of case -- you

24  make a very good argument if this draft of 19 came from Ms.

25  Baugh.  It came from you.

1    So you're saying I agree to this language. Are you

2 suggesting that the language that came back is what the

3 distinction is that, Judge, you should take that, including

4 FollowMyHealth, as being a distinction that confirms there is

5 no agreement?

6    MR. LEHMAN: Well, Your Honor, I think there are two

7 things going on. One is that this was language I was

8 suggesting for further conversation. Two, yes, I do think its

9 material that then they include a specific definition that we

10 then followed up and said, well, we need to understand -- you

11 know, he hasn't worked there, he doesn't know what has happened

12 with FollowMyHealth over the, now, pretty considerable time

13 since he's worked there. Give us insight into what exactly

14 that product does now so that we can ensure that wherever he

15 might end up they're not doing something similar.

16    That is when, I think, Mr. Bulsara and I think I

17 also testified we were directed to the website that we didn't

18 find helpful or we were told that we could look through all the

19 discovery in the case and --

20    THE COURT: So, Mr. Lehman, do you understand the

21 testimony to be that you -- when you sent this you thought that

22 I'm sending this blacklined agreement over as a starting point

23 of negotiations relative to what the competitive scope would

24 be?

25    MR. LEHMAN: Yes. In the context of all of our

1    communications I understood that there would be more discussion

2    about narrowing in on that.

3            THE COURT:  Okay.  And you would view that, under

4    your argument, to be material?

5            MR. LEHMAN:  Yes, absolutely.

6            THE COURT:  So when you said in a court hearing that

7    we have agreed on all material terms how do I reconcile that?

8    I have an objective standard.  How do I reconcile that?  You

9    say -- that means that you understood that this is material,

10   you have agreed to that materiality.

11           MR. LEHMAN:  So, Your Honor, the way that I would

12   explain that, and as I said in my declaration, I apologize if

13   the language I used was not phrased carefully enough.  Frankly,

14   I wasn't expecting to speak, but what I was conveying, based on

15   what I felt had been productive conversations moving in the

16   right direction with Ms. Baugh, that I thought we had an

17   agreement and I thought we would need to have clarifying

18   discussions, but hopefully there would be no hurdle to

19   finalizing something.

20           THE COURT:  If the -- I think you -- I think your

21   partner asked a fair question, it didn't need to be asked

22   because it's an opinion, the scope of a non-compete is often

23   the rump, right?  When a judge hears that we have reached

24   agreement on the material term in a non-compete that would seem

25   to me to be scope along with temporal limit would be the two

1  questions that a judge would jump to right away.  How long is

2  it going to be and what is the geographic scope; what's the

3  limit of it?

4       That is first thing, but when you come back on the

5  24th and say we suggest the revisions, we appreciate this

6  material and we suggest these revisions.  What I'm getting at

7  that word -- are you not there saying this is material and we

8  are agreeing to use these terms as being a material term that

9  the products competing against Allscripts.

10      Tell me, again, how I don't, on objective standard,

11 find that that's not a material term that you are offering?

12      MR. LEHMAN:  I'm sorry, are we --

13      THE COURT:  I'm combining -- I'm pointing out that

14 you use the term "material" and let's assume I put that aside

15 and say, Judge, I never looked at the agreement when I said

16 that statement, but, second, you did look at the agreement and

17 not only that but you marked it up by the time you sent over

18 another document which says which compete -- which offers

19 healthcare software products which compete against products

20 offered by Allscripts.

21      Curiously, then, we call it the restricted period

22 but in any event what is the -- my point is this, you just

23 confirmed to me that scope of a non-compete is material.  I

24 agree with you.  Healthcare software products, which compete

25 against the products offered by Allscripts is what you defined

1  as that term.   How, as a matter of law, do I read in that we're

2  going to have to give you that list because -- let me ask it

3  this way: later in the same paragraph its agreed that Bulsara

4  may provide Allscripts with notice of intention including

5  information and scope of the job duties, and Allscripts will

6  inform Bulsara whether he considers the job duties of it.

7        In other words, it seems to me you are both

8  contemplating the idea that there is going to be some future

9  back and forth between Mr. Bulsara and Allscripts.   Hey, I'm

10  going to go work for whoever and is that okay.   So it seems to

11  me that that addresses your concern about some ambiguity.   That

12  Mr. Bulsara is going to have the chance to go back and forth.

13        MR. LEHMAN:   Well Mr. Bulsara's concern and my

14  concern on his behalf, at that point, was that we were leaving

15  too much ambiguity and discretion in Allscripts favor.   And

16  that was the motivator for subsequent discussions about let's

17  hone-in on exactly what your competing products are.

18        And as we moved along with this process I thought we

19  would work toward a framework where Mr. Bulsara could be very

20  comfortable that Allscripts had provided him with a good enough

21  idea of what they were going to consider to be competitive on a

22  going forward basis, at least for the next six months, so that

23  he could have some assurance as he is going and looking at

24  different opportunities; that he's not totally at the mercy of

25  Allscripts to say that's patient engagement and telehealth or

1  that competes with us without any framework within which he

2  could understand in advance what was on the table and what

3  wasn't.

4         That was the problem here and why there were more

5  discussions after this was he needs to know what you are

6  considering competitive.  Let's talk about what products you

7  offer and what they do because what we don't want is him to

8  quit his job, put in his two weeks' notice, and then find that

9  Allscripts takes the position that a whole universe of things

10 are competitive with them that weren't clear to him going in

11 because as you heard in his testimony he was very concerned

12 that anything beyond three months would be a tremendous

13 hardship.

14        The concern was if we leave too much discretion with

15 them and it's not clear -- initially if it wasn't clear what

16 patient engagement and telehealth were, which is a debated

17 issue between the other parties in the case, or if we weren't

18 sure what they were considering competitive or what

19 FollowMyHealth was currently doing that they would be in a

20 position to say no to jobs that he presented to them without a

21 meaningful opportunity for him to know that in advance or

22 contest that. He could find himself out of work for four, five,

23 six months basically without recourse.

24        So the efforts that I was making, and I thought that

25 I was on the same page with Allscripts counsel about, were lets

1  reach a more clear understanding of what exactly is going to be
2  a problem for your client and what is not.  He needs to know
3  that now and not when you deny him the opportunity to take job
4  opportunities.
5         THE COURT:  What is the genuine issue and material
6  fact that is disputed?
7         MR. LEHMAN:  Well, I think that in the context of
8  the motion the genuine issue of material fact is did we reach
9  any agreement?  Was there a commitment to accept --
10        THE COURT:  That's a question of law.
11        MR. LEHMAN:  Well, I think, then, the question of
12  fact is -- I mean, I think it's still ultimately a legal
13  determination --
14        THE COURT:  Okay.
15        MR. LEHMAN:  -- but when they asked me will he
16  accept something and I say assuming we agree on the specifics
17  then the question of fact is did we agree on all those
18  specifics such that a contract actually came into being.
19  Certainly not as of the 15th, 16th, 17th or 18th, the timeframe
20  that Allscripts says here is a contract that we want deemed
21  signed and enforceable, don't worry about the fact that there
22  were communications about further discussions that would be
23  necessary or that Mr. Bulsara had never seen it, certainly
24  hadn't signed it, and hadn't had an opportunity to discuss it
25  with me.

1          THE COURT:  Okay.

2          MR. LEHMAN:  I think when you start looking later,

3   you know, Your Honor has been curious about the later draft, I

4   think the question is whether there were ongoing discussions at

5   that point aimed toward narrowing this and whether this was a

6   suggestion that was intended to foster discussion or whether

7   this was intended as an offer that they can accept and that was

8   the end of it.

9          THE COURT:  Yeah, and you view that as a question of

10  fact.

11          MR. LEHMAN:  I think that it's a question of law in

12  the context of, you know, is everything that was important to

13  the parties incorporated here.  I mean, certainly, my view on

14  it was we need to get clarity on that issue first because then

15  there were later discussions even after that.

16          My view was we need to clarify exactly what is going

17  on with the restrictions first and then later, after this, I

18  said, oh, by the way, now that we've gotten further along he's

19  not agreeing to be bound by Illinois law and litigate in

20  Illinois.  He doesn't agree to have it fee shifted if you sue

21  him under this agreement.

22          So it was always an evolving situation from my

23  perspective.  Certainly if the requests being made to Your

24  Honor is to enforce an agreement between the 15th and 18th

25  there is absolutely not one.  If Your Honor then looks later I

1 would submit that the discussions were ongoing and as I

2 testified I view these as, you know, brainstorming to try to

3 come to a resolution with them if Allscripts would play ball

4 with us on defining more narrowly what was competitive, or they

5 would view as a problem that would stop Mr. Bulsara from taking

6 a job, or having to quit a job if he took it and then they

7 subsequently determined that the company had begun competing

8 with them, for example.

9          THE COURT:  Thank you.

10          MR. LEHMAN:  Thank you, Your Honor.

11          THE COURT:  Counsel, it's your motion. I will give

12 you any chance to rebut anything on anything you heard.

13          MR. DURBIN:  Judge, two things.  In addition to

14 Lawrence we recommend the Court's attention to the Maio

15 Swimwear case which is cited in our brief.

16          Second, what is missing from the discussion that

17 just occurred is the unrebutted testimony of Ms. Baugh about

18 what happened on the evening of the 15th, after the let's work

19 out the specifics email from Mr. Lehman and before pen put to

20 paper for the settlement agreement.  The conversation that she

21 testified to was, what do you mean, do we have an agreement or

22 not. The response was we had an agreement.

23          I have nothing further, Judge.

24          THE COURT:  Okay.  Thank you, counsel.  It's going

25 to take me some time to put some findings of fact and

1  conclusions of law together.  I urge you to, as experienced

2  counsel, think about whether there's a chance to come together

3  and find some other way.

4          Still, one way or the other I'm going to -- you

5   know, if you find some resolution in the middle here then that

6  will be helpful to you rather than having a third-party

7  objectively evaluate what is going on here.  So I urge you,

8  with Mr. Bulsara here and others here in the room, if you could

9  take a moment and think about it I urge you to do it;

10  otherwise, we will make the call based on the law.

11          Thank you very much.  I appreciate you all coming to

12  Philadelphia.

13          COURTROOM DEPUTY:  All rise.

14      (Proceedings concluded at 3:54 p.m.)

15

16

17

18

19

20

21

22

23

24

25

<u>CERTIFICATION</u>

We certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of our knowledge and ability.


<u>/s/ William J. Garling</u>                    <u>August 22, 2022</u>

William J. Garling, CET-543

Certified Court Transcriptionist

For J&J COURT TRANSCRIBERS, INC.


<u>/s/ Mary Zajaczkowski</u>                    <u>August 22, 2022</u>

Mary Zajaczkowski, CET-531
Certified Court Transcriptionist

For J&J COURT TRANSCRIBERS, INC.